Out of a panel of five hundred jurors summoned, most of whom were challenged for principal cause and to the favor, and set aside, a jury was obtained and sworn.
On the second day, A. OaJcey Hall, the district attorney, opened the case for the prosecution, after which the following testimony was taken.
The first witness called for the prosecution was Dr. J. W. Francis, who was examined by Mr. Hall, and testified as follows:
I was born in the city of New York, and am sixty-seven years of age; I have been in the practice of physic forty-seven years, and have also been engaged, during a considerable portion of that time, as a professor of medical jurisprudence in the college; I have been residing in Bond street, near Broadway, for some twenty years; oh the morning of Saturday, the 31st of January, I think, I was called into the house No 31 Bond street, at ten o’clock, or ten minutes past ten o’clock; I accompanied the messenger, whom I did not know, to that house, passed through the front door, ascended the first and second flights of stairs into the second story back room, which was the dentistry office of Dr. Burdell; as I was ascending the stairs I asked *392 if the person was very ill; the messenger told me he was dead, and they wanted to know the cause of his death; there was a police officer at the door, and he let me in; the messenger stood partially outside as I entered the room, which' I did carelessly; I stepped into blood; there was a large quantity of clotted blood on the floor; casting a glance downwards I saw a large, stout, strong, muscular body, seemingly in great health, lying dead on the floor; a gentleman in the room, I don’t know who he was, told me he had turned" the body over, but had let it lie in the same place in which he first saw it; the face was now upward; the clothing of the body seemed to be very tenaciously wrapped around it, and upon feeling it I found it a mass of soaked linen and clothing super-saturated with blood; between the body and the wall was a large mass of clots of blood, which might have been forming for some four or five or six hours, and some of which might have weighed half a pound, and some a pound and a half; the bood had coagulated and laid there; one of the men asked me to move around cautiously, for there was a good deal of blood about there; I cast a glance at the countenance of the corpse; I was not familiar with Dr. Burdell, but had seen him one hundred times probably; the coroner came up to me and told me to wait a few moments, as Dr. McKnight, his assistant, was in the next room and would be ready in a few moments, having a case with some instruments or probes, to make a thorough examination of the body; in a few moments Dr. McKnight entered; we approached the body, took a look at the countenance, and found it to be a surcharged, plethoric, full' distended face, with the eyes obtrusive, with the mouth firmly drawn together, and with the tongue protruded between the teeth; it looked at that moment as though the man had died of a convulsion; in examining farther, I perceived a line sufficiently distinct passing around the front part of the neck; but inasmuch as the body was of a full habit, *393 and the mark of the application of a ligature could be there but a short time, it would naturally be a little evanescent; after a while the body would react and absorption would set in, so that the mark would not be so distinct; but still there was a strong mark, which others saw as well as myself, though no ligature could be seen; I immediately thought of that popular idea of garroting, but said nothing particular about it; Dr. McKnight being now ready with his instruments, we turned the face of the corpse a little about towards the right side, and I observed under the angle of the ear and jaw, on the left side, a wound; on being probed it was found to extend nearly the whole length through the neck; it allowed the probe being extended so far that we put it down to six or seven inches; on examination we discovered that it had divided the carotid artery and the great vessels of the neck. We found on the cheek—the malar bone—on the left side, a wound that went down and inwardly into the face; on the one side there was one distinctly marked; on the left side there was an abrasion; lower down on the right side, near the clavicle, was a wound which extended directly into the thorax some six or seven inches, and running into the internal portion of the chest; on the right arm was a transverse wound, pretty low down; some two inches or so below, on the left arm, near what is called the deltoid muscle, where the swell is, there was a wound that went down four or five inches; there was another wound on the same arm, lower down, that went in two or three inches; the clothes being removed from the body, and the abdominal region and trunk all exposed, it was immediately apparent how many additional wounds had been received. There was one on the left side, between the fourth and fifth ribs, which extended some six or seven inehes, perhaps seven and a half; about two inches lower down there was another wound that ran upward in the region of the heart, and which, according to an examination subsequently made by *394 others, proved to be in.the auricle of the heart; there were two or three wounds in the abdomen, near the region of the stomach, in the abdominal viscera, that extended inwards, I should say, some four or five inches; there was another wound near what is called the margin of the hip, that rah inwardly and outwardly on the left side; there were altogether fifteen wounds; but there is one other wound yet to be* mentioned of great importance, and that was a wound under the left auxiliary or arm-pit, which extended in many inches, some six or seven; the course of that wound in the arm was directly inward and down towards the thorax; on examining the body w;e did riot see anything particularly worthy of remark more than what I have, mentioned to you; the mark of the ligature about the neck was rather heavy; I suppose it was about a third of an inch broad, or a little more perhaps; some parts of it appeared to be more distinct than others; we did not observe any marks on the back part of- the head; • it appeared a little more distinct on one side, and seemed as though the head had been drawn back; many of these wounds might, in their nature, have been fatal; I should suppose the wound under the arm was aimed at a vital part; when that wound was received undoubtedly the arm must have been raiaed; the wound was rather downward; the wound about the fourth and fifth ribs ran upward; the wound two inches or so below that ran forward, so that the cavity of the heart and apex of the heart were reached by two different processes; three of those wounds in the abdomen in front looked like a kind of helter-skelter driving without any special object; it is impossible to decide whether the wound in the carotid artery or that in the heart was given first; if the wound had been first made in the heart, a spout of blood would have followed the second wound, which was in the carotid artery. After the wound in the artery death would ensue in perhaps some two or three or four or five minutes; as to the wound in the heart, *395 I could not say how soon death would ensue from it; I have known a person to travel about the house with a wound in the heart, and then sit down and die; it depends somewhat on what part of the heart it is wounded; with a wound in the apex of the heart, which is solid, a person might live a long time; if in the substance of the heart he might die almost immediately; the auricle of the heart and the apex of the heart were both wounded in this case; the wounds all seemed to be inflicted by something like a similar instrument, an instrument of about two-thirds of an inch or a little more in breadth, and we thought sharp-pointed, and some eight or nine inches in length; the wound would naturally enlarge a little after being cut; the wounds most assuredly produced death; there was no apoplexy in the case nor anything of the kind.
Cross-examined hy Mr. Dean: Q. Can you recollect the precise hour in the morning when you arrived at the house No: 31 Bond street ? A. My own opinion was that it was just about fifteen minutes after 10 o’clock; I have said at ten.
Q. You came immediately on being summoned? A. Yes, sir; with the messenger who came.
Q. Are you able to say who that messenger was ? A. That I cannot tell.
Q. Was it a man or boy? A. A man; decidedly a young man.
Q. Not a police officer ? A. No, sir.
Q. When you got there you found there was a police officer and coroner there ? A. No, the coroner was not there; but I was a few moments in the room when the coroner came in.
Q. The coroner was not in the room then ? A. Not at the first moment I entered.
Q. Do you know who the police officer was ? A. That I could never find out.
Q. Was the police officer who was in the room the one *396 who told you that the body had been turned over ? A. Yes, sir.
Q. What kind of clothing did the deceased have oil! his neck? A. I think he must have had a black, cravat, and it was hanging off loose.
Q. He had, shen, a black neck-handkerchief as distinguished from a stock ? A. I cannot swear positively as to that, but I think so; his clothes were all cut open.
Q. Were his clothes cut open after you arrived ? A. Ho, sir.
Q. Are you able to fix the precise place on the neck where the red spot was visible? I wish you to fix it anatomically and name the place. A. It went across Adam’s apple, and was rather lighter on each side than in the middle.
Q. Do you know what the length of his neck was from the points where this spot became visible on one side, to the point where it became invisible upon the other—how many inches? A. It struck me as being a little over six inches; it was a very large neck, and under the circumstances it was a little distended.
Q. There was more of this mark visible on one side than the other? A. It seemed to be a little lighter on one side.
Q. When death has been occasioned by strangulation, what is the effect upon the brain—can it be determined? A. There have been a great many cases determined. There is generally a larger quantity of blood in the vessels covering the membranes of the brain than in the ventricles.
Q. Would dissection determine exactly. A. It would confirm death by strangulation.
Q. What would you know when you made the examination? A. I examined nothing but the external wounds.
Q. In what particular direction did this' wound enter on the left side of the neck? A. It was below what is called *397 the mastoid lump, directly cutting the carotid vessels; the carotid arteries and the jugular veins were all cut.
Q. Did you notice whether round the mastoid lump was cut? A. I was pretty well satisfied that it was not reached.
Q. You had no dissection? A. No, -sir.
Q. Is it possible to tell accurately the direction of a wound without a dissection? A. A dissection is rather a better help.
Q. As a professor of medical jurisprudence, I ask you, if in the case of death by violence and wounds, a dissection of these wounds is not absolutely necessary to the purposes of justice ? A. To give a mathematical, precise account it would be necessary, undoubtedly, to have a dissection, still you might go on at work, using a microscope, and fill up a quarto volume with the minute details, if you wanted to enter upon such an examination.
Q. Will a probe tell the depth of a wound exactly ? A. Yes, sir, if the probe is long enough.
Q. Do not the parts of the wound close up, so that the probe would not go to the bottom of it ? A. Blood might form, and the probe might not ascertain the depth of the wound exactly sometimes.
Q. From the appearance of this man, you judged him. to be a strong and muscular man ? A. A very firm and hardy man, strongly developed.
Q. Will you state what the wound was in the left arm ? A. It began on the inside of the left arm; it went inward and partly upwards.
Q. Did it go beyond the elbow? A. Yes, sir, somewhat; neither of the wounds went through the arm, and they were each about five inches in length.
Q. Did they go through the muscles? A. Yes, sir, into the substance of the arm.
Q. Did they go through so that a dagger would come out? A. No, sir, they did not go through.
*398 Q. Is it possible to tell whether the instrument that made these wounds was sharp on both edges? A. I do not think it could be determined absolutely.
Q. What was the appearance of the wounds? A. Sharp-edged and clean, and they seemed to have been made by a sharp-edged instrument on both sides.
Q. In a dissection could you tell whether a wound was alike on each side—whether the instrument that made it had two edges or not? A. It would show whether the instrument was sharp edged or not.
Q. Would a dissection tell whether the wound had been . caused by a carving knife or a dagger? A. I think to á rational, close observer it would determine it more precisely.
Q. .Suppose the wound had been inflicted by a dagger of that character (a common sheath dirk), is that the kind of instrument which would naturally cause those wounds? A. I came to the conclusion that it was a good deal such an instrument; not so broad as that, but about eight inches long.
Q. In looking upon the man, did you suppose that he looked like one who might have died of convulsion? A.
I have seen countenances like his of men who have died of convulsion, but it would be wrong to suppose that he died of convulsion; there were full evidences of strangulation in his case, wonderfully strong, a protruded tongue and distended large eyes.
Q. This wound in the left side of the neck, I understood you to say, went through the neck? A. It went pretty nearly through; there was no mark on the left side corresponding to the place where it would come out.
Q. Did you notice whether the neck was dislocated? A.
I did not see anything like it; I did not see any marks of violence upon it.
Q. Did this wound which you saw in the clavicle in the right shoulder extend into the thorax? A- As no exami *399 nation of the thorax was made, we only inferred that it went into the cavity of the thorax without cutting any very large vessel.
Q. Would it have required a great deal of force to have made that wound? A. Not a great deal.
Q. Did you make any dissection to know? A. We did not, we only probed the wound that went into the large clavicle; the wound that might have been given with a little more violence, was the wound that was upon the anterior part of the trunk, between the fourth and fifth rib, which cut the edges of the rib.
Q. Had he a woollen coat and a woollen vest, with a lappel? A. I do not remember, it was so covered with blood; it looked like a piece of old silk that had been soaked in water.
Q. Did you notice how far down the blood had run upon his clothing? A. Inside it had run down, covering his clothing; it was all matted thoroughly; there was a great deal of blood down his legs.
Q. Did you notice the condition of his boots. A. I did not.
Q. How many of these wounds would necessarily have been mortal? A. The wound in the neck might have been mortal; the wound under the mastoid lump was alone sufficient.
Q. What other wounds were mortal? A. The wound upon the anterior part of the chest, between the fourth and fifth ribs, wound under the left arm, and the wound under the edge of the right clavicle, and even the abdomihal wounds might have been mortal, although it is possible that the man might have survived them.
Q. I mean mortal in the end? A. He might have survived a number of those wounds; they were not wounds which would necessarily be fatal, as those of the carotid artery and heart.
Q. How about the one in the shoulder? A. He might have survived that.
*400 Q. Was that in an important place, where a man who knows the human body would strike to affect death? A. Yes, sir; that would have been one of the knowing places.
Q. Did these wounds indicate that the person who made them, knew where to strike, in order to effect the death of the person, or were they struck at random? A. I thought that some of the wounds had been inflicted with a little anatomical knowledge, and I thought that others had been inflicted without any extraordinary care or attention.
Q. Were they wounds made by a person competent to give testimony as an expert? The witness was understood to answer affirmatively.
Q. Did you not make the remark that day in the room, after looldng at the wounds, that they were made with singular accuracy? A. I did make a remark of that kind; my language was that these wounds seemed to evince anatomical knowledge.
Q. [By a juror.] Do you say that the person who gave these wounds would be competent to give evidence as an expert? A. I thought the wounds looked a good deal like as if the persons who made them had a knowledge of the human structure, and knew what they were about.
Q. [By a juror.] I would like to have your opinion, and I will ask you one question in reference to the wound under the arm, to which you have referred: Can you tell me how the party inflicting that wound must have stood in reference to the doctor ? Could he have stood before him, or must he have stood before him in striking that wound? A. It looked as though the person might have stood rather more backward than in front, rather more behind than upon the anterior part.
Q. [By a juror.] There is another wound to which you referred, the one upon the left arm. Could you tell me in reference to the locality in what manner the wound was made ? A. I think the person must have been rather upon *401 the front; some of these wounds evinced a reckless mode of administering them, and seemed to have been made in a hurried manner.
Q. [By a juror.] Do you suppose the stab in the left arm could have been made by a person standing behind ? A. Standing behind and on the outside it might have been.
Q. [By a juror.] Then you could not judge by these wounds whether thgy were inflicted by a left or right-handed person ? A. That is a subject which I have thought over without ever answering any questions about it; I have asked nobody a question about this matter since I was first examined; I once came to the conclusion that the blows might have been inflicted by a left-handed person, but it would have been better to have examined them more minutely to determine this question; I was rather inclined to favor the idea that it was done by a left-handed person.
Q. Did you depend upon the relative positions of the person wounded and the person giving the blow? A. Yes, sir.
Q. There is one question which I wish to ask you further. You have noticed the blood upon the wall? A. Yes, sir.
Q. Did you notice the character of the blood ? A. Yes, sir.
Q. Could you tell whether it was arterial or venous blood ? A. Ho one could tell that; I formed the idea that this blood had spurted chiefly from the neck.
Q. Did some of the blood bear marks of having spurted, and did some of it look as if it was dropped ? A. Some of the blood on the wall looked as if it were spurted.
Q. Did you notice it when you first went in ? A. In a moment after I got into the room to see a patient, as I thought, but found a dead man,
Q. Did you notice if there was any blood on the wall leading down? A. Yes, sir.
Q. Was the blood then perfectly dry? A. Yes, sir; it was not a hard, dark incrustation, but a light discoloration.
*402 Q. I want to ask you one question further. Did you notice the blood on the front door ? A. Yes, sir.
Q. Was it dry? A. Yes, sir.
Q. Was it thick, clotted blood ? A. It was rather hard and dry..
■ Q. It was on the outside ? A. Yes, sir, a little above the lock.
Q. Was not there a severe rain storm that morning ? A. It rained pretty hard that day.
Q. Do you recollect what the character of the night was ? A. I think it was rather a tempestuous night.
Q. Was it the Saturday in which that very severe rain storm arose ? A. Yes, sir.
Q. [By a juror.J What was the appearance of the mark around the neck ? Did it look as if it were made by a rope or by the hand ? A. It might have been something like an inch wide, and could not have been made by the fingers.
Q. [By a juror. J Was this blood on the outside of the door ? A. It was on the outside of the hall door, just above the keyhole.
Q. Would not an immediate anatomical dissection have determined how much force was used, and the character of that ligature ? A. No, sir. .
Q. Was the blood settled or not ? A. It was a little dark and discolored, but it was not an effusion of blood.
Hannah Oonlan was then called for the prosecution, and . testified as follows:
I lived in the house 31 Bond street going on two years; Mrs. Jones kept that house when she first went there, and she (witness) never knew Dr. Burdell until she went to live in his house; Mrs. Jones stopped keeping house six days before May, a year ago; Mrs. Cunningham was boarding in the house when witness went there, and began to keep the house when Mrs. Jones left; Mrs. C. had a room in the attic for a while during the time she boarded, and then a room below, next the doctor’s, on the second story; *403 she took the lower room when Mrs. Voorst went into the country, but she had been down there sleeping with Mrs. Voorst, before that lady left; Mr. Baker and Mr. Thayer occupied the floor over that in which Dr. Burdell’s and Mrs. Cunningham’s rooms were; Mrs. Jones’ room was in ' the attic; witness could not say how long the doctor and Mrs. Cunningham had occupied that second floor; on the first Thanksgiving day after she (witness) went to the house, Mrs. Cunningham was sick; the doctor had gone to Brooklyn for her two daughters, and he being away, Mrs. C. cried: “ Oh! doctor, where are you ? ”
Q. What did Mrs. Cunningham say concerning Dr. Bur-dell at the time of her sickness, on Thanksgiving day, 1855?
Mr. Dean objected to the question. It was altogether irrelevant, he maintained. Suppose it was shown that Dr. Burdell produced an abortion on the person of Mrs. Cunningham, would that prove that more than a year after-wards she had murdered Dr. Burdell? Was it not done to blacken the character of that lady ? What family in the city would be safe if the memory of a domestic was, in case of any charge against them, to go back to conversations so remote ?
Mr. Clinton argued that-it would be in direct violation of the ruling of the court to allow testimony of one offense to be’given as evidence of the commission of another.
The district attorney said that he had never heard that an abortion had been produced. He expected to prove from the witness the domestic relations of Dr. Burdell and the prisoner, from the time spoken of till the time of his death.
The court allowed the question. ■ •
The witness proceeded: Mrs. Cunningham said, in her sickness: “Oh! doctor, where are you?” She (the witness) went for a doctor, and while he was in attendance Dr. Burdell came home, went up stairs, and attended to her himself.
*404 Mr. Clinton moved that the latter statement should be stricken out of the evidence, on the ground that the witness was not present, and did not know what took place. (Objection sustained.)
District Attorney: Did Mrs. Cunningham say what was ' the matter with her ?
Mr. Clinton objected. (Objection sustained.) Witness went on to state that Mrs. Cunningham was sick for about a month; she did not, at that time, know what her sickness was; she saw a chamber vessel in Mrs. Cunningham’s room, and took it down stairs; the contents appeared like the shape of a child.
District Attorney: Did she state who was the father of that child ?
Mr. Clinton objected. Question allowed. Exception taken.
Witness: She said it was Dr. Burdell’s; the doctor began to take his meals at the house, at the time Mrs. Cunningham took the house, six days before May, 1856; she could not say how long he took his meals there; it was about two or three months; witness heard Mrs. Cunningham talk about Dr. Burdell; they often had rough words; she ‘ paid no particular attention to the quarrels; when vexed very much, she said she would be revenged on him; she . accused him of keeping company with ladies, very often; on the afternoon of the third day before the doctor was killed, Mrs. Cunningham asked the witness what some ladies, who had come to see Dr. Burdell were looking at; she replied that they were looking at the parlor, dining-room, closets and washtubs; witness told her the doctor was going to let the house to them and sign a paper; Mrs. Cunningham replied “Perhaps he will not live to let the house, or sign the paper either; ” this was said in the kitchen; the doctor went out that afternoon to dinner ' * about five o’clock; I went to bed that night, the witness • continued, at ten o’clock; Mrs. Cunningham and Mr. Eckel *405 came down and told me to go to bed, for it was near ten o’clock; I told her I would as soon as I had washed some clothes out; I went up stairs to go to bed, and stopped in in Mrs'. Cunningham’s room—third story front; Mrs. Cunningham, Mr. Eckel, Mr. Snodgrass, and the two daughters were there; I then went up stairs to the attic, and went to bed immediately; my room was boarded off with partitions from the rest of the attic; Mr. Snodgrass and Miss Helen Cunningham came up stairs before I went to sleep; that was the last I saw of them that night; I then went to sleep; I got up next morning about seven o’clock; the only clock in the house was in Mrs. Cunningham’s room; I did not notice any marks upon the floor or walls as I went down; it was dark, and I had a lighted candle; the first person I saw, was the doctor’s boy; he came in at the basement door; I let him in; the door was bolted and locked; the next person I saw in the house, was a young woman who was engaged to come there and live; I went up to Mrs. Cunningham’s door to call her to come down, as breakfast was ready; she asked me if Mr. Eckel was down at his breakfast; I said he was not down; I had not seen him that morning; Mrs. Cunningham and Miss Helen came down to breakfast first; Mr. Eckel was not at breakfast; Miss Augusta and Mr. Snodgrass came down after-wards; it was half an hour after that when little Johnny, the doctor’s boy, told me the doctor was dead; I went up stairs to the doctor’s office, opened the door, and saw the doctor lying with his hand twisted around on his back; I was much excited, and went up stairs to Mrs. Cunningham’s room; they had all gone up stairs from breakfast; I saw Mrs. Cunningham, her two daughters, and Mr. Snodgrass; Mr. Snodgrass was playing on the banjo; I said, “ My God, you are enjoying yourselves all very well, and "the doctor is either dead or murdered in his room;” Mrs. Cunningham asked me what I said, and I repeated it over again; she looked very excited, and ran over to the bed; *406 So did Miss Helen, who fainted; Snodgrass ran downstairs and came back; he said, “ That’s a fact, he is dead;” Mrs. Cunningham cried, but did not say much; I ran for Dr. Stevens.
District Attorney: Did you ever hear Mrs. Cunningham say any thing about Dr. Burdell and Mr. Eckel?
Question objected to and allowed.
Witness: She said that the doctor was jealous of her and Mr. Eckel, because he had told her he had looked through the key-hole, and saw what he did not like; she said this á little before he was murdered; there were no servants but myself in the house on the night of the murder.
Cross-examined by Mr. Clinton: Q. Were you first employed by Mrs. Jones? A. Yes, sir.
Q. What time did you first go to that house? A. I think it was a couple of months before a year ago last Christmas.
Q. Was. the defendant there at that time? A. She was boarding there then.
Q. Were her family boarding there also? A. There was but one of her daughters there at that time—her oldest daughter, Augusta.
Q. Any other boarders there at that time? A. Yes, sir; Mr. Hubbard, Mr. Hart and his family and quite a number of gentlemen boarders were there.
Q. In what capacity were you employed there? A. As . cook.
Q. When you first' came to that house do you know which room Mrs. Burdell occupied? A. She occupied the room next to the one where I slept—the back one in the attic.
Q. Do you know how long she occupied that room? A. I do not know.
Q. Did she occupy that back room all the time Mrs. Jones occupied the house after you went into her employ-. *407 ment? A. Ho, sir; she slept down stairs with Mrs. Hubbard or Mrs. Voorst.
Q. Who is Mrs. Hubbard? A. She is a cousin of the doctor’s.
Q. Do you know what her name was? A. I- heard it was Hubbard, and that she got a divorce from her husband.
Q. What was her husband’s name? A. Voorst.
Q. When was it Mrs. B. first occupied the room down stairs? A. -She slept with Mrs. Voorst or in the same room when Mrs. Voorst came from the country.
Q. Had you anything to do with Mr. Burdell’s room before she took the house in May, a year ago, before Mrs. Jones left? A. I had nothing to do there unless she would send me on an errand.
Q. Do you know how long she and Mrs. Voorst occupied the room? A. I do not know.
Q. When did Mrs. Voorst come there? A. She was there when I came there..
Q. How, at the time you went there, who ocupied the room on the third story? A. Mr. Bartholomew and Mr. Hubbard used the back room, and Mr. Hart used the front room and the bed room.
Q. Did that continue so until Mrs. Jones left ? A. Yes, sir.
Q. You say you had nothing to do with Mr. Burdell’s room, except when she sent you on errands? A. Yes sir.
Q. Were you generally sent on messages? A. Hot very often.
Q. While Mrs. Jones was there, did she ever send you half a dozen times? A. Ho, sir; she sent me once or twice.
Q. Was that all you had to do with her? A. Yes, sir.
Q. Were you employed by her? A. I was not; but I was employed by Mrs. Jones, and my business was in the kitchen.
*408 Q. Who was the chambermaid at the time you first went there? A. Mary Maclain.
Q. While Mrs. Jones occupied the house did you ever go into any room occupied by Mrs. Bur dell at all? A. I went into it with an orange when her little boy was sick, and I went upon another occasion into a small bedroom off the front room; I could never recollect of going upon any errands but twice.
Q. Do you recollect of going into that room upon any other occasions while Mrs. Jones occupied the house? A. She has called upon me very often, and I have been in her room.
Q. How often do you think you have been there—fifteen or. twenty times? A. No, sir.
Q. Can you say you have been there three times? A. Yes, sir.
Q. Have you ever been there for any other purpose except upon errands? A. Yes; sir; when Mrs. Cunningham would send for me, I have been there; she would send for me for some little trifling things.
Q. When was it that Mr. Bacon and Mr. Thayer occupied the room on the third story, when you first went there? A. It was last summer sometime.
Q. How long did they occupy that room? A. I do not remember exactly.
Q. Did you stay in the employment of Mrs. Cunningham until you were taken in custody—from May until January? A. Yes, sir.
Q. Were Mrs. Cunningham and the doctor friendly? A. They were quite so. He took her out very often in the day time.
Q. Did he bring his acquaintances there to see her? A. Not to my knowledge.
Q. How was it last spring? A. A year ago they were friendly together until Mrs. Voorst came there.
Q. Did you go on errands for Mrs. Voorst? A.. Never.
*409 Q. Did you ever speak to her? A. No, sir.
Q. Do you know whether they (referring to the doctor and Mrs. Cunningham) were on good terms last fall? A. At times they had hard words.
Q. Did you see any more differences betweén them last fall than you had seen between people where you have lived? A. I have when this woman (Mrs. Voorst) came into the house. Mrs. Cunningham had forbidden the doctor to bring this woman into the house.
Q. Did you ever hear Mrs. Cunningham talk of her? A. I have. She said that she would not allow any correspondence between her and the doctor.
Q. Did she say why? A. She said she was not a good woman.
Q. Did she say anything as to her virtue? A. She said that she did not like her conduct.
Q. Her conduct in what respect? A. I do not know to what she alluded.
Q. Was there anything said about Mrs. Voorst sleeping with or having any improper intercourse with any one? A. Mrs. C. accused her and the doctor of having sexual intercourse with each other.
Q. How late did you hear this complaint made by her? A. Mrs. Voorst went to the country on the 4th of July, I believe; I do not know how long she staid there, but the doctor wanted to fetch her to the house, but Mrs. C. would not allow it.
Q. What time did Mrs. Voorst come back from the country? A. It was last fall, but she did not come to the house.
Q. Would Mrs. Burdell have her there? A. No, sir.
Q. Did you let people in generally when they came to the house? A. No, sir.
Q. Did you when the chambermaid was there? A. I did not very often; I do not think that I answered the door-bell six times in my life.
*410 Q. Three or four days before this homicide, was there any other servant there but yourself? A. No girl; but there was the doctor’s boy.
Q. The day before the doctor was killed, was there any other person to attend the door; did you attend it? A. I did not, but Mrs. C.’s little boy attended to it.
Q, Did you see Mrs. Voorst there? A. I did not, but I heard she was there. •
Q. Have you seen Mrs. Voorst since she returned to the city? A. I saw her twice myself, and heard she was there at other times.
■ Q. You say that the doctor began to take his meals there when Mrs. Burdell took the house? A. Yes, sir.
Q. For how long? A. I think it was about two months.
Q. Did he take his meals of Mrs. Jones? A. I never saw him take any.
Q.' Did he not dine there the Christmas when Mrs. Jones kept the house? A. That was by Mrs. Burdell’s invitation.
Q. You said upon your direct examination that you had heard hard words between the doctor and her? A. Yes, sir.
Q. When? A. I told you that when Mrs. Voorst came back there were some rough words.
Q. Where were you? A. I was in the hall of the second story; I asked her what it was about, and she said that it was about fetching Mrs. Voorst back; he shut the door as he pushed Mrs. C. out.
Q. When you first heard them talking, did you see them? A. I did not, until I saw her coming out of the room.
Q. Where was thé doctor when you saw her coming out? A. He was inside the door; I was in the hall of the second floor going up stairs.
Q. Did you see him push her out? A. I did not, but he said that he pushed her out.
*411 Q. \By the Judge.] Did you hear her voice? A. I did not; I only heard the noise; I heard very loud talk; I heard both their voices; but I did not hear anything that was said.
Q. Then you asked Mrs. C. what it was about? A. Yes, sir.
Q. Did you advise her? A. I did not; I do not think that was my business.
Q. When was this? A. It was in the fall of the year.
Q. Can you tell about what time it was in the fall? A. I cannot.
Q. Was that the only occasion ■ when you heard loud words between them? A. This was the only one at that time; I heard rough words afterwards.
Q. What did Mrs. C. say when you asked her what was the matter? A. She said she did not want Mrs. Voorst to come into the house; they wanted to bring her back but she would not allow it.
Q. Before this did you ever hear any rough words between the doctor and Mrs. C.? A. She accused the doctor of having ladies come there for improper purposes.
Q. Was that the only fault she found? A. That was the only fault I have ever heard her find.
Q. After this occasion, when these words were uttered ■ by Mrs. C. in reference to Mrs. Voorst coming back, did you hear any unpleasant or rough words between them? A. I have; it was a little while before he was killed; a few words about the signing of papers.
Q. How long before he was killed? A. It was the Saturday night before.
Q. You said upon your direct examination that she said she would be revenged upon him. When was this? A.
It was when she was going to enter a law suit against him, for she said he had done her a heavy wrong, and she would be revenged upon him.
*412 Q. Did she speak about taking the law upon him? A. íhat is what she meant by it.
Q. You say it was in reference to Mr. Thayer commencing a law suit for her? A. Yes, sir.
Q. Was that the only time you heard her say anything about being revenged upon him? A. It was.
Q. You were a witness before Coroner Connery, and you testified twice then, did you not? A. Yes, sir.
Q. You said, on your direct examination, that she said upon this occasion, that perhaps he might not live to sign the paper or let the house. Did you swear to that before the coroner? A. No,-sir.
Q. Were you not asked to tell all you knew before the coroner? A. That did not come into my head until the lady that took the house was asking me.
Q. Where did Mrs. Stansbury see you? A. She saw me in the dining-room in the house in Bond street.
Q. When was this? A. At the examination of the coroner’s jury, before it was ended.
Q. You said that you did not think of this when you gave your testimony before the coroner’s jury? A. I did not think of it then.
Q. Did Mrs. Stansbury talk much with you after you gave your testimony? A. Not much.
Q. Did you tell Mrs. Stansbury of this at the time? A. No, sir.
Q. To whom did you first name it? A. I have now named it to Mrs. Foster, the matron of the city prison.
Q. How recently to her? A. Within three or four days.
Q. Is that the first time you ever mentioned it? A. Yes, sir.
Q. Did you ever think of it before you told it to Mrs. Foster? A. I did, but not at the time I was before the coroner.
Q. Was it after you were examined the first time that you had this conversation with Mrs. Stansbury ? A. It *413 was after I was examined the second time—the same day.
Q. You were in custody as a witness at that time ? A. Yes, sir.
Q. Were you not asked, before the coroner, to state all • that was said upon that occasion ? A. I was.
Q. You did not then recollect it ? A. I did not.
Q. How many days before the death of Dr. Burdell was this conversation ? A. I could not say; it was before he was buried.
Q. Have you not been asked, since the coroner’s jury rendered their verdict, whether you knew anything farther about this case? A. I was never asked by anybody about it.
Q. Has anybody called upon you to ask any questions in reference to this matter ? A. Ho, sir.
Q. Where have you been since this homicide ? A. I have been three weeks in the station house, seven weeks boarding with Capt. Dilks, and four weeks in the tombs.
Q. Has Capt. Dilks said anything to you about this matter ? A. Ho, sir; and no one has spoken to me about it.
Q. Did you tell Mrs. Foster, two or three days ago, about it? A. Yes, sir.
Q. Did Mrs. Foster speak to you about it first ? A. Ho, sir; it was running in my mind.
Q. Do you know Mary Donohoe ? A. Yes, sir.
Q. Do you recollect when Mary left the doctor’s house ? A. I think it was three days before the murder of the doctor.
Q. Did she ever leave the house before that ? A. She went away for a night or two.
Q. Do you know anything about her being discharged ? A. I didn’t know that she was to come back.
Q. Will you state what transpired when Dr. Burdell and Mary Donohoe were in the cellar? A. She can answer for herself; I have nothing to do with Mary Donohoe’s business.
*414 Q. State what transpired in the cellar upon that occasion ? A. There was nothing done by him but to help me up stairs with Mary.
Q. I ask you whether Mary and the doctor had fights and quarrels ? A. I don’t know whether they had, and I never knew them to have quarrels; there might have been sharp words about cleaning and sweeping, and raising of dust.
Q. Have you ever heard Mary use any threats about the doctor ? A. I never did.
Q. Have you ever used any yourself ? A. Never in that way.
Q. Did Mrs. Burdell take care of the clothing of the doctor at the time' of his death ? A. Yes, sir; I did his washing, and she attended to his clothes.
Q. Did you see Mrs. Burdell that Friday evening, before she came down into the kitchen, about ten o’clock ? A. I do not think I did; I went up to tell her that there was a girl, Mary McClinchy, that wanted to see her; I could not say whether it was before or after dinner time;-I told the girl to come the next day—she was coming as chambermaid.
Q. When you went up to the room to tell them about the murder, what were they doing ? A. Snodgrass was writing;. Eckel was sitting at the fire.
■ Q. Was it used as a sitting room for the family ? A. They used, all of them, to sit in it before - they went to bed.
Q. How long do you think you were in the room altogether that night—the third story front room ? A. I did not stop more than a minute or two.
Q. Did you then go immediately to bed ? A. Yes, sir.
Q. Where were the little boys when you went into Mrs. Burdell’s room ? A. They were in bed; Snodgrass told •me that George said I was intoxicated.
Q. Did you go into their room ? A. I did not.
*415 Q. Do you know they were in bed ? A. I heard them talking.
Q. Do you- know whether they were undressed ? A. I saw little George come down in his night clothes; I did not see him afterwards that night, or hear him say anything; I heard him talking to George Snodgrass.
Q. Did you hear William talk ? A. Yes, at the same time, in the bedroom.
Q. When was it that the conversation occurred that George said you were intoxicated ? A. He told that to his mother that night after I came up to my bed.
Q. Snodgrass told you that ? A. Yes, sir.
Q. You were not intoxicated ? A. I was not at all; I was just as sober as I am now, and knew just as well what I was doing as I now do.
Q. During that Friday evening was not the bell rung for you to, go into the parlor ? A. It was not.
Q. Will you swear that you did not come into the parlor ? A. I did not go up stairs at all.
Q. Do you know whether the girl who called went up stairs that evening ? A. She did not, but Mrs. C. went down to her.
Q. When you told Mary to come the next day, where did she go ? A. She .went out at the basement door; I went to the door with her, bade her good night; I unbolted the door when she went out.
Q. Was it bolted all the evening? A. I always bolted that door.
Q. Was it bolted then just as usual ? A. It was bolted by me just as usual.
Q. Can you tell how long you lay awake that Friday night ? A. I cannot tell exactly the time.
Q. Did you hear Snodgrass come up« stairs after you went to bed ? A. I did, and I heard Miss Helen Cunningham come up; I heard them bid good night to each other!
Q. Did you hear Helen go down ? A. I did.
*416 Q. Do you know where Helen and Augusta slept that night ? A. I do not.
Q. The next morning, when you called the mother to breakfast, did you see the girls ? A. I saw Miss Augusta; she was in her mother’s room.
Q. Was Helen there? A. She was up in the garret; I called to her to come down to breakfast and she answered me.
Q. Do you know anything about overcoats being lost in the hall? A. I heard them say that they were, but I know nothing about it.
Q. How long was this before the homicide? A. It was about a week or so.
Q. Did you let anybody in at the time these overcoats were said to have been stolen? A. I did not.
Q. With the exception of what you have said as to the hard words between Dr. Burdell and Mrs. Burdell, was her conduct uniformly kind towards him? A. Yes, sir; very kind, and sociable enough.
Q. How did she address him? A. She always called him doctor.
Q. Did you ever hear her address him by the name of Harvey? A. Yes, sir.
Q. How long before daylight did you get up the next morning? A. It was between six and seven o’clock; I came down to get breakfast.
Q. What time did you go to call Mr. Burdell to breakfast? A. It was about eight o’clock.
Q. Did you generally call him to breakfast? A. I did not generally call him, but the chambermaid was away then, and that was the reason I did it.
Q. Was John Burchell the first one you let in? A. Yes, sir.
Q. Had you been up stairs from the time you went down in the morning until you called Mrs. Burdell to breakfast? A. I had not.
*417 Q. What time was it that you let John Burchell in? A. It was not quite eight o’clock.
Q. Was it before or after breakfast he came? A. It was before breakfast.
Q. How long after you let him in before he came down and told you about the doctor’s death? A. I do not think that he came down and told me anything about the doctor’s death until about nine o’clock; it was a little more than an hour before he brought me any word about the doctor’s death.
Q. Do you know anything about the doctor’s habit of going to the door if the boy was out? A. He answered the door-bell very often himself in the day time; he never answered it at night.
Q. Are you certain what words you used when you went up to Mrs. Burdell’s room to announce that the doctor was dead? A. I could not say exactly what the words were ; I think the words were, “ My God, you enjoy yourselves well when the doctor is dead.”
Q. How long did you stay in that room when you went up stairs to announce that the doctor was dead? A. I staid there until Mr. Snodgrass went down stairs, came up and said that that was the fact.
Q. What did you do when he came into the room and announced it? A. I went over and caught Mrs. C. by the hand, she was fainting away; I went down then and called the next door neighbor, and I went for Dr. Roberts.
Q. Was she crying at that time? A. She was.
Q. You took her by the hand and moved her on to the bed? A. Yes, sir.
Q. Did you help Helen any? A. I did not.
Q. Did you notice that Helen fainted? A. Yes, sir.
Q. \By a Jurori] 1‘understood you to say that Mr. Eckel did not take breakfast? A. I did not see him at breakfast.
Q. ]_By a Juror.~\ Did you have any company on the evening the murder occurred? A. I did not. *418 Question by a Juror: Had you been drunk? A. No, sir.
Q.. What time was it that this conversation occurred as to the doctor being jealous of Eckel? A. I could not exactly tell the time.
Q. How long was it before the death of the doctor? A. It was about one month or less, I should think.
Q. Where did this conversation occur with Mrs. C.? A. Down in the kitchen.
Q. Do you recollect of anything else said in that conversation? A. She said first that the doctor was vexed at her; that was the way the subject was brought about; the conversation was in the day time.'
Q. She told you that he was jealous of Eckel? A. I said that I did not think that she gave him any occasion.
Q. What did she say then? A. She gave a smile; she said that she did not care much what he said in that respect, and she did not care about such foolish talk as that.
Q. Did she say anything else? A. That was all she said.
Q. Was anybody else present? A. No, sir.
Q. Was the doctor down in the kitchen much? A. He would happen in occasionally if he wanted something.
Q. Did he pay any attention to what was going on there? A. There were a great many mice there, and he used to set a trap to catch them; he came down every day to see if there were any in the trap.
Q. On the Friday before the doctor was killed, did you see much of him? A. I saw him at night; I saw him pretty often.
Q. About what time was it that you last saw him? A. I saw him, to the best of my knowledge, before he went to to dine that day.
Q. Where was it when you last saw him? A. On the kitchen stairs.
Q. Did Dr. Burdell attend to matters about the house down to the time of his death? A.- Mrs. C. attended to them.
*419 Q. Did he have anything to do with the gas bills? A. I do not know anything about the gas bills.
Q. Did he go and cover up the dishes down stairs? A. Yes, sir.
Q. What did he say about the bread and other matters in the kitchen? A. He said that the bread ought not to be lying there, exposed, in the way for the mice to get at.
Q. Did Mrs. B. tell you not to contradict and dispute the doctor? A. She did; she told me to treat him kindly, and let him have his own way.
Q. Are you married? A. I have been, but my husband is not living; he has been dead four years October last. •
Q. Have you been in the habit of getting drunk a good deal? A. I could always take my share, but never so much as not to be able to work; I never saw any one who would throw it over their shoulders, whether they were rich or poor.
Q. Have you ever been charged with any criminal offense? A. Mot to my knowledge.
Q. Have you ever been charged with receiving stolen goods? A. Mever.
Q. At the time you and Mary Donoghoe were at Capt. Dilks’, was any criminal complaint made against either of you? A. There was no complaint made against me.
Q. Have you been in the habit of meeting men in the State Prison? A. I was never in the State Prison but once in my life.
Q. Whom did you go to see upon that occasion? A. Dick Smith.
Q. How long ago was it? A. It was fourteen years ago; he was in the employment of my husband; I went to see him from the friendship of my husband for him and no other.
Q. Where did you live before you went to Mrs. Jones? A. I kept house for my husband.
Q. Did you ever go out to service before? A. Mever; I kept house in the Sixth ward.
*420 Q. What street and number? A. It was at the corner of Pearl and Cross streets; I do not know the number.
Q. Where did you live before that? A. No. 30 Orange street.
Q. How long did you live there? A. Five or six years,
Q. Where did you live next before that? A. We had .an oyster saloon at the corner of Elm and Walker streets.
By a Juror: You stated when you went up stairs to Mrs. Cunningham’s room and reported to them that Dr. Burdell was dead, you waited there until Snodgrass went down and came back; did Mrs. Cunningham make any effort to go down stairs? A. No, sir.
By a Juror: Was she in a fit state to make any inquiries? A. She looked confused.
Q. [By a Juror.~\ You stated you were seven weeks in Capt. Dilks’ family; you were not confined in the house all? A. I was not out but twice in that time.
Q. Did you go out alone? A. Yes, sir.
Q. Did you have any conversation about this matter at this time with anybody? A. I did not, for the people were afraid to ask me anything.
Catharine Btansburg was examined by the district attorney,, and testified that she was the wife of the cashier and accountant of the New York Express; she had known Dr. Burdell twenty years.
To the question whether she had ever engaged to hire the house No. 31 Bond street, of Dr. Burdell, Mr. Clinton objected, on the ground that Mrs. Cunningham was not present at the time of the engagement, and that nothing which took place in her absence ought to be admitted as testimony. The judge allowed the question. Exception taken by Mr. Clinton.
Witness: I went to No. 31 Bond street at Dr. Bur dell’s request; my object was to hire the house from May 1, 1857; I was there on the Friday afternoon preceding the doctor’s death; the papers were to be signed the next *421 morning; Dr. Burdell and my mother went through the house with me; I saw Hannah, the cook; I did not talk with her at that time; Hannah was present while we were conversing about renting the house; I did not see Mrs. Cunningham; I had previously been to the house to see .Dr. Burdell; I once saw Mrs. Cunningham there.
Mr. Clinton again excepted to all this testimony, on the ground that Mrs. Cunningham not being present, such evidence was not legal.
Witness resumed: I once saw Mrs. Cunningham when I called at Ho. 31 Bond street; she was close to the door of the doctor’s room; I had been talking to'the doctor, and suddenly opened the door; Mrs. Cunningham was going away from the door.
Witness continued: I was half way in the room when I was talking to Dr. Burdell; Mrs. Cunningham was immediately outside the door.
Cross-examined Toy Mr. Dean: It was in the second'story back room, I had this conversation with Dr. Burdell; the conversation occurred partly near the fire-place, and partly near the door; the doctor stood part of the time with his hand upon the knob of the lock, as if aboiit to open the door; Demis Hubbard was in the house on Friday, 30th of January; I never saw her before; she was there before I arrived there.
To a Juror: My business conversation with Dr. Burdell took place partly while I was sitting in the dentistry chair, near the window; I do not know how near Mrs. Cunningham had been to the door when I opened it; she was a few feet from it when I saw her.
John J. Burchell, the boy employed by Dr. Burdell, was the next witness: He said he was in the employment of Dr. Burdell for about a month previous to his death; he knew Mrs. Cunningham; on the day before the doctor’s death he was in the doctor’s office with Mrs. Cunningham, between seven and eight o’clock in the morning; the doctor. *422 had gone to the bank; he was told by Dr. Burdell to go up stairs; Dr. Burdeil gave the witness the key; I had been in the room about ten or fifteen minutes, said the witness, when Mrs. Cunningham came in; she asked me if I had the ashes out of the stove, and I said, “yes;” she asked me who sent me, and I said the doctor; I was to tell Dr. Cox that he (the doctor) would be back from the bank by 11 o’clock; Mrs. Cunningham said to me, “the doctor is a passionate man;” I said, “Yes, ma’am;” then she said, “ he will get over his passion in three or four days;” I left the room, and presently returned; I was absent only a few minutes; she asked me to go up and take the ashes out of her room, which I did; I left her in the doctor’s room; I went again to the doctor’s room; I asked her for the key of the room; she said she would take charge of it; about eleven o’clock the doctor came back from the bank, and asked me for the key; I told him Mrs. Cunningham had the key; he ran up stairs to her room; I did not see him come back; I saw him afterwards about two o’clock in' the afternoon; I never talked with Mrs. Cunningham about Dr. Burdell; I do not personally know of any difficulty between her and Dr. Burdell, except a quarrel about coal; I went to the house the next morning between seven and eight o’clock; the basement door was bolted, when the cook let me in; the back basement door was fastened; I went into the yard for a scuttle of coal, and had to unbolt it; I went into the doctor's room between eight and nine o’clock; the key was outside the door in the lock; I did not see any blood outside; the door is only one step from the head of the stairs; I knocked at the door before I went in; when I got no answer I opened .it; I saw blood on the side of the wall of the room; the door opened inward against the side of the room; I saw the doctor's body; I only opened the door about six inches; he laid so near the door that a common sized man could not get in without pushing away the body; I put my hand against the side of the door, or *423 I would have fallen down; I went and told the cook, and afterwards went up to Mrs. Cunningham’s room; Mr. Snod- * grass was holding her on the bed, and she was crying; I heard her scream; she did not speak to me; Snodgrass spoke to her; I do not know what he said; I was there ten minutes; I went to the front parlor when I left her room; Snodgrass came down after me, and told me to take charge of the front door; Snodgrass ran into the street; he returned with Dr. Eoberts; George Cunningham went out for somebody, and I went out for Dr. Smith: I did not see Mrs. Cunningham again; I went into Mrs. Cunningham’s room that morning before I found the doctor was dead; I went to clean away the ashes; nobody was in the room; they were down at breakfast; the first I saw of Mrs. Cunningham, she was standing at the back parlor door; I do not know whether it was before breakfast or after.
Cross-examined hy Mr. Clinton: Q. Did you see Eckel that morning? A. Yes, sir.
Q. What time? A. It was just when I came in; I went up to the operating room, and I was cleaning out the stove.
Q. Was he at breakfast that morning? A. I don’t know whether he was or not; the first place I saw him was in the middle of the grass plot.
Q. [By the Court.] In the yard? A. Yes, sir.
Q. How old are you? A. Fourteen, going on fifteen.
Q. Had you known Dr. Burdell before you went to live with him? A. Ho, sir.
Q. Did you see any money paid to Dr. Burdell on Friday? A. Yes, sir.
Q. By whom? A. By Dr. Smith.
Q. Bills, or silver, or both? A. Bills.
Q. About what time of the day? A. Between two and three.
Q. [By jurors.] What time was it you came on Friday, the day before the murder? A. I came that morning'just at seven o’clock.
*424 Q. What time did you say the doctor left? A. He left about half-past seven to go down to the bank.
Q. What time did the doctor generally get to his office? A. Why he used to sleep right in front of it.
Q. He left then between seven and eight o’clock? A. Yes, sir; half-past seven.
Q. Where were you when you saw Mr. Eckel in the middle of the grass plot?' A. I was in the working room, back of the back parlor.
Q. Was that after you went out with the ashes and for coal, or before? A. No, sir; just when I came in to work.
Q. Who unlocked the back door on the parlor floor? A. That was never bolted, not since I was there.
Q. Did you see Mr. Eckel when he went out that morning? A. I did not see him go out; I only saw him on the grass plot.
Q. [By the District Attorney.] Do you know where the doctor breakfasted? A. Yes, sir; at the Metropolitan Hotel.
Q. [By Mr. Olinton.\ Did you know that any other way than by what the doctor said? A. No, sir.
Q. Where was Eckel going? A. He had his back turned towards me; he had his two hands in his pockets, and had a light coat on.
Q. [By Mr. Clinton.] Was he going to the water closet? A. Yes, sir.
Mary Donahoe was then sworn, and testified that on the 25th or 26th of November last, she went to live in the family of Mrs. Cunningham as chambermaid and waitress, and that Dr. Burdell lived in that house at that time; Mrs. Cunningham mentioned to her particularly that she should attend to Dr. Burdell’s office and bed-room, besides doing all the rest of her work, and she (witness), while she remained in the house, did clean his office and bed-room, and always made his bed; one day, when she had been ' about eight days or so in the house, whilst she was making *425 the doctor’s bed—(his bed-room being then the back room, and his office the front one)—she heard a great deal of talk in the front room; she recognized Dr. Burdell’s voice very well, but there was also a female voice which she did not know, till afterwards; the noise continued for some time— more than ten or fifteen minutes, she should think—when the doctor came out into the bed-ioom, walking very fast, she, at the time, being engaged in fixing the bed, and whether he went into the little closet or not, she did not know, but he hurried into the front room again; the person with him there was Mrs. Cunningham; she heard him call her a bad woman, or words to that efiect, and Mrs. Cunningham, in reply, informed him that he was a bad man, a wicked bad man, as nearly as the witness could recollect the words; he seemed, by the noise, to take a hold of her, and push her out, as he said these words to her, (“that she was a bad woman,”) and then locked the door on her; she (Mrs. Cunningham), from the entry, came into the bed-room where the witness was employed in making the bed, and seemed very much excited and flushed; she asked the witness if she had seen the doctor take a gun out of that closet, and witness replied that she had not, as her back was to him when he came in, and she only heard his feet; Mrs. Cunningham then said to her: “Mary, you have no notion of what a bad man that is.”
Mrs. Cunningham said that he (Dr. Burdell) was a bad, passionate man; upon which the witness remarked: “ Bless, me, ma’am, he must be dangerous!” She then told witness what the noise was about—that the doctor wanted to bring some woman back to the house, which she did not wish, as she (the woman) was not a good character, and she did not wish him to bring her in among her daughters; whereupon witness said she was perfectly right in that; Mrs. C. then said: “ Mary, I don’t wish you to take any notice, or make any remark, of what is said here, or done; I can manage him myself; ” which ended the conversation; *426 when witness had done making the bed, she went away about her work, through the house; the doctor, when witness came out, was in his office room; about an hour, or an hour and a half after that, the doctor came to witness when she was brushing the stairs on the lobby; he appeared to be dressed; he locked the door of his office .room and put the key in his pocket; that room was then the front room; he went down stairs as if he was going out; while on the stairs, and just after this, witness saw Mrs. Cunningham take a key, seemingly from- her pocket, or in her hand—she did not know, in" fact, where it was taken from— and put it in the lock of the bed-room door and unlock it; she told witness to go up and tell Miss Augusta to come down, and that the doctor had gone out; witness went accordingly, and Miss Augusta came down and went into the room into which Mrs. Cunningham had already gone; witness went into the doctor’s front room, passing from the other room and going through the passage between them, to dust it; witness found them in the office room; they were looking at papers; the bureau on the right hand was open, and some of the little drawers were open; it was the same bureau that stood at the side of the iron chest in the room where the doctor was murdered; after witness had dusted about the bureau a little, Mrs. C. said: “That will do, Mary,” and she (Mary) left the room, in which Mrs. and Miss C. still remained; witness often saw in that house a bunch of keys, tied with red tape; they seemed to be like iron keys; witness never noticed them' particularly, but she never saw any brass ones among them; all down stairs, in the parlors and bed-room were brass keys; up stairs, they were mostly brass keys, but the middle doors, she believed, had iron keys; witness noticed particularly once one little iron key in the door, between Mr. Eckel’s and Mrs. Cunningham’s rooms. [This last statement, after argument, was excluded by the court for the present.]
*427 The witness was then asked what connection there was between Mrs. Cunningham’s and Mr. Eckel’s rooms as to closets, doors, &c.
The question was objected to and ruled out by the court, on the ground that the evidence already in the case, as to the existence of a jealous feeling on the part of Dr. Burdell toward Mrs. Cunningham, on suspicion of improper intimacy with Eckel, was sufficient, so far as the question of motive was concerned.
Counsel for the defense then admitted the relative locations of the rooms of Mrs. Cunningham and Eckel.
Witness, in resuming, said she always thought that Mrs. Cunningham slept in her own room on the third story, front; she always made her bed there.
Q. Where was Eckel’s bed ?
Witness continued: While she was living there Mr. Eckel slept in the small room; there was a door in the partition between these rooms; witness attended to all the rooms in the house; witness said she had often heard Mrs. C. say that he (the doctor) was a very wicked, bad man; that there was no doing anything with him; she heard that about three weeks before the murder was committed; it was a frequent thing for Mrs. C. to say so, but witness did not remember to hear her say that within three weeks before the doctor’s death; she never heard her say anything about the doctor being married, but when Mrs. C. complained to her of his being so cross, she joked her about it, and said: “Perhaps, ma’am, if he was married, and had a wife to guide him, he would not be so cross;” to which Mrs. Cunningham replied that it would be a pity of any woman who would get him; witness thought this was a fortnight or three weeks before the murder; witness said that they were talking at the breakfast table about the words the doctor had had with Snodgrass; Mr. Eckel remarked that he (meaning the doctor) deserved a good knock down, if it could be done handy; Mrs. Cunningham *428 did not seem to make any remark; she merely laughed; that morning there was nothing more said, but on the following morning they were conversing again about the doctor’s ugliness; there were present Mr. Eckel, Mrs. C. and Miss Helen; the two children were at the table,, and Miss Augusta, she thought, was present too; the conversation was a general one; they were talking about the doctor being an ugly man; Mr. Eckel was eating cakes, she thought, at the time, and laughing, when, putting down his knife and fork, he rubbed his hands just so, like making fun, and said: “By jingo! shouldn’t I like to be at the stringing up of that old fellow, if I would not have too hard a pull at the cord; ” Mrs. Cunningham just seemed to give a little laugh; she did not say anything, but told witness she need not remain in the room any longer; on the Saturday night before the murder, witness had been later than usual in washing out the front entry, and heard a great deal of noise in the doctor’s room; she could not distinguish between the voices, the noise was so great; just then a ring came to the door, and witness went to it, opened it, and closed it again as soon as she could; the noise up stairs continued for about fifteen minutes; witness saw the doctor running down stairs; Mrs. Cunningham, she supposed, was up stairs, but she did not see her; about an hour before she heard the noise, witness had seen Mrs. Cunningham go up stairs; that night, about nine o’clock, Mrs. C. came into the kitchen and told Hannah and witness to get ready as quick as they could and go to bed; she had never before ordered them to bed in that way; witness asked her could she not stop and set the table, and do some other little things, it being Saturday night; she come back twice and said: “ Now, look here, Mary, I don’t want a muss; ” Mary said she would make no muss, as she had only to clean her knives and wash her silver; Mrs. Cunningham then said to Hannah: “ Mary does not understand what I mean of the affair about the doctor.” “ Oh! ” *429 said Hannah, “you need not care about that, for Mary was in the entry and heard all the noise, and all that the doctor said in passing her by.” Mrs. Cunningham then went up stairs and came back again. Witness was never asked by her to go into the bath-room for any purpose. One time Mrs. C. sent her with a plate of soup to the doctor, who had a bad cold, and he refused it. Witnes took it down and told Mrs. C. that he (the doctor) said he was going to dinner, or had had his dinner, and did not require it. One time witness was asked by Mrs. C. to bring up to the doctor a sort of hot stuff which the family were in the habit of making for themselves altogether twice a week, and he did not take it, saying he did not take anything like that. Witness brought it back to Mrs. Cunningham. Witness very often stood behind Mrs. Cunningham’s chair and she remarked that she used her left hand more than her right; she saw that Mrs. Cunningham used her fork a good deal and generally used the knife in her left hand to cut with. Witness assisted to change the doctor’s bed from the back to the front room about a fortnight after she went there; at any rate it was before Christmas a good while. At the time of making this change witness heard Mrs. C. remark that she supposed the doctor had made that change so that he might hear every noise and every foot up above in her room. Witness left the house on the Wednesday before the murder, she thought at about half-past six o’clock in the evening.
Cross-examined by Mr. Clinton: Q. Do you recollect any overcoats stolen out of the hall? A. Yes.
Q. How long was that before the murder? A. It was a long time before the murder; overcoats were stolen twice, one of which belonged to George Snodgrass, and the other to Mr. Eckel.
Q. When was Snodgrass’ coat stolen? A. I think that was six or seven weeks before the murder; Snodgrass was always in the habit of visiting when I went there; he was *430 in the habit of coming every evening to see the young ladies, and after 'a week that I was there he hung his coat in the. hall, and Mr. Eckel had been hanging his there also, and both were taken.
Q. That was about a week after you left? A. I think so.
Q. Were they both taken at the same time? A. Both at the same time.1
Q. Do you recollect that any coats were stolen after that? A. Yes.
Q. About how long after that?1 A. I think it was upon a Friday, a week or so before the murder; I know that on the following Monday Dr. Burdell put a new lock upon the door.
Q. What room did Mrs. Burdell occupy while you were there? A. From the time I was there I always made her bed in the third story front room.
Q. And you always supposed that she slept there? A. I always supposed so.
Q. Without interruption? A. Yes; I always had her bed to make in the morning.
Q. Do you not know that Dr. Snodgrass and his wife occupied that room for, a portion of that time? A. For a fortnight they did; she (Mrs. Cunningham) always occupied that room, but gave it up to Dr. Snodgrass.
Q. He and his wife (Doctor Snodgrass) were visiting there at that time? A. Yes, sir.
Q. Was not Mrs. Snodgrass there longer than that? A. No, sir; I do not think she was.
Q. Did she not remain there while Doctor Snodgrass left, and subsequently returned after having been gone a week or two? A. Not while I was there; I did not miss them out of the house for a meal; they may have been away a day or' so, but not more.
Q. They are the father and mother of George Snodgrass? A. Yes; I waited upon them and attended to them.
*431 Q. You say that Mrs. Burdell made a remark that she supposed the doctor had changed his room so as to hear all that was going on in her room? A. Yes.
The District Attorney: Overhead in her room? A. Yes..
Mr. Clinton: About what time was it? Are you sure how long it was after you went there that the bed was changed? A. I do not think that it was more than a fortnight after I went there that the bed was changed.
Q. You took the drink to the doctor? A. Yes.
Q. About when was that that you first took this drink to the doctor? A. Only once.
Q. I ask when was that? A. About a 'month or so before the murder.
Q. After you returned with it what was done with.it? A. I do not know; I sat it down on the parlor table; she (Mrs. Cunningham) sent one up another night to Mr. Oilman.
Q. Were other parties drinking this same hot stuff down stairs? A. Yes. 6
Q. It was the same drink? A. Yes.
Q. Nothing poisonous in it as far you know? A. I never thought of poison, nor anything of the sort.
Q. Fix the time when you .took the soup up to the doctor? A. As near as I can, I think it was about six weeks before the occurrence—between five or six weeks; it was six weeks at all events.
Q. Did you make that soup? A. It was soup which Hannah made.
Q. For the family? A. Yes.
Q. And not specially prepared for Dr. Burdell? A. No; it was soup made for the family.
Q. Good soup, was it not, and nothing wrong about it? A. No.
Q. What was done with it? A. I brought it down again, and took it into the kitchen.
Q. Did the doctor have a cold at that time? A. Yes.
*432 Q. And was complaining? A. Yes.
Q. You heard a conversation as to the doctor wanting to bring some women there which Mrs. Burdell did not want, as she did not wish them to associate with her daughters. Do you know what women were meant. A. No.
Q. Were not their names Hubbard and Post? A. I understood it was afterwards.
Q. Did you attend to the door in the evening? A. Yes, sir, always; there was no boy when I went there first.
Q. You did not let any one in who took the overcoats, of course? A. No, sir.
Q. You do not know who took them? A. No; I told them that it was their own carelessness; I know nothing about it.
Q. Now, as to this talking about the doctor at the breakfast table, on the Monday morning. State who were present on that occasion? A. As far as I can remember, Mrs. Cuhningham, Mr. Eckel, Miss Helen, and the two little boys.
Q. Was Augusta there? A. I do not think she was down.
Q. Was Snodgrass there? A. No; he had taken his breakfast in the kitchen, and went to his" work early.
Q. Was Snodgrass present when this conversation occurred? A. I think not.
Q. Did you not swear before the coroner that he was present? A. No, I did not; I do not think I ever did.
Q. Did you not state that Snodgrass spoke about the doctor in that conversation at the breakfast table, on that Monday morning, about his having got up to let the doctor in the night before? A. Yes, but it was not at the breakfast table; he ate his breakfast in the kitchen that morning, for he would not wait for the family to come down.
Q. He did not make this remark at the breakfast table? A. Not at the breakfast table with the family.
*433 Q. What were you doing in the breakfast room at this time—waiting on table? A. Yes; I always stood and waited from the beginning of meals until they were done.
Q. Do you recollect anything else that was said at the breakfast table that morning? A. No.
Q. Who began the conversation about Dr. Burdell? A. I cannot say directly, but I think it was Mrs. Cunningham; she said George Snodgrass could have him punished for using the language to him that he had done, after getting up and letting him in on Sunday night.
Q. What language did she say he (Burdell) had used to Snodgrass? A. Something or other about knocking in his brains.
Q. Had the doctor said he would knock his brains in? A. Yes, for putting a bolt in the door, so that he could not get into his own door, and she (Mrs. Cunningham) said that George Snodgrass, could have him arrested for that language.
Q. He did not say that Dr, Burdell claimed that Snodgrass himself had put a bolt in the door against him, but that somebody else had? A. Yes; and that Snodgrass and he had some words, and that he was mad.'
Q. Did she say anything about Snodgrass getting up at one or two o’clock in the morning, and letting him in? A. No.'
Q. Were you sleeping in the attic at the time that Snodgrass let him in? A. I was undressed, and in bed.
Q. You had been asleep? A. No, sir.
Q. It was after he and the little boys had' gone to bed? A. They were in the room; little Tom Snodgrass was there, and the two boys.
Q. George and Willie Cunningham? A. Yes, the four Were in that front attic room.
Q. You heard a bell ring? A. I heard a. great deal of noise; I told Hannah that there was some noise down stairs, *434 and she said, never mind; then I heard the bell, and says I, “ that is Dr. Burdell, and he can’t get in.”
Q. Did you ever have any difficulty with Dr. Burdell? A. I never had any difficulty with him.
Q. Did Dr. Burdell and Hannah take you out of the cellar on one occasion? A. They did.
Q. Were you intoxicated at that time? A. I had been very poorly for a long time.
The remainder of the cross-examination "related only to the habits and history of the witness.
After the cross-examination was closed, the district attorney said there was an item of direct evidence which had been overlooked. He asked the witness who occupied the little front'room next to that occupied by Snodgrass. . She replied it was not occupied; there was a fire-place in it; fires were very seldom lighted there, bub a few days before the murder of Dr. Burdell, she was told to lay a fire there, but not to light it, as it would not be required for a day or two.
At the instance of a juror, the witness was asked whether Mrs. jCunningham used her knife in eating with her right hand? She replied that she used her left hand in eating, and she (witness) thought her left-handed.
Dr. Stephen A. Mayne was the next witness, and was examined by the district attorney. He said: I am a dentist; I live at Ho. 32 Bond street, exactly opposite Dr. , Bur dell’s; I was called into Dr. Burdell’s on the morning of January 31, between eight and nine o’clock; I ran up to the doctor’s room where he was lying dead; I placed my hand upon him, and found him dead; I passed into his bedroom, and found his bed had not .been tumbled; I then returned, locked the door of the office, and gave the key into the hands of my student, who had followed me in; as I was leaving the door, Snodgrass called to me from the next flight of stairs above, to come up stairs into Mrs. Cunningham’s room; I went up—saw Mrs. Cunningham *435 and her two daughters there; the youngest was faint; while I was there Mrs. Cunningham spoke in regard to the doctor being dead; she asked me if he was dead; I told her he was; she then asked me how he died, or what was the cause of his death; I told her that he had died from the bursting of a blood vessel, or an hemorrhage of the lungs; she asked me who was in the house; I told her I had seen no one but the dentist Smith’s boy, who stood at the door; she made some remark in regard to the doctor’s death again, and I repeated that he had burst a blood-vessel; she said she was glad that was the case, for Hannah had told her he was murdered; -she wished that I would keep a good lookout for Dr. Smith when he came, for he was a bad man; she wanted me to keep an eye on him, stating that he had nothing in the house except a case of instruments—all the rest of the things were her’a and Bur dell’s; the doctor’s head lay within two or three inches of the door, as it opened into the room.
When I went to Mrs. Cunningham’s room, she was very excitable and agitated; she had a sort of hysteric action, as if she felt very bad; I was in the room only a minute or two; no one but Snodgrass came into the room while I was there; I was out with my wife at a party the night before, and returned home about one o’clock; as we came into Bond street, my wife called my attention to a peculiar smell, as of something burning; I did not notice it particularly, myself, till I came near my own house; when I got out of the sleigh, I noticed it very plainly.
Mr. Dean objected to the witness stating what the smell resembled. Overruled by the judge. Exception taken.
Witness resumed: The smell was like the burning of woolen or leather—he would not be certain which it was; it was stronger when I arrived at Ho. 32 Bond street, opposite Ho. 31; I was in the-room when Mrs. Cunningham was brought before the coroner for examination on *436 the afternoon of January 31st; I do not recollect how she was dressed, except that she had a large fur cape on.
Cross-examined hy Mr. Iiomeyn: What sort of a day was it on the 31st January? A. Very cold; a stormy day.
Q. How did you happen to go to Dr. Burdell’s house that morning? A. The doctor’s boy came for me.
Q. Were you the first person in the house, as far as you saw? A. Yes, except the family.
Q. Did you say the body laid so as to be clear of the door, when it opened? A. It was about six inches within the door.
Q- From all that appeared, you were the first person in the room? A. Yes, sir.
Q. Were the hands apparently in the position in which he had fallen? A. Yes, sir.
Q. Did you move the body? A. I did; I turned it over to see if he had killed himself.
Q. Did his right hand grasp the breast over the mortal .wound in the heart? A. Yes; his hand lay immediately over it.
Q. Was there much blood about his.face? A. Yes; his nose was nearly covered in the pool of coagulated blood in which his face lay.
Q. Was there anything to indicate that he had been removed into the position where you saw him, after he was dead, and the body laid out there? A. None whatever.
Q. You did not perceive the odor until you got near your house? A. My wife spoke of it soon after we came into Bond street. I did not notice it so much until I got near home. Then I noticed it very particularly.
Q. Was it perceptibly stronger when you got nearer home than when you entered Bond street? A. It appeared to be.
Q. What was the character of the atmosphere at that time—was it clear? A. No; it was quite warm, near to rain.
*437 Q. Was the state of the atmosphere favorable to the transmission of odors? A. It was cloudy and foggy.
Q. In what direction was the wind that night? A. I am not positive, but I think it was in the south."
Q. Was there not an easterly storm impending—an easterly wind blowing? A. There was; the storm of next morning, which commenced that night, was from the east.
Q. NoWi Doctor, if that odor had come from the house Ho. 31 Bond street, and the wind was from the east, would the smell have been stronger when you got to your house opposite and north of it? A. Hot if the wind were in the east at that time, but I am not positive how it was.
Q. How far was it- from Ho. 31 Bond street to Broadway? A. About thirty-five houses.
Q, Four or five hundred feet? A. Yes.
Q. How, if the wind" had been blowing from the south, and if the smell had proceeded from that house, is it likely that you would have perceived it from Broadway as you entered Bond street? A. We entered Bond street from Fourth avenue.
Q. Was it a usual thing in your neighborhood, with the wind from the south and' east, and in that state of the atmosphere, to perceive this disagreeable odor from Broadway? A. We often smell something coming from the Bowery; it is a universal place for burning up rubbish in the street.
Q. There are a great many factories in the Bowery? A. Yes, sir.
Q. Are there any which burn bones? A. Hot to my knowledge.
Q. Did you observe when you went into Dr. Burdell’s room the state of the curtains and the shades at the back window? A. I did when I went in the second time—after I came in with the policeman.
Q. There had been no apparent change in the interval ? A. Ho; nobody had been in.
*438 Q. Now, will you- state to the jury what was the sitúa tion of those windows with reference to the shades, curtains and blinds, if any? A. The blinds were about half way up; the window has lattice blinds, like these in the court room.
Q. Swinging on hinges? A. Yes, and they opened on the.inside; above is straw colored curtains, which go over the lattice, clear the whole length of the window; they were both pulled down, and I raised them to get light when I went in.
Q. The curtains were pulled down and the lattice was closed? A. Yes.
Q. They were the ordinary buff muslin or linen curtains? A. Yes.
The Court: They are properly called window shades.
Mr. Romeyn: The shade pulled up and down with a cord or pulley? A. Yes.
Q. Were those blinds of such a character that a person from the outside could see into that room with the blinds closed? A. They were opaque blinds.
Q. Could they see into the room if there had been no blinds, if the shades were drawn down? A. No, unless they were very high upon the other side; they could not.
Q. And if there had been no blinds, they could not have seen through the curtain, the curtain being down? A. No.
Q. You have for some time, I believe, lived in the house No. 29 Bond street? A. I have.
Q. Directly adjoining Dr. Burdell’s? A. Directly adjoining.
Q. Your house is of a similar character to that of No. 31 • Bond street? A. Perfectly similar.
Q. The same in arrangement and the same in internal appearance—the same in every respect? A. Yes.
The Court: Internally and externally? A. Yes.
Q. Pattern houses? A. Yes, sir.
*439 Mr. Romeyn: There were two windows in the rear of the room in which the doctor’s body was found?
The Oourt: We have had that already. You need not go into that.
Mr. Romeyn: And the gas burners were there? A. On the further window, west.
Q. And the hall was on the east side .of the house? A. Yes.
Q. Was that gas turned up so as to give a full light ? A. It was a full jet.
Q. You spoke of keys that lay upon the secretary— were they ordinary pocket keys, that a man of business would carry? A. They were a bunch of keys that fitted small locks.
The Oourt: Was there a night key among them ? A, Ho; I think the night key was in his vest pocket, but I will not be positive.
Q. It was not attached to this bunch of keys? A. Ho; I think I should have known it, for it was a peculiar key.
The Oourt: Do you say it was a peculiar key? A. Yes; he had got a new lock on the door a short time before that; it was a singular key.
Mr. Romeyn: Do you know how long that lock had been • on the door? A. I think some two or three months; I recollect when it was put on, but I cannot exactly locate the time.
Q. The secretary that stood against the side of the room, was it what you call a bookcase, having shelves upon the top? A. It was a writing desk; it was used for that purpose and for nothing else.
Q. And this desk was open, and there was a bank book lying upon it? A. A blank check book.
The Oourt: A deposit book? A. Yes, sir.
Mr. Romean: The portfolio lay upon the dental desk? A. Yes.
Q. Was it open? A. Yes.
*440 Q. Did it lay close to the light? A. Yes; the light was darkened partly between the two windows, and it laid nearly under the light.
Q. When you went down after discovering the dead body, did you look about you for marks of blood on the outside—that morning when you returned with the police officers? A. I did with the officer, but did not until he came.
Q. How long were you gone before you were joined by him? A. Five or eight minutes—as soon as I could run to the station; two or three of the policemen came with me, and he was one; I do not know that I knew them.
Q. Did you observe traces of blood outside of this room, and if so, state what they were—what you saw? A. First we discovered them upon the outside of the door.
The Court: What door? A. The door that leads outside of Dr. Burdell’s room. We discovered the marks ■upon the moulding or casing in the hall.
Q. State whereabouts you saw it, and what it was? A. It was about a foot to eighteen inches from the floor, upon the woodwork near to the corner as you go round into the hall.
Q. Which side? A. On the side towards Bond street, .opposite from the edge of the door.
The Court: The door was hung upon the south side of the frame of the door, the lock was on the north side, as I understand it, and this blood you found upon the north side of the outside casing, about one foot from the floor? A. Yes.
Mr. Romeyn: Was it drops of blood, or a brush from a garment? A. I cannot be positive in regard to that.
Q. Leaving that, where did you next find blood? A. Coming down stairs. After we came to the turn on the last side of the wall of the house there were several spots of blood. This was coming down the main stairway.
*441 The Court: How far down the stairs? A, Soon after we commenced to descend.
Q. How high was that from the stairs? A. About three feet probably. It was in three or four places.
Mr. Romeyn: Now between the door and the window that you first go down to, a few steps upon the platform— before you turned to go down the main stairs—did you see any blood there? A. I did not observe any on the platform.
Mr Hall: I have now in court a model of the house of Dr. Burdell, which will facilitate matters.
[A model of the house was then produced and inspected by the court and jury, the witness marking in pencil the various places where he had observed blood.]
The Witness: I have marked upon the door, and the three or four places upon the sides of the stairs—upon the wall as I descended, which was "in the main hall—where the blood was found.
Q. As you went down these little stairs (referring to model) you observed no blood? A. No.
Q. But on these stairs you observed blood, as you have indicated? A. Yes.
The Court: How many spots, and how far were they up from the stairs? A. Three or four spots, and about three feet from the stairs.
Q. Were the drops of blood run down, or smears of blood? A. Smears of blood, as though rubbed with the hand.
Mr. Romeyn: When you got to the foot of the stairs in the main hall, did you find any blood in that main hall? A. The only blood that I noticed was on the front door.
Q. The outer door? A. Yes, the outer door that leads into the street. There was blood on the inside about four to six inches above the lock, on the edge of the door where it shuts. There was blood there which was cut off.
*442 The Court: That is on the side' of the door? A. Where the knob is.
Q. Was the blood both inside and outside of that door? A. On the edge of the door.
The Court: He means that there was some blood on the inside of this door about four to six inches-above the lock, also a spot of blood upon the edge of the door, which, when the door was shut, was shut in. (To witness)—Is that so? A. Yes, sir.
Mr. JRomeyn: The case of dental instruments stood between the two back windows? A. Yes, they did.
Q. Was there any blood on the desk where the dental instruments were? A. I did not notice any. There was blood upon the floor’.
Q. What was the appearance of that blood which was nearest to that case of dental instruments? A. Drops of blood, as though it had fallen. Hot tracks of blood, but drops.
Q. Upon the centre-table there was, I think I understood you to say, a paper that had some blood upon it?. A. There was considerable blood upon that.
Q. Had that blood the appearance of having been dropped upon the paper? A. Yes.
Q. Hot as if made by rubbing, but as if dropped? A. Yes.
Q. In .the southeast corner of the room was there any blood between the secretary and the rear wall? A. It was all dropped round.
Q. I mean between the secretary and the end of the house? A. It was mostly from the secretary to the instrument case.
Q. But against the hall wall ? A. There was none at all there.
Q. What was upon the sofa? A. A shawl and cap.
Q. The sofa stood here [illustrating] and a shawl and cap were upon it? A. Yes.
*443 Q.. Were there any marks of blood upon the shawl or cap? A. Hone whatever, nor upon the sofa.
Q. Where were the overshoes? A. At the far end of the fireplace.
The Oourt: That is on the north side? A. Yes.
Mr. Romeyn: Was there any blood about those overshoes? A. Hone.
Q. Was there any blood in the other comer of the room, opposite the door? A. I do not recollect that any was there.
The counsel for the prisoner here produced four draw-, ings of the room, furniture, &c., in which the murder had been committed, which were explained to the court and jury, and he was further examined as to them as follows:
Q. Have you examined the drawings you have in your hand? A. Yes.
Q. You aided to some extent in their preparation? A. I did.
Q. And they are correct representations of the room and the objects in them, as you perceived them when you went in that morning? A. They are correct.
The Oourt: How just explain the first one to the jury. [Witness explained.] I understand, continued His Honor, that that drawing, Ho. 1, represents the appearance of the room, the blood upon the wall, the location of the body, and all the articles of furniture precisely as you found them when you first entered the room, as it appeared to you at that time? Yes, sir.
Diagram Ho. 2, which represented the furniture covered with blood; Ho. 3, the sofa and the south and west side of the room; and Ho. 4, the northwest corner of the room leading into the doctor’s bedroom, were then identified by the witness as correct.
Oross-exandnation continued: Q. What was the color of the steps of this house? A. White marble.
*444 Q. And the platform in front of the door, at the top of the steps? A. White marble.
Q. What color was the door? A. Painted white.
Q. And of what material, and what color, were the railings of the steps? A. Iron railings, and black.
Q. Open railings? A. Yes; filigree work.
Q. Was there any blood upon the bank book that laid upon the secretary? A. None.
r Q. Was there any blood upon the portfolio which was lying upon the case of dental instruments? A. I did not see any.
Q. Upon the secretary was there any blood? A. I am not positive.
Q. How far from the chair was it to the centre-table upon which' the bloody newspaper was? A. Eighteen inches to a foot, perhaps. Not over that.
Q. Was there blood on the chair? A. There was considerable blood on the right side of the chair—on the back part of the chair.
The Court: That is the chair that stood in the front of the secretary? A. Yes.
Mr. Itomeyn: How as to the sofa? Was there any blood upon it? A. No.
Q. I think I understood you to say that you looked on the catch of the safe and found it up? A. The knob was turned so that you could put the key in.
Q. If there had been any blood about that, do you think you would have seen it? A. I think I should.
Q. Between the secretary and the door opening into the hall upon the wall there was blood? A. There was very little.
Q. Upon the door opening into the hall there was considerable blood? A. There was a good deal of blood upon it.
Q. And on the door which led to the closet there was a good deal of blood? A. Yes.
*445 Q. How large a man was Dr. Burdell? A. He was a man of about five feet eight inches.
Q. Very nearly as tall as you are? A. Tes, very nearly.
Q. The blood in the corner was a jet of blood apparently? A. Yes.
The Oourt: Was he a man as heavy as you? • A. Yes; a little thicker set—a little heavier than I was.
Mr. Romeyn: He was a stout, thick-necked man—a thick-chested man? A. Yes, a very solid built man, and weighed about from 160 to 170 pounds.
Q. He was a man whose appearance indicated a great deal of muscular strength? A. I think it did.
Q. How high was the jet of blood upon the wall, measured by Dr. Burdell’s standard? A. I think the height was not more than eighteen inches or two feet from the floor when the jet of blood started out upon the side of the door.
Q. And the jet of blood upon the partition of the door was about as high as his neck? A." Yes.
Q. Below the horizontal jet of blood on the lower part of the partition of the door there was a spouting of blood also? A. Yes.
Q. Was this blood dried upon the- wall when you went there? A. Oh, yes.
Q. How was it as to the blood on the stairway and on the outer door? A. That was dry.
Q. When you went up with the policeman did you go into the room with him? A. I did.
Q. Did you and he go together and examine the premises? A. We did.
Q. And you and he were together when you discovered this blood? A. Yes.
Q. That was on examination? A. Yes.
Q. What had Dr. Burdell about his neck? A. A black silk handkerchief; I think it was black.
Q. Was it loose or tight? A. Tight.
*446 Q. Was there a stiffener in it? A. None at all.
Q. Tight and tied twice round his neck? A. Yes.
The Court: Had he a collar on? A. He had.
Q. What kind of one? A. A common linen collar; ■ a standing-up collar. .
Q. Was the handkerchief folded narrow or wide? A. ' It was very narrow; it was almost like a string round his neck.
Q. Did you observe marks of redness round the doctor’s neck? A. Yes, and we all of us spoke of that when we were examining him; the neck handkerchief appeared to have been twisted choking; it was not done with a cord, but something larger; we took it to be with his neck handkerchief; he was choked, for his tongue protruded.
Q. Would his appearance indicate that some man had seized him by the neck-cloth and twisted it. A. It might have been done by that.
The Court: By this black silk handkerchief? A. Yes.
Mr. Romeyn: Was there or not anything which would lead you to suppose that a narrow cord had been put round his neck? A. No; it would have shown a mark if it had been—if it had been drawn tight.
Q. Where was this redness? A. Below, at the lower part of the throat.
Q. Did you see his wound examined? A. I did.
Q. You saw the body stripped in the first place? A. I did.
Q. What was your opinion as to the manner in which those wounds were inflicted?
The Court: How do you suppose they were inflicted— with what kind of instrument, and under what circumstances? A. We had several suggestions in regard to it; I came to the conclusion at last that it was done by a person first from behind, who struck him upon the right side when sitting in the chair.
The Court: That was the blow in the clavicle? A. Yes; *447 I was of opinion that the wounds were inflicted by some person standing behind the man, and holding him by his right hand, as there were no wounds in his right arm, but his left was cut in three places; round his right wrist there was a little rubbing, as though it had been rubbed; I noticed that particularly; it yas scratched, as though done by the finger nails; I was of opinion that most of the wounds were given from behind, though not all. Therefore, it must have been a very tall person, for when standing up a person could not inflict those wounds unless very tall; if done in front, a person of any height could have done it; that was my theory.
Q. Now, as to the wound that cut the carotid artery. How, in your opinion, was that done? A. I think that-was done by a person standing in front; it was struck in a diagonal form; we probed that wound, and found it to be six or seven inches.
Q. Did you form any opinion as to whether the.man was standing up or not when that blow was struck? A. I did not at the time; we came to the conclusion that the first blow was struck while he .was in the chair; after that I do not know that I formed any conclusion at all.
Q. Did you observe the wound under the left arm-pit? A. I did.
Q. Did you form any theory as to the manner in which that wound was given? A. I think the man held Dr. Burdell by the left hand, for the doctor’s right arm was raised to defend himself, and was wounded in three places, and it would have been impossible to have given him the wound in the arm-pit if his right arm had not been extended.
Q. Could that wound have been inflicted by a person who was striking at him in front? A. I do not think it could.
Q. You do not form any definite opinion as to the manner in which that wound was given? A. I do not.
*448 Q. You stated that when the door was opened, it was within but a few inches of his head? A. Yes.
Q. Could that body, from the appearance of the blood, have been moved within half an hour or an hour. A. Oh, no.
Q. What was the situation of the inmates of that room when you went up stairs? A. Mrs. Cunningham was upon the sofa when I went up; the eldest daughter was upon a chair, leaning upon a large trunk, on the south side of the room, and the youngest daughter was on the bed.
Q. Was she (Helen) in a state of actual fainting—in a state of syncope? A. Yes.
Q. What did you say to Mrs. Cunningham upon the propriety of her staying up stairs? A. I do not remember what I did say, if anything.
Q. Did you not tell Mrs. Cunningham that she had better not go down stairs, and that you had immediately sent for the police and the coroner? A. I might have said so, and I probably did.
. Q. Try and refresh your recollection? A. I cannot; I might have said so; there was every reason for my doing so, but I do not recollect it.
Q. You put your boy at once to watch the door, and let nobody in? A. Yes.
Q. You locked the door? A. I did.
Q. And, after having put the boy there, and locked the door, you went up stairs? A. Yes.
The Gourl: It is not now a proper time to argue the question,
Mr. Romeyn: I desire to draw the witness’ mind to the state of facts, and I will ask him this: Do you remember saying to Mrs. Cunningham that she ought not to go into the room, or that she could not get into the. room, or something of that kind? A: I might have said so, from the fact that I had locked the door, and did not calculate that anybody would go in until I got a policeman, and gave orders to that effect: I might have said so to her.
*449 Q. Did Mrs. Cunningham attend to her fainting daughter? A. She did not.
Q. Did you, yourself, attempt to relieve Helen? A. I did.
Q. Do -you remember taking hold of both of Mrs. Cun. ningham’s hands and placing her upon the sofa, and saying to her, “stay there,” or, “you must stay there?” A. I do not recollect; I might have done so; there was a great deal of excitement at the time, and this may have escaped my memory.
Q. You have no recollection of what you did in that respect? A. I know that Snodgrass caught hold of her to keep her quiet, and told her she could do no good.
The Court thought that this was not testimony.
Mr. Dean: It is a part of the res gesta. The district attorney said that she was playing theatricals.
The Court: Counsel are very well aware that the opening is not testimony in the case. The court and jury will, I trust, discriminate between what is said by counsel and what by witnesses. I shall rule your question out.
Mr. Bomeyn: Then what Mr. Snodgrass said or did to Mrs. Cunningham you will not permit us to offer in evidence?
The Court: No, notnow.
Mr. Bomeyn: Then I will ask you to note our exception. I offer to show it as a part of the res gesta.
The Court: Go on and examine the witness.
Q. In Dr. Burdell’s room there was gold tinfoil and valuable metals, as is usual in dentists’ rooms? A. Yes, there was in his instrument case.
The District Attorney: When you went up stairs into Mrs. Cunningham’s room, you stated that you spoke of his having bursted a blood vessel? A. Yes.
Q. Did you, at that time, believe that he had burst a blood vessel, or was killed? A. I believed he was killed.
*450 The Court: You stated the reverse to her? A. Yes, sir; I knew he was killed, for I had examined him before.'
To thé Jury: The blood on the walls going down stairs was three or four feet from the stairs; Dr. Bur dell was a thick-necked man; I think that Mrs. Cunningham was incapable of going down stairs when I went up to her, as far as I could judge, but I should not like to speak positively in regard to that; I might have told them not to go, but if I did, I have forgotten it; they made no effort to go when I went in; the doctor had thin whiskers, shaved under the chin, and wore a goatee; the blood must have flowed from the doctor’s body until it was coagulated; in probably from twenty to thirty minutes the blood would cease flowing; I observed no bloody - footsteps round or outside the door; I turned the body over. _
Q. Are you perfectly satisfied that none of the blood stains, the position of which you have described, came from your fingers? A. I know they did not, for I took hold of his shoulder, which was dry; his whole surface was dry, excepting his face; when I turned him over he was wet, and the blood could not have got off from him to me.
Q. There was no appearance that the party who murdered him had bloody feet? A. No.
Q. Do you think that the persons up stairs were in a position to help one another? A. I should say not; she did not assist, and therefore I should say she was not.
The Court: That is Mrs. Cunningham? A. Yes; I suppose if she had been able she would have assisted her daughters.
The District Attorney: If she had been able you think she would have done so? A. Yes.
Q. When you told Mrs. Cunningham that the doctor had broken a blood vessel, what was her manner? A. She was very much excited and agitated; there was then all kinds of theories; we all had our theories at the time.
*451 Mr. Bomeyn: I wish to ask you a general question in regard to the house in Bond street: Were the walls strongly and firmly built, or the reverse? A. Very firmly built, and the walls were thick and solid.
Q. When you were in an upper room in the house, could !you hear a person moving in the story below you? A. No; you could not do so in any of those houses unless the-door were open.
Daniel Ulhnann was examined by the Attorney General, and testified that he lives in the St. Nicholas Hotel, and is ailawyer; on the 30th of January last, he boarded at the St. Nicholas Hotel, and had a lodging room and study in the house, No. 31 Bond street; on that same day (the 30th of January), which was a Friday, he saw Mrs. Cunningham; he had returned to his room in No. 31 Bond street, at about four o’clock in the afternoon, and just before five, as he was leaving to go down to the hotel for his dinner, he met her in the passage, and she apologized to him because there had been no fire in his room; he answered that it was not of much consequence, inasmuch as he would be out the whole evening; he then left; while talking with some gentlemen that evening, in the St. Nicholas Hotel, he took out his watch, and said to them he must return home,' because it was then after twelve o’clock; he returned to his room, and on laying aside his watch, he observed that it was exactly half-past twelve o’clock; in coming into the house he had opened the front door with a latch key; there was an inner door, which had also a latch lock, but it must have been open, as he had not that key with him; that door usually stood open, but not always; there was then no light at all in the hall; as late as that there was rarely, if ever, any light in it; he thought never; generally there was a light before eleven o’clock, but he had never seen it later than that; witness heard nothing unusual that night before retiring; next morning, he was roused about half-past eight o’clock by the voice of some one run- *452 mug up the stairs and crying “ Good God! Good God!” It was the voice of a woman; he then heard some indistinct expression of “ Dr. Burdell is dead!” or something of that kind; it was difficult for him to say from whence the voice proceeded; he thought it was from the third story hall; his room was the rear room on the third story, and the voice came past his door; then he heard several voices, as he thought, shrieking; the shrieks appeared to come from the front part of the house, or the room fronting his, but he did not know whose room it was; the first voice he did not recognize; the shrieks, which were very loud indeed, that he heard afterwards, were in the voice of Mrs. Cunningham; three or four minutes, he should think, had elapsed, when a person threw herself against the inner door, and cried out, with a perfect shriek: “Mr. Tillman, Dr. Burdell is dead!” That also was Mrs: Cunningham’s voice; witness then sprang up, dressed himself, and went down stairs without going into that front room; he did not see Mrs. Cunningham at all that morning, nor until late in the evening; he went down to the door of Dr. Burdell’s office—the rear room on the second story—and found a young man standing there; witness asked him what was the trouble, and the other said “Dr. Burdell is dead;” witness said, “ Let me see him;” the young man hesitated a moment; “ Why,” said witness, “ perhaps he is not dead! What have you done? Have you sent to the coroner? Have you sent to the station house?” The young man replied that they had sent to the station house. Witness renewed his request to see the body, whereupon the young man opened the door, and, as it sprang open, witness saw the doctor lying there, evidently dead. He closed the door again, and in a short time afterward an officer and one or two other persons appeared, and they all entered the room. Witness did not know whether Dr. Mayne had been in before that time; he did not know Dr. Mayne, nor did he know the name of the young man who *453 stood at the door, though he had since understood that he was an office boy of Dr. Mayne. Witness remained in the 'house until ten o’clock, busily examining everything about the room and the body. He did not recollect of hearing anything said about employing counsel that morning, but something was said about that in the evening.
Cross-examined by Mr. Clinton: Q. You are a practising lawyer in the Supreme Court? A. Yes, sir.
Q. You were not applied to as counsel by Mrs. Bur dell at all? A. Ho, sir.
Q. In what tone did she give you warning? A. In a tremendous shriek; in a louder shriek than I ever heard from any one.
Q. Did she attempt to get into your room? A. She dashed herself against the door; I was at the door in a moment, but she did not come in.
Q. You had a night key to that house? A. I had. .
Q. What was the character of the lock on the door? A. There had been an ordinary lock on the door, and it was very easy to be opened with an ordinary night key until some time, I think, at the close of December, when Dr Burdell caused a new lock to be put on the door, a patent lock, which was exceedingly difficult to be opened; I met the doctor one day and told him that it took me four or five minutes to open it; he said, “That maybe remedied.”
Q. What was done about it? A. I cannot tell you what was done.
Q. What was the state of the lock afterwards? A. Afterwards it was very easily opened.
Q. Could you open it with your night key? A. It would open with the slightest touch; the very night of the 30th of January I opened it with extreme ease.
Q. That lock had been on from December until the time of the homicide? A'. I am not sure as to the time; it might have been at the close of December or the early part of January.
*454 Q. Was the door left sometimes without being locked? A. I found the door open the 30th of January, about half past nine o’clock; it was open some ten or twenty inches; this was the outer door of the house.
Q. The inner door was not fastened ? A. It was wide open.
Q. How long were you in your room that afternoon [referring to the day of the murder]? A. I was there fron? four to five o’clock.
Q. Do you know whether one of the servants was absent—the servant who usually built the fires? A. Mrs. C. said that the servant was absent, and that was the reason she offered for there being no fire in my room.
Q. Do you say whether the voice of the person running up stairs was or was not -that of Mrs. Burdell? A. My impression decidedly is that it was the voice of some woman..
Q. Do you know who went ’to the door, nights, when the door bell rang? A. I do not know.
Q. Did you ever have to ring the bell to get in? A. One night I found the outside door locked, I rang the bell, and some one opened the door, and asked who it was; he came down and let me in; it was Dr. Burdell.
Q. About what time was it in the evening, and what month was it? A. It was about eleven o’clock at night, and it must have been somewhere about the middle of December; he opened the door twice for me.
Q. You rang the bell and he answered it? A. Yes, sir.
Q. While you were there you saw the inmates of the house, as you went in and out of the house, this prisoner, her daughter and sons? A. Yes, sir, occasionally.
Q. What was the weather when you came home that night; do you remember it? A. Distinctly. When at the' corner of Broadway and Bond streets, I looked and saw that the stars were partially obscured; it appeared to me that it would either rain or snow before morning.
*455 Q. Did you observe the smell of any burnt woolen or leather on your way home or in the house? A. Nothing of the kind.
Q. Do you know of any deficiency in your smelling organs? A. None whatever.
Q. Did you notice any unusual smell outside or in the house? A. I did not.
Q. Did you see any light in the house?. A. None; on the contrary, it was extremely dark as I went up stairs.
Q. Was the stairway to the attic generally open? A. Yes, sir.
Q. Did you see any light in the attic? A. I saw no light in the house at all until I lit the gas in my own room.
Q. Was there a small room between you and the front room? A. Yes.
Q. For what purpose was it occupied? A. It was a sort of store-room; I had four or five trunks in there myself; there were two doors leading into it, one from my room and one from the hall.
Q. Is there a window in this store-room looking directly into Mrs. Burdell’s room? A. I do not know.
Q. Did you have access to it? A. The door was generally locked between it and my room.
Q. How was it about the hall door? A. That was very frequently locked.
Q. How did you get into it? A. I had very rarely occasion to go in there. I do not think I went in there more than three times in my life.
' Q. When you went in how did you get in? A. I found the door open.
Q. Was there anything peculiar about this lock or night-key to the hall door? A. It was a peculiar key; it struck me as having a great deal of arrangement without amounting to much. At first the lock was exceedingly difficult to open, but afterwards it was a great deal easier and satisfactory to me.
*456 Q. Did you ever open any other lock with it? • A. I never have. I have seen other keys exactly like it, about the city, and I came to the conclusion that a single wire pressed into the part of the largest ward would open the lock.
District Attorney Hall stated that he would not make objection to this evidence, as he would produce the lock hereafter.
A. Dewitt Baldwin was the next witness. He said he was a member of the bar, and resided at Ho. 16 Bond street; on the night of January 30, last, he left that house with three companions, at about half-past eleven o’clock; they proceeded toward Broadway, and witness perceived a strong smell, of burning clothes in the street; one of his friends remarking that somebody was burning up their old rags. Witness noticed the smell very particularly; he could not remember which way the wind blew.
Cross-examination: Q. You said you lived at Ho. 16 Bond street? A. Yes, sir.
Q. What time did you go out on the Friday evening referred to? A. About a quarter past eleven o’clock.
Q. How long was it before you returned? A. About an hour.
Q. That would make it about a quarter past 12 o’clock? A. Yes, sir.
Q. Did you then perceive anything of this smell? A. I do not recollect that I did.
Q. If you had perceived it you would have remembered it? A. Very likely.
Q. Was there much wind that night? A. Very little.
Q. Did you observe in what direction the wind was blowing? A. I think it was in an easterly direction.
Q. You looked to see if there was any smoke? A. Yes, we looked- up to see if we could see anything from the houses opposite.
Q. Did you observe any light that attracted your attention? A. I did not.
*457 Q. Had you resided at No. 16 Bond street for any length of time? A. Since October.
Q. It was not a very unusual thing to have bad smells from the direction of the Bowery? A. Bond street is a-pretty clean street.
Q. Did you observe any offensive smells upon any other occasion? A. I do not remember that I ever did except a few evenings ago, when there was a straw bed burnt in the street.
Edgar Davis was next examined. He said he was a policeman of the Fifteenth ward, and was called into Dr. Burdell’s house, by Dr. Burdell, sometime in the month of September last; he saw Mrs. Cunningham and Dr. Bur-dell in the hall; Mrs. Cunningham told him to take no notice of what Dr. Burdell said, as he had ruined her family and her; she appeared to witness to be very much excited, and said she would have satisfaction for what the doctor had done; she said she would have his heart’s blood or words to that effect; witness stepped in between her and the doctor, and advised her to stop, for she was doing wrong; he told her she did not know what might happen hereafter; he advised her and the doctor to leave the hall and go into the parlor; in the meantime officer Little came in, and, to use witness’ words, did the balance of the talking; witness was present in the parlor when officer Little was there; Dr. Burdell told witness, in Mrs. Cunningham’s presence, that he had lost a note, and that she had taken the key of his safe out of his pantaloons pocket while he was asleep; witness advised him to go to a police magistrate and make a complaint; Mrs. Cunningham made no remark to this; Dr. Burdell said she had taken the key out of his pocket, opened his safe, and taken the note out; this conversation took place in the forenoon of a day about the middle of September; on the morning of the discovery of the murder, witness went again to the house, and saw the body of Dr. Burdell lying on the floor of his office; *458 Dr. Smith was there, the office boy, and officer Little; witness saw the doctor’s pockets examined; he had a watch, a night key, the key of his safe, and some other small keys; •his watch had stopped; the lid of the bookcase was down; the doors of it were shut; witness remained in the house all day; he saw Mrs. Cunningham in the morning up stairs in her room, but did not speak to her; she appeared to be in distress; her daughters, Mr. Snodgrass and the two boys were there; when the coroner was present, witness was present, and was sent after Mrs. Cunningham by the coroner, who wanted her to come down and give her statement; she said she would not go down without consulting with her lawyer; witness went down stairs and told the coroner; the coroner’s son said she would have to come down; the . next morning witness saw Mrs. Cunningham, and advised her not to talk about the murder; when witness was in the house in September, Mrs. Cunningham struck Dr. Bur-dell on the shoulder; on the Sunday after the murder witness was present in Mrs. Cunningham’s room when it was searched by order of the coroner; a dagger, Dr. Burdell’s pistol, a key of his safe and two pocket knives were found; John Connery, the coroner’s deputy and son, conducted the search; the dagger was found in her bureau; the safe-key was found in the landing place of the attic, among some rags.
Q. [By Attorney General.] Is that the key which you found up stairs [handing him a key] ? A. It was one like it.
Q. Do you know where the dagger is now? A. No, sir.
The Court: Is there any dispute about this being the key in question?
Counsel for defense said that they had no knowledge upon the subject.
Cross-examined by Mr. Clinton: Q. Was there no'money found upon the person of Dr. Burdell at the time the body was examined? A. I think there was found some small change.
*459 Q. How much? A. I do not know; there was some silver and there were pennies.
Q. About how much? A. I should think about seventy-five cents.
Q. Do you recollect anything about it, whether it was six cents or seventy-five? A. I recollect that there was money found upon his body.
Q. Do you recollect what pieces of money were found, whether there were a few coppers or silver? A. I recollect that there were some pieces of silver and copper.
Q. Of what denomination was the silver found upon the body? A. The silver must have been sixpences, shillings or quarters; there were no half dollars.
Q. Are you sure that you were present when his pockets were examined? A. I was present.
Q. Did you testify before the surrogate that nothing was found in his pockets? A. No, sir; I have not been before the surrogate.
Q. On the Saturday evening, or the Saturday during the day, did a great many people come to the house No. 31 Bond street? A. I think that towards the evening they did—long about the middle of the afternoon a great many people came.
Q. Was there not a very great crowd? A. A great many people came, but there was not so great a crowd there that day as the Sunday following.
Q. Still there were a good many people going into the house? A. Yes, sir.
Q. In what part of the house were you mostly on Saturday? A. I think I was in the doctor’s room mostly.
Q. The second story back room? A. Yes, sir.
Q. Did you allow any body to go up stairs that day? A. Yes, sir.
Q. Up to what time? A. I think the coroner gave orders toward night not to allow any .one to go up there.
*460 Q. Was it in the middle of the afternoon? A. It might have been somewhere in that neighborhood.
Q. From that time until the coroner’s inquest ended, the defendant was in custody, was she not? A. She was kept up stairs.
Q. I ask you whether she was in custody? A. I do not know whether the coroner can commit or not; he told me to keep her up stairs, and not let her come down.
Q. Do you not know whether that is keeping a party in custody? A. I should think it was.
Q. Did you do as directed in that respect? A. I did.
Q. You were there until the inquest was closed? A. Yes, sir.
Q. How soon after this conversation occurred in her room was it when you told her the coroner wanted her to come, down stairs and give her statement, before she did go down and testify? A. It might have been eight or ten minutes.
Q. When you went up stairs the second time, she immediately came down? A. Yes, sir.
Q. During that time she did not see any counsel? A. I do not think she did.
Q. How did you come to go there that morning? A. Dr. Mayne came down to the station house and made the request, and three men were sent onward.
Q. Who took possession of the dagger? A. I think the coroner’s son John did.
Q. Did he take possession of the pistol? A. He did. ■
Q. Did he immediately upon finding them? A. I believe he did.
Q. Since that have you seen them? A. I have seen the dagger but not the pistol.
Silas O. Herring, examined by the district attorney, said he sold a safe to Dr. Burdell in April, 1856; he furnished duplicate keys, as was his custom, when he sold the safe; on June 28, Dr. Burdell having lost a key, had the lock *461 altered, so that the lost key might not open the safe; he had" two new keys made for the altered lock; witness always keeps a record of all keys made by him, and on seeing a key, by referring to his book, could tell to whose safe it belonged; the safe was registered 13,772, and the key was stamped with the same number; the doctor said he had lost one of the original keys, or it had been stolen; the new key of the altered lock was marked with the original number; after the 20th of June, the original key shown to witness, he said, would not open the safe.
Cross-examination: Q. Was the new key delivered up to the doctor on the 28th of June? A. I think it was on the same day.
Q. It was returned to him on the same day with the other key? A. Yes, sir.
Q. That new key opened the safe at the time of the inquest? A. That I do not know.
By a Juror: Do you know whether that key will open the safe as it is now? A. It will not.
The Court: It has been already testified, that it will only open it as it was on the 28th of June.
Hector Moore, an officer attached to the fifteenth district police, testified that he knew Dr. Burdell during his lifetime; witness went to Ho. 31 Bond street some time in the month of September last, but that was a different occasion from that spoken of by the last witness; he met Dr. Burdell at the corner of Broadway and Bond, and went with him to the house Ho. 31 Bond street, where he saw Mrs. Cunningham; as he and the doctor passed into the hall and passed the door of the front parlor, Mrs. Cunningham stood there as if she had come just out of the parlor; Dr. Burdell, who had been talking to witness about her before, made a motion with his hand and said, “ That is the woman, or the lady;” she replied, “I am his wife;” he made-no response to that, but proceeded up stairs, whither witness followed him; witness did not see her after that *462 until he came down stairs again; Dr. Bur dell said nothing to her in witness’ presence; witness was in the house perhaps twenty minutes altogether; he could not remember the day of the month this occurred, nor whether it was before or after officers Little and Davis had been there; it was his impression it was the latter part of the month; it was not the first part of it at any rate; witness was there in that house again on a Sunday morning after the murder; he saw Mrs. Cunningham that day, and all her children were with her, in the bed room on the third story front; she and the younger daughter appeared to be arranging affairs about the house; they had just got up and were partly dressed; witness was there some three hours dr so, and went down to breakfast with them; he heard singing in the house that morning; Mrs. Cunningham and her daughter sung together; witness did not call it sacred music, though it might have been, for he was not a good-judge of music; he supposed they sang a tune through, and believed it was before breakfast.
Cross-examined by Mr. Clinton: Q. Were you present at the time of this singing? A. I was, sir.
Q. Where did it occur? A. In that room.
Q; Who else was present, if there was any? A. I think the family were all present.
Q. Can you name the individuals present? A. It is my impression that those four children were all present.
Q. The two little sons and the two daughters? A. Yes, Sir.
Q. You say you are not a judge of music? A. I don’t profess to be a judge; no, sir.
Q. Were any words used in singing it, or did you not pay particular attention to it? A. .1 cannot say that I did not; I think I did; but I would not be positive that I heard any words.
By a Juror: What Sunday morning do you rxfer to?
Court: The Sunday morning after the murder. ' *463 Witness: I would not be positive about that, whether it was the first Sunday morning or the next. I am pretty confident now that it was the second Sunday morning.
By a Juror: And after the funeral? A. Yes, sir.
By a Juror: Were there note books to sing from? A. No, sir; they did not sing from any books; I am positive now that it was the second Sunday morning.
George W. Bilks was examined: He said he was captain of the Fifteenth Ward police; he was present at a search made in Mr. Eckel’s bedroom on the Sunday evening after the murder; he marked some papers found there with his initials; the papers exhibited to him by the district attorney he recognized as the papers in question; they were found in Mr. Eckel’s bedroom, in a piece of furniture, used both as a secretary and a bedstead.
The district attorney offered the papers in evidence. Mr. Clinton said they were not traced to the possession of the accused, and there was no legal rule for admitting them as testimony.
Q. Who, if anybody, was present when these papers were found by him? Witness answered that there were John Connery, a lawyer, whose name he did not know, but who acted as counsel for Mrs. Cunningham the day before the inquest, and Mrs. Cunningham herself.
The Court: Mrs. Cunningham was there, that is sufficient.
Q. When those papers were found, did or did not Mrs. Cunningham say anything about them, and if she did, what did she say? A. She said the papers were her’s, and she wanted them.
The district attorney now renewed his offer to put the papers in evidence.
Counsel for the defense admitted that the testimony just given disposed of the objection.
The district attorney read the papers.
The first was an envelope marked in pencil on the top “Private papers, John J. Eckel, 171 Stanton st.” Below *464 was the address, “ Miss Augusta Cunningham, 31 Bond st.” The first exhibit was a declaration, with no jurat, and unsigned, of the loss of a certain note drawn by Mrs. Cunnigham for $612.30. The second was the assignment of a judgment for $612.30, sworn to and signed by Harvey Burdell. The third was a paper relating to Mrs. Cunningham’s private affairs, which was not read. The fourth was a discharge of a judgment. The fifth was a paper relating to certain transactions regarding the same note, between Mrs. E. A. Cunningham and Edwards Pierrepont. The sixth was a receipt, signed by Harvey Burdell, for $84.30, on account of rent due November 1, 1856: The seventh was an unexecuted release to Dr. Burdell, signed by Emma A. Cunningham. The eighth was a security for a note signed by Mrs. Cunningham. The ninth was an unexecuted affidavit, signed by Dr. Burdell, and declaring that up to the 13th October, 1856, he had made no will. The tenth was a lease of the house in question from May, ’56, till May, ’57, dated 19th March, 1856, and executed between Mrs. Cunningham and Dr. Burdell, without witnesses, and with some erasures. The eleventh could not be found. „ .
Examination resumed: Q. What was done with those papers? A. Mr. Connery himself marked them, and he kept them in his possession.
Q. Did Mrs. Cunningham make any other observation than you have stated regarding these papers, and if so, have the goodness to state it? A. I don’t recollect any particular remarks she made, except that she was very desirous to get possession of them.
Cross-examined by Mr. Clinton: Q. Did she say that ? A- Yes, sir.
Q. You are the captain of the police for the ward in which Bond street is, the Fifteenth ward? A. Yes, sir.
Q. And under the coroner you had charge of the premises there, had you not? A. Yes, sir.
*465 Q. Do you know what officer of your ward was on duty on the beat which embraced No. 31 Bond street on the night of the 30th of January last?
Witness: The fore or latter part of the night?
Counsel: Both. A. I can tell who was there on the fore part of the night; it was Officer Tilton.
Q. What are the limits of that beat? A. From Broadway to Bowery, and from Bond to Great Jones street, and up to Astor place.
Dr. JErastus Wilson, who is a dentist, testified that his place of business last January and February was No. 27 Bond street; he Icuew Dr. Burdell, and was on speaking terms with Mrs. Cunningham; he heard Mrs. Cunningham speak of Dr. Burdell at different times, but could not say when the first time was; he knew the doctor by sight, but had no acquaintance with him before May, a year ago; he was sure he had heard Mrs. Cunningham speak of Dr. Burdell several times; he frequently met her in the hall when going to the doctor’s laboratory; he remembered hearing a remark about the first of December from Mrs! Cunningham; she said that Dr. Burdell would learn to behave himself before she vacated his house.
Cross-examined by Mr. Clinton: Q. Was Allen T. Smith there at that time? A. I believe no one was there at the time.
Q. Did he have an operating room there? A. I beEeve he did.
Q. Did'you ever see Dr. Burdell there operating? A. I have seen him in there with patients; it was a very convenient place to the parlor.
Q. Were you ever there in the house in the daytime? A. Frequently.
Q. Fpr what purpose were you there—was it on a visit or for professional purposes? A. In the first place, I called upon Dr. Burdell sometimes in connection with business of the Artizans’ Bank.
*466 Q. Did you use the laboratory there sometimes? A. I did.
Q. In that room? A. I had my own laboratory in my own house.
Q. You stated that you called there for the purpose of using the' laboratory? A. I did; he had a small lathe which had some improvements in it upon those usually in use, and the doctor invited me to call there and make use of it, and I did.
Q. In the daytime as well as in the evening? A. Yes, sir.
Q. How were you enabled to find the time at which this conversation occurred with Mrs. Burdell? A. By thinking it over and looking at my bank book at the Artizans’ Bank; I called there about a week after I commenced an account with the Artizans’ Bank; I believe it was election day; I called upon Dr. Burdell upon a business matter in connection with the bank, but the doctor, at that time, was out; I am quite sure that it was before the time I heard the expression of Mrs. Cunningham; I think several weeks.
Q. Did you not state before the coroner that it was October or November? ■ A. I was not quite sure about it then.
Q. Are you quite sure about the time you have now fixed upon? A. I feel quite confident about it; since then I have recollected the circumstances; have looked at my' books; I am not quite positive about the precise time.
Q. Who else was present- when this conversation occurred? A. I did not see any one else; I heard a gentleman’s voice as I came into the hall; whether Í saw the gentleman with Mrs. Cunningham in this little back office or not, I am not quite sure.
Q. Was it not Dr. Smith? A. I think not.
Q. Did you see the gentleman? A. I cannot swear positively that I saw his face; I heard a gentleman’s voice, and I think I saw a gentleman; I saw Mrs. C. at any rate, and I heard male and female voices in conversation there.
*467 Q. How near were you to them when you heard the conversation? A. Probably ten feet.
Q. You came in, and she invited you into the laboratory? A. Ho, sir; I went into the laboratory myself.
Q. Did you speak to her? A. I did not.
Q. How came she to speak to you? A. I am not aware that she spoke to me.
Q. Whom was the expression she made directed to? A. I do not know; after she let the gentleman out, I believe she closed the door, and that was the time she used the expression.
Q. Where did the gentleman go; into the street? A. I do not know where he went; he passed out of the operating room into the hall, and where he went to then I cannot tell.
Q. After he went out of the operating room, and had passed out, you heard this remark? A. It was after he had passed out, and that is where I think I must have seen him.
Q. Did you hear anything that the gentleman said? A. I might have heard if I had listened.
Q. Was she.with that gentleman at the time you heard the remark? A. Ho, sir.
Q. Was she near enough to the gentleman for him to have heard the remark? A. My impression was that the gentleman had gone out into the street.
Q. Ho one else was present beside you? A. Hot that I am aware of.
Q. I understood you to say that the remark was made to you? A. I do not know to whom it was addressed; she made the remark in a somewhat angry tone.
Q. What was her exact expression? A. I think that I can be positive that this was the exact expression: “ Ho, Dr. Bui'dell will learn to behave himself before I vacate this house.”
Q. Was it not this: “Ho! Doctor Smith will learn to behave himself,” &c.? A. Ho, sir; it was Dr. Burdell.
*468 Q. You do not know whether it was addressed to you or somebody else? A. I do not know who it was addressed to.
Q. Did you speak to her? A. I did not; I stood where she could see me distinctly, and where I could see her; her eyes were turned towards me.
Q. Can you swear positively that the remark was not this: “Dr. Burdell will learn to behave himself before he leaves this house? ” A. I think I will have no difficulty in swearing that was not the remark as you worded it.
Q. As you understood it? A. Yes, sir.
Q. Did you make any memorandum of the exact expression? A. I did not.
Q. Were you in the house No. 31 Bond street the Friday night before the murder? A. I was.
Q. About what time? A. I think it was about seven o’clock in the evening.
Q. You were in the laboratory? A. Yes, sir.
Q. How long were you there? ' A. I was there but a very few moments, probably not more than five minutes at the longest.
A. Did you pass through the parlor ? A. I passed through the hall.'
Q. Who let you in? A. One of the little boys, her son, probably little Georgey.
Q. You were in the habit, under Dr. Bur dell’s invitation, of using his laboratory whenever it suited your convenience? A. I used to run in frequently after my business hours, as I had more leisure then.
Q. During what time? A. It was directly after my office hours, from six to seven o’clock.
Q. For how long a time before that had you been in the habit of using his laboratory? A. Occasionally for several months.
Q. Did you see. Mrs. Burdell that evening [referring to Friday]? A. I saw her in the hall.
*469 Q. As you were going in or ¿coming out? A. As I was coming out.
Q. In what direction was she going? A. She was going . in the direction of the basement stairs.
Q. Were you at home Friday evening? A. I believe I was most of the evening, but I am not positive.-
Q, Your number is No. 27 Bond street? A. Yes, sir.
Q. Were you home from the time you left. No. 31 Bond street until the next morning, as far as you recollect? A. To the best of my recollection I was.
Q. Were you in the street at all? A. I have no remembrance of it.
Q. Did you smell anything offensive, like burnt woolen? A. Nothing.
Q. Do you recollect at what time of the night you retired? A. Probably about eleven o’clock.
Q. Did you hear any sound or cry that night? A. None whatever.
Q. Do you know Mr. Blaisdell? A. I do not—never saw him to my knowledge.
Warren Leland, one of the proprietors of the Metropolitan hotel, testified that he knew Dr. Burdell; the doctor was. a guest at the Metropolitan hotel from the fourth of January till the time of his death; he was a day boarder and had breakfast and dinner; he generally dined about five and breakfasted about nine o’clock; witness did not see him on the day previous to his murder.
Samuel W Family, the next witness, stated that he was a dentist; residing at No. 30 Bond street, nearly opposite the house No. 31, in the same street; his attention was particularly attracted to No. 31 a little before eleven o’clock on the night of Friday, January 30; he was in his sleeping room that night until half-past nine o’clock; he then went out and walked up Broadway as far as Eighth street; when he went out at that time there was some-. thing unusual in the atmosphere; he was at the corner of *470 Eighth street and Broadway when the lights were put out in the Mercantile Library, and by that fixed the time at ten, as that was the time of putting out those lights; he then went home and remained at home about fifteen minutes; called his dog and went ■ out again, returning about eleven o’clock; while standing on the steps of his house he noticed something unusual in the atmosphere, different from what he.noticed at half-past nine; it was the .smell of burning clothes, and his attention was attracted to a bright light in the west attic windows of No. 31; while looking at that light he noticed it diminished very much; it then flashed up again, and again subsided; his attention was particularly kept on that house by its unusual appearance that evening; when he left his stoop, he went to the stoop of No. 31", and went up on the stoop'; he went there for his dog, which was attracted there and would not come away; he noticed that the house, except the attic window, was very dark; he crossed the street again to his own house, and noticed that the light was still in the attic room; it was not so bright as it was before; he then went into his own house, and did not again notice the light. Witness had never been examined on this subject before.
Cross-examined by Mr. Clinton: Q. You attended before the coroner from day to day, while he was holding the inquest upon the body of Dr. Burdell? A. I was in there frequently.
Q. Was there a day during the whole progress of the inquest that you were not there? A. I cannot state posi-. tively, but I think there was.
Q. To the best of your recollection were you not there nearly, if not quite, every day? A. Yes, sir, I was; I cannot say that I was there every day.
Q. How do you fix the time when you first went out that evening? A. By a perfect recollection of looking at the clock; it was much later than my usual time of going out.
*471 Q. Half-past nine was later than your usual time for going out? A. Much later.
Q. You spoke, upon your direct examination, about the unusual state of the atmosphere at that time—was there any smell of burnt clothing, or anything like that, when you first went out? A. No, sir.
Q. Did you not state to Dr. Enrich Parmly, a nephew of yours, that you perceived the smell of burnt clothing the early part of the evening, as early as ten o’clock? A. I do not know that I stated to him that I smelt anything like burnt clothing; I did state to him that I noticed something unusual.
Q. You are a younger brother of Israel Parmly? A. Yes, sir.
Q. And Henry Parmly is a son of his? A. Yes, sir.
Q. Have you conversed about this matter with Enrich Parmly? A. Yes, sir.
Q. Have you with Israel Parmly? A. No, sir.
Q. Will you swear thajb you did not tell Enrich Parmly that you perceived this smell of burnt clothing, woolen, leather or whatever else it was, as early as ten o’clock? A. I did not tell him that I knew what it was.
Q. Did you not tell him as far as you could tell that this smell of burnt clothing or woolen, or whatever it was, was perceived by you as early as ten o’clock that evening, or something to that effect? A. I told him that I noticed something unusual before ten o’clock.
Q. Be kind enough to tell me what you did say? A. I cannot remember what I did say, because it was a long conversation I had with him.
Q. Will you say that you did not so tell him? A. I cannot tell.
Q. Have you not talked with him frequently about it? A. No, sir; I have no distinct recollection of talking but once with him about it.
Q. Did you not tell your wife that it was before ten *472 «’clock, that you perceived this smell? A. I say now, that it was before ten o’clock I perceived it; I do not know what it was; I first noticed an unusual smell at half-past nine, o’clock.
Q. What kind of smell was it? A. It was a smell like that occasioned by the burning of something at the soap works, at Second street.
Q. Had it the smell of burnt soap? A. I cannot tell.
Q. Can you tell as a matter of medical science? A. I cannot.
Q, Did you not tell" your wife, a day or two after this murder occurred, that before ten o’clock that night, you perceived the smell of burnt clothing? A. I did not know what it was. ■
Q. In your conversation with Dr. Enrich Parmly did you say one word about the burning of anything before ten o’clock? A. I cannot recollect that I told him.
Q. Did you not state in that conversation that you believed the murder occurred in the early part of the evening? A. I have no recollection of it—not burnt clothing. I did tell him I smelt something unusual.
Q. Did you speak of any other smell to Dr. Enrich Parmly than the one you perceived before ten o’clock? A. I do not recollect that I did; we talked a long whilé about it.
Q. Did you look at your watch, or any time-piece, from the time you left your house at half-past nine o’clock until you returned again? A. I did not.
Q. Did the Mercantile Library shut up before you left? A. The lights were put out in. the reading room.
Q. You stated that you went across to No. 31 Bond street to get your dog away. Have you not been frequently to other houses to get your dog away? A.. No, sir.
Q. Did you not go to the house next door, where Mr. Robinson resides, to get your dog away from there? A. No, sir.
*473 Q. You never had such a • circumstance occur in that neighborhood except upon this occasion? A. I have some two or three times before been obliged to catch my dog in the street, but never, in my recollection, upon the steps of any house; I generally caught him in the street, between the two sidewalks.
. Q. What was the breed of that dog? A. A Spaniel of the Bang Charles breed.
Q. Was he old or young? A. He was a tittle more than a year old at that time.
Q. What kind of a night was it? A. It was very damp, but not very dark.
Q. Did it not rain or snow that evening? A. Hot previous to that time; I think the walk was a tittle wet when I last went in, about eleven o’clock.
Q., Was it not from rain or snow? A. If it was snow, it must have melted immediately upon falling.
Q. Do you recollect whether there were three or four inches of snow the next morning when you got up? A. Yes, sir; there was.
Q. Did it not rain the next day? A. Very fast, indeed.
Q. Are you not a man of very strong temperament? A. I do not know that I am unusually so.
Q. Very excitable? A. I do not think that I am very.
Q. Did you not testify before the surrogate that you were a man of very strong temperament? A. I think I told you that I was rather zealous in whatever I undertook.
Q. You enter into whatever you undertake very strongly? A. I do not know that I do; I generally give my attention to whatever I have on hand for the time being.
Q. Have you not taken a very active part in this matter? A. I was very indifferent to the matter at first.
Q. And from time to time as you devoted your attention to it you became very much warmed up and very zealous *474 in the matter? A. I have been very much interested in it from a particular time, - but at first I was rather indifferent.
Q. From the time of the inquest have you not devoted a great deal of attention and time to this matter? A. Not a great deal of time.
Q. Have you not offered to spend your money in it? A. Never—not a farthing.
Q. Have you never stated that you would spend money? A. I have never offered to spend one cent in any possible way connected with this matter.
Q. Have not the relatives of Dr. Bur dell made a rendezvous of your house? A. No, sir.
Q. Were they not there on Sunday last? A. There was a cousin of the doctor’s there, Mr. McGuire; and a Mr. Boullon was there; they were not there to see me. •
Q. Who were they there to see? A. They were there to take dinner with Mr. Hutton.
Q. You were there in company with them? A. No, sir; I only showed them the parlor door.
Q. Who is Mr. Hutton? A. He is a merchant, and an acquaintance of theirs, as I understand.
Q. You stated that the house that night was very dark? A. I thought it was.
Q. How long after the homicide did you conclude that it was very dark? A. It was not after the homicide; it was at the time, in the evening, that I noticed it.
Q. Did you notice the house No. 31 Bond street at half-past nine o’clock, when you first went out? A. No, sir.
Q. When did you first notice the house? A. Just before I went into my house, about eleven o’clock.'
■>Q. Was it a quarter before eleven o’clock? A. It might have been a few minutes before eleven.
Q. At that time you say the house was dark? A. Yes sir.
Q. Did you know whether the lights, a? a general thing, *475 were put out in that house about eleven o’clock? A. As a general thing they were not; there were lights there usually when I returned home.
Q. What was your usual time for your perambulations in the evening? A. I usually returned to my house about eleven o’clock.
Q. What was your usual time for going ont? A. About nine, or a very little before.
Q. Did you make it a practice to remain out from nine to eleven o’clock every night—had you any rule upon this subject? A. I went out a great deal in the evening; it was my only time for exercise.
Q. Was it your practice to walk two consecutive hours in the evening? A. Hot all the time; I was generally out two hours in the evening, but I was not walking all the time.
Q. Your usual hour, you say, for going out was about nine o’clock? A. Yes, sir.
Q. Do you not go out as early sometimes as eight o’clock? A. Yes, sir, sometimes.
Q. Earlier than that? A. Ho, sir.
Q. Had you any rule as to how loug you would be out? A. Eleven o'clock was my hour for retiring.
Q. Did you not frequently go home and sit up reading? A. Hot long; my object in going out was for exercise.
Q. Did you not frequently sit up half an hour before retiring? A. Yes, sir.
Q. Did you not frequently sit up an hour? A. Hot as a general thing.
Q. How were the lights at Ho. 25 Bond street that night? Á. I do not know.
Q. How were the lights at Ho. 23 Bond street when you came home? A. I do not know.
Q. How were they at Ho. 19? A. I do not know.
Q. How were they at Ho. 33? A. I do not know; I did not go to the doors of any of these houses.
*476 Q. Did yoii observe the lights of any other house in Bond street that night? A. No, sir.
Q. What is the general practice as to the lights being put out at No. 29 Bond street? A. They are put out early, and there are never any lights at the front; I only recollect two occasions that any lights have been seen in the front room.
Q. When were those two occasions? A. Last New Year’s evening, and I think once upon a fourth of July evening; the front parlor of that house is not occupied at all.
Q. Are you acquainted with the people who live in the house? A. I am not; they appear to live in the back part of the house.
Q. What was the practice at No. 27 Bond street in regard to the lights in the evening—was the house usually lit up or not? A. It was usually lit up.
Q. At what hours have you noticed that it was lit up? A. I have noticed lights there at various times; I have seen lights there very often when I have been going in for the night.
Q. Can you recollect any" one occasion when you have seen this light there a quarter before eleven? A. No, sir.
Q. Can you recollect any night when you have seen lights in any particular room in that house? A. No, sir.
Q. Do you know what time the lights were usually put out there? A. No, sir.
Q. Were there lights usually at eleven o’clock? A. I do not know.
Q. Do you know whether they put them out at nine, ten or eleven o’clock? A. I have no recollection of seeing the house darkened.
Q. Do you recollect when you have seen lights as late as eleven o’clock there? A. I have seen them at the windows of the second story; there were children in that part of the house all winter.
*477 Q. Did you notice the parlor windows at any time? A. No, sir.
Q. At 23 Bond street, did you ever notice when the lights were put out? A. No, sir.
Q. Have you ever noticed whether there were lights in the attic at that house, or the adjoining house, at any particular time of the night? A. I cannot say. •
Q. You say that in the house 31 Bond street there were generally lights at eleven o’clock—were they in the first, second and third stories? A. I think there were lights generally in the third story and in the parlors.
Q. How often have you seen lights in the parlor? A. I have seen them often as late as I have been out.
Q. Have you often seen lights in the parlor, the first floor, as late as eleven o’clock at night? A. I think so.
Q. Are you a friend of Dr. Burdell? A. No, sir.
Q. You knew him by sight? A. I was very familiar with the appearance of the man; I was not intimately acquainted with him; he was not a friend of mine, and I neither visited him nor did he visit me.
Q. Were you one of his pall bearers? A. I was, but not by my wish. '
Q. Were you ever in the attic of No. 31 Bond street before the death of Dr. Burdell? A. Neither before or after.
Q. Were you examined as a witness before the coroner? A. No, sir.
Q. Did you make known the fact which you now testify as to the lights?- A. Yes, sir; I think I spoke to the coroner about it.
Q. Did you ask him to call you as a witness? A. No, sir.
Q. Are you certain that you told Coroner Connery that you would testify in respect to the light? A. Yes, sir.
Q. At what time did you tell him? A. Some time during the inquest.
*478 Q. In time to call his attention to it? Was it before the jury rendered their verdict? A. Yes, sir. I had no conversation with the coroner afterwards, and what I told him then particularly I don’t know.
Q. Were you examined as a witness before the grand jury? A. Ho, sir.
Q. Did you make known to the ■ district attorney this circumstance about seeing the light, before the grand jury found the bill of indictment against the prisoner? A. I think I did; I was subpoenaed there and could not remain, as I told Mr. Hall.
Q. Did you meet anybody in the street that night when you came home, before you went into the house? A. Ho one that I knew; I met, certainly, two persons.
Q. Which way did you go into the street on your return home from Broadway, the last time? A. The last time I came from the Bowery, and the first time from Broadway.
Q. Which side of the street did you walk home? A.On the upper side—the north side.
Q. Where did you meet the two persons? A. Between our house and Broadway.
Q. Did you meet anybody on your return home the last ■ time? A. I have no recollection of meeting with anybody then.
Q. What time did you return home the first time? A. It must have been a little after ten o’clock.
Q. How long had you been out the first time? A. About half an hour; I took a walk and then returned.
Q. You then came from Broadway? A. Yes, sir; from Eighth street.
Q. How long did you stay in the house after your return? A. Perhaps fifteen minutes.
Q. How far did you walk after you went out the second time? A. I walked into the Bowery, into Broadway, and up and down Bond street.
*479 Q. When you went into Broadway, after ten o’clock, how far did you go up Broadway? A. Not many steps.
Q. When you returned and went to the Bowery, on which side of the street did 3 ou walk? A. On the north side, and returned the same way.
Q. Did you go any distance into the Bowery after you reached that street? A. Not far; I turned up Great Jones street, and then returned right back home.
Q. When you came back the last time did you see anybody in the street before you went into the house? A. Not to my recollection; the only reason that I recollect of seeing two persons the first time I was out, was that they were suspicious looking characters, and I turned off from the walk; it was at a time when there was a great deal said about the danger of walking in- the streets at night.
Q. Were they in front of you? A. They were passing towards the Bowery, and I was going to Broadway; I turned and went around them.
Q. What kind of looking persons were they, tall or short? A. I should think they were full medium size.
Q. Were they old or young? A. I cannot tell.
Q. Do you recollect anything whatever in respect to their personal appearance? A. No, sir.
Q. Were they shabbily or well dressed? ■ A. They were shabbily dressed; they looked like rough characters, and they were walking in a manner that did not suit me.
Q. Were they walking fast or slow? A. They were walking slower than I was.
Q. Can you give any other description of them? A. No, sir.
Q. Was there anything else, except their walk, in their movements which looked suspicious ? A. They were rather coarse looking men in their appearance.
Q. Were they talking to one another? A. They were not together; I first met one and then the other; they might have been two hundred feet apart. ,
*480 Q. Was one a tall man and the other a short one? A. That I could not say; I did not notice them enough to decide that.
Q. Can you recollect -what kind of a coat either of them wore—whether it was a raglan or not? A. No, sir, I cannot.
Q. Can you recollect whether they had on overcoats? A. I cannot.
Q. Did each one.look suspicious? A. I did not like the appearance of either one.
Q. Did one look as suspicious as the other? A. I was a little more suspicious of the last one I met than the other.
Q. Were both going towards the Bowery ? A. Yes, sir.
Q. Were you a good deal frightened at the appearance of these men? A. Not much; I merely turned out of the walk to avoid them.
Q. What excited you about them? A. Seeing the first one made me notice the next one a little more.
Q. Did you notice a light in any other attic but No. 31 Bond street, on the south side of the street, that night? A. No, sir; that was the only one I noticed; I should not have noticed that much if it had been an ordinary light; I thought Dr. Burdell’s house was on fire.
Q. Will you swear whether there was or was not a light in any other attic on the south side of Bond street? A. I could not, because my attention was only directed to that one window.
Q. Are you not a very nervous man? A. No, sir.
Q. Not distinguished for that among your acquaintances? A. I do not consider myself to be so; I do not know that I have ever been accused of it by anybody.
Q. Was these any snow in the street that night? A. I do not think there was, not when I went in; I think the walk was a little wet.
*481 Q. Was there not snow upon the sidewalk which had fallen days before—was there not a good deal of snow in the street that night? A: The sidewalks were dry, but the streets were filled with snow and ice, and it was piled up.
Q. Did you cross the street in the snow?- A. There was snow and ice in the street, but it was entirely hard.
By a Juror: Did you observe the time of night you went into the house? A. I think I noticed the clock when I went up stairs; my wife was sitting up with a sick lady; I looked at the clock and went to bed.
By a Juror: Was it not unusual for you to return home and go out the second time? A. I often do it.
By a Juror: When you came home you say you saw a light in tbe attic window; did you see any light in the third story window? A. I can’t say.
Edwin II. Stone, of the Lafarge Hotel, testified that he * knew Dr. Burdell as a boarder at that hotel during the months of October, November and December, 1856; he took breakfast, dinner and supper there, and was a regular attendant at all the meals.
Daniel Olney, on examination, stated that he was a carpenter, and, at Dr. Burdell’s request, ordered a lock on the door of the house No. 31 Bond street; the lock was supplied by Mr. Butler.
William H. Butler was then called, and stated that he was a manufacturer of locks and safes; in the month of December last, he placed a lock on the door of No. 31 Bond street; he produced a lock which he said was exactly similar, with the exception of the key, the keys to all the locks he furnished being made to vary; he exhibited the lock to -the court and jury, and explained its peculiarity; it was burglar-proof, and could not be opened except by the key made for it, when a certain slide on the inside was properly fixed; otherwise it was no lock at all, and could be opened from the outside by merely turning the handles.
*482 Gross-examined by Mr. Glinton: Q. This article is patented? A. Yes.
Q> When? A. In October, 1855.
Q. By whom ? A. By myself and partner, Valentine & Butler.
Q. Who is the inventor? A. I am the "inventor.
Q. And they are patented by Valentine & Butler? A. Yes.
Q. There are other patent locks? A. O, yes, a great many.
Q. And are they all burglar proof? A. They may be, or may not be.
Question repeated. A. I do not know.
Q. The action of this lock depends upon the bolt on the inside? A. Yes.
Q. If any person leave the catch on the inside unfastened, it is not a lock at all? A. It is not.
Q. Then all a person has to do upon the inside, is to* turn it, and it is opened with a slide in that position? A. Yes, sir.
Q. You do not know how the slide was on the night of the murder? A. No.
Q. There is a mere catch, and it is opened from the outside as well as within? A. Yes.
Q. With this slide in the centre? A. It is then a lock, and requires a key upon the outside.
Q. How about the inside? A. It does not require a key at alh
Q. Then upon the inside where the slide is it cannot be opened by pulling or turning? A. Neither.
Q. When the bolt is in that position (illustrating), it is then neither a key nor a latch? A. In that position it is a bolt simply.
Q. Whether or not it can be opened by a person from the outside depends on the position of the slide? A. Yes.
Q. Were you called upon to alter the lock after it was put on, because it could not work? A. Yes.
*483 Q. Did you fix it? A. Yes.
Q. What was the matter with it? A. There was a fault I believe in the spring; I believe the spring was too stiff to allow the key to open it; there was too much pressure upon the key to open the lock.
Q. When was that? A: I should think it was a week or ten days after the lock was put on;- I cannot speak within a week, perhaps.
Q. About when was it put on? A. The charge to Dr. Burdell was on the 13th December, as appears by our books.
Q. You cannot tell when it was put on? A. The charge was about that time: the order was on the 8th December.
A Juror: How many pattern keys do you make for those locks? A. They are varied without any limit; our machinery is so arranged that we think we can make a million of them not alike.
Mr. Dean: You can make just as many alike as you choose? A. Yes.
John II. Thompson, who was the next witness, deposed that he was a doctor of medicine; he knew Di’. Burdell, and knows Mrs. Cunningham; Dr. Burdell called upon Mm in the early part of October last, about half-past three o’clock in the afternoon, and asked him whether he had ever noticed, during his visits to Ho. 31 Bond street, in his (the doctor’s) conduct, anytMng to induce him to believe that he was engaged to be married to Mrs. Cunningham; about that time Mrs. Cunningham came in and asked what the doctor had to say; he replied, “ I am telling Dr. Thompson that you have commenced an action against me for breach of promise of marriage;” she said, “What has Mr. Thompson to do with it?” he said, “I suppose you want money of me;” she replied, “Ho, you know I do not, you promised to marry me, and you shall fulfill your word;” witness told Dr. Burdell he declined having anytMng to do with the matter in any shape or *484 way; Dr. Burdell then asked witness to think it over; he did so, and wrote Dr. Burdell a note, declining to have anything tq do with the affair, unless compelled by law to do so; this occurrence took place in the early part of October; witness added that he was at Dr. Burdell’s house on the Friday preceding the murder; he was speaking to Mrs. Cunningham in the back parlor, when Dr. Burdell came down stairs; she opened the. parlor door as he was walking along the passage to the front door; she either said to him, “ Where are you going, Harvey?’ or “ What time will you return home?” Witness could not remember which; Dr. Burdell made some reply, but witness did not hear what he said; witness called on Mrs. Cunningham, because she had sent for him; she wanted to know if he had discounted a note of $100 for her, and if not, she wished him to return it to her; witness had discounted notes previously for her, of which she was the maker, with one exception; he told her on this occasion that he had paid away the note she inquired about, in business, and would hand her the money, less seven per cent; he was not more than five minutes in the house; had never lodged there.
Gross-examined by Mr. Glinton: Q. I am requested to ask you to repeat the language which Mrs. Burdell addressed to the doctor upon that Friday? A. She said, “Harvey, what time shall you be home?” or “Where are you going?” " .
Q. Was it not said as one would ordinarily address a person going out? A. Yes.
Q. There was nothing unusual about it? A. Nothing.
JDr. George F. Woodward testified that he had made a post mortem examination of the body of Dr. Burdell, assisted by Drs. Wood, Uhl and Knight; witness did not recollect the day; it was on the Monday after the killing; they reduced to writing the result of their medical post mortem; the document was in the handwriting of Mr. *485 Dodge, now Dr, Dodge; it was written at the dictation of witness and Dr. Wood, both of whom then read it over and signed it; it was signed.
The District Attorney read the written description of the wounds in the body of Dr. Burdell as furnished by the witness and his associates to the coroner at the time of the inquest. The witness described the position of the several wounds by pointing to their relative locations as on his own body.
Cross-examined by Mr. Dean: Q. What is your age? A. Thirty-one, sir.
Q. How long have you been in the profession? A. Between seven and eight years.
Q. Do you take any particular .branch of the profession, or are you in a general practice? A. In general practice —in surgery, perhaps, more particularly.
Q. Tour particular branch, then, is surgery? A. I cannot say that it is the particular branch, for I practice both surgery and medicine.
■ Q, You have a partner, I believe? A. Yes.
Q. Who is he? A. Dr. James R. Wood.
Q. You are the junior partner? A. Yes, sir.
Q. How long have you been practicing in this city? A. As I said before, between seven and eight years.
Q. And you always have practiced here ? A. Yes, sir.
Q. Have you, at any time before, been engaged in any case that was the subject of legal investigation? A. I have, sir, in the way of practice—broken bones, &c.
Q. I mean the subject of investigation in a capital case? A. Ho, sir, not in a capital case—(pausing)—excuse me, I was, in the Pool murder; I was examined there; I attended Mr. Lozier.
Q. Did you attend the post mortem? A. I was not present, but my partner was. .
Q. Then this is the first capital case in which yon have *486 conducted, a post mortem where the parties were arrested for murder? A. Yes, sir.
Q. Was this- paper that has "been read drawn up "by you, or under your directions ? A. Under my direction and my partner, Dr. Wood.
Q. I do not see any signature to it? A. The signatures are there.
Mr. Dean: I do not see them in any part of it.
The District Attorney: It is possible that they may have dropped.
Mr. Dean: I want the whole document; I want to have' this embalmed in the annals of medical jurisprudence. [To the witness] I ask you whether that document was made out under your directions? A. It was made out under the directions of Dr. Wood, myself, Dr. Knight and Dr. Uhl.
Q. Who had the control of the post mortem—who gave directions? A. There were no directions given; we all examined, Dr. Wood and myself more particularly.
Q. Dr. Wood and yourself conducted the examination more especially? A. Yes.
Q. And are responsible for the paternity of tliis medical opinion. A. Yes.
Q. When was this codicil added? A. At the same time, sir.
Q. Before it was signed, or after? Just look at it [handing it], and tell us when that codicil was put to the will. A. That was put there after it was signed, but it all signifies the same thing.
Q. I do not ask you what it signifies; it speaks. for itself. Answer the questions put to you.
Witness: These notes were added in the corner, but were all written at the same time.
Q. Are you responsible for what was written after the signatures, the same as before? A. Yes, sir.
Q. Did you direct that a copy should be furnished to each of the papers? A. No, I did not.
*487 Q. Look at the top of that paper—does it not begin by saying: “Furnish a copy to each of the papers?” A. I am not responsible for that; that is not my writing, and not given by my directions.
Q. That is not a part of the post mortemf A. No.
Q. You do not then wish to be responsible for that paper? A. Only that which appertains to the examination of the body of Dr. Burdell.
Q. You mean to be responsible for all that is in the handwriting of Dr. Dodge? A. Yes.
Q. The rest you do not vouch for? A. No.
Q. How did you come to put on that after you four had signed it? A. I cannot tell you exactly.
Q. Who directed it? A. I think my partner, Dr. Wood.
Q. Did Dr. Uhl and Dr. Knight assent to it, and were they all present? A. Yes, sir;
Q. Why was it not put in before it was signed? A. I cannot tell you why now.
Q. You know no reason for it? A. I cannot tell the reason why now.
Q. Was it at a subsequent examination, after reflection, and thinking that the first was not sufficient? A. It was upon a re-examination.
Q. Why was it not signed? A. It was all put together.
Q. Why was it not signed?
The Court: Let him give the reason why it was not signed.
Witness: It was all done on the spot; those papers were drawn up together and signed; then there was a re-examination going on over some new ground, and they were all put together, meaning that the signers would be responsible for the whole of that document, with the exception of those words put on, which I know nothing of. ■
Q. Drs. Uhl and Knight knew about this and assented ? A. Yes.
Q. When was this subsequent examination? A. At the same time; a short time afterwards. .
*488 Q. Which do you mean? ■ A. Well, half an hour after-wards.
Q. What day was this examination—the first examination? A. I think it was Monday or Tuesday, but I am not sure.
Q. You do not know which? A. I do not; I stated Monday previously; it was either Monday or Tuesday.
Q. Do you know Dr. Gillman, of this city? A. Yes.
Q. Do you know Dr. Camochan? A. Not professionally.
Q. Do you know him by sight? A. Yes. •
Q. Did Drs. Camochan and Gillman come into the room while you were conducting this examination? A. No.
Q. Did you refuse to go on in their presence? A. No.
Q. You stopped with it while they were in the room? A. Yes.
Q. They are eminent surgeons? A. Dr. Gillman is not a surgeon.
Q. But Dr. Camochan is? A. Yes; I did not wish to be interfered with; we were all there conducting the examination, and did not wish to be interfered with.
Q. Who do you mean by “all?” A. Dr. Knight, Dr. Uhl, myself and Dr. Wood, who I do not think was then present.
Q. Who is Dr. Knight? A. I cannot tell you, except that he is a regular practitioner.
Q. He is a son-in-law of Coroner Connery? A. I have so understood.
. Q. Did Dr. Uhl object to go on when Drs. Gillman and Camochan were present? A. There was no objection made.
Q.' Why did you stop when those gentlemen came into the room? A. Because 1 wished to.
Q. You did not doubt your ability to conduct this examination at all, did you? A. I did not.
Q. Did you doubt their ability to see whether it was properly done or not? A. I did not consider it necessary for them to interfere.
*489 Q. Did they offer to interfere or say a word while they were in the room to look on? A. They did not; excuse me; Dr. Gillman, while I was- examining the body, immediately took my place, and commenced making an examination himself; Dr. Camochan said nothing.
Q. He said nothing and stood back? A. Yes.
Q. You did not invite him to participate? A. I did not.
Q. Did you not say that the examination should be suspended unless they left the room? A. I said nothing of the kind.
Q. What did you say? A. Nothing.
Q. You neither spoke nor acted? A. To Dr. Camochan I said nothing, but to Dr. Gillman I said I must go on with the examination, and after I had got through he might conduct his.
Q. What was the objection to having Drs. Gillman and Camochan in the room? A. I had no objection after I got through.
Q. While you were conducting the examination, did you mean to have anything secret about it? A. No.
Q. What was your objection then to having those gentlemen present? A. Because we were examining the wounds and measuring them, and we did not want anybody to interfere with us; we could not do it when the doctor wanted to measure at the same time.
Q. Did Dr. Gillman ask to measure the wounds? A. No; I have stated to you that Dr. Gillman came into that room, and went and examined the body while I was measuring the body; he took my place, and commenced to feel over the body.
Q. That, you thought, was interfering with you? A. While I was examining the body, most decidedly.
Q. Did Dr. Knight agree that he would have no interference? A. He said nothing.
Q. Did Dr. Uhl? A. He said nothing.
Q. Did Dr. Wood? A. He was, I think, not present.
*490 Q. What did you mean by saying that all agreed that neither Gillman nor Camochan should be present? A. I suspended the examination while Camochan was there, and I said to Dr. Gillman—
The Court: The witness has already answered that question.
Mr. Dean: I did not hear it.
The Court: I have upon my notes thus: “I told him after we got through that he might conduct his examination.”
Mr. Dean: And you did not say that it must be suspended if he stayed in the room? A. I did not.
Q. Did you dissect the wound in the neck? A. Dr. Wood and myself did.
Q. Where? A. In a room.
Q. In whose presence? A. Dr. Wood’s and myself.
Q. And Drs. Uhl and Knight did not? A. No, sir; they were in the other room.
Q. And they indorsed what you said? A. They saw ■ the wounds and the arteries.
Q. And did not dissect, but you and Dr. Wood did? A. No; we only did.
Q. And Drs. Uhl and Knight did not? A. No, sir.
Q. They signed, then, what you wrote or dictated? A. They signed after seeing.
Q. To what extent did you dissect? A. To the extent of taking out about two and a half inches of the carotid artery—half an inch of the common carotid, and two inches of the external and internal carotid arteries.
[The witness was here shown a diagram of the cavities of the body, plate No. 5, and marked the arteries in pencil.]
Q. After the forking or bifurcation, then, it is external and internal? A. Yes.
Q. Tell me exactly where was the cut of the knife—was it above the bifurcation or below? A, Above.
*491 ■ Q. It cut both? A. Yes.
Q. Did you dissect it through the neck so as to show it upon the right side as well? A. Ho, sir.
Q. How, then, did you know the direction in which the knife went? A. By a probe, and the dissection afterwards.
Q. When was that? A. In taking out the carotid arteries.
Q. After this examination? A. At the time that we dissected the. arteries, we discovered the direction which the wound had taken.
Q. To what extent did you dissect this wound in length? A. Lengthwise, so as to get at the carotid arteries, and then laying the neck open sufficiently to see the direction that the wound had taken externally.
Q. Did you dissect the other side? A. On the right side we did not.
Q. How did you not then know that the right carotid was wounded. A. We did not say that it was.
Q. The depth of the wound in the neck you know only from the probe? A. Yes, and dissection.
Q. To what extent did you dissect in depth? A. Sufficient to get out the arteries.
Q. "But beyond that you did not go? A. Ho; and the probe went to the depth of six inches.
Q. The neck is not solid? Ho, sir.
Q. Can you tell, without dissection, the actual direction of the wound—its extent upon the neck? A. We cannot tell exactly.
Q. This wound in the neck is necessarily a mortal wound, is it not? A. Yes, sir.
Q. And must cause death very soon? A. Yes, if the hemorrhage is not stopped.
Q. Can the hemorrhage, when both carotids are cut, be arrested? A. It might be, by applying the pressure to the carotid, and then ligaturing it.
Q. Then it is not a mortal wound? . A. It is a mortal wound.
*492 Q. How soon? A. Perhaps thirty seconds.
Q. Did you ever know a case where both carotids were cut? A. Yes, sir,
Q, Do you know how long the party lived? A. No; I have seen several suicides where both carotids were cut.
Q. Is it a matter of opinion as to how long the party would live? A. Yes.
Q. Is it generally known by people who are not in the medical profession jnst where- the carotid lies? A. Well, there are some people out of the profession who know better than others.
Q. I ask if it is generally known? A. I think the precise locality is not generally known.
Q. Is there any place in the human system where a cut is more fatal than one which strikes the carotid? A. The heart.
Q. Is a blow more fatal in the heart than in the carotid? A. More instantaneous, perhaps.
Q. That is 'not the question. The question is whether there is any place where a blow was more fatal than a blow that cut the carotid artery? A. No, sir.
Q. Ordinary people, when they cut their throats, do they cut the carotid? Do they not generally cut the front of the throat? A. They generally attempt to cut the veins in the neck.
Q. There is no vital organ directly in front? A. There is the larynx. Ordinarily, people who commit suicide cut the front of the throat.
Q. They do not attempt to cut the carotid? A. I do not know what they attempt, but that is generally what they do.
Q. The- wound you spoke of in the left nipple reached the heart also? A. There were two wounds in the heart, one- about' one inch from the left nipple, which penetrated the heart, and the other five inches below, and a little *493 outwards, which touched the apex of the heart; I simply measured the wound in the left nipple.
The, Court: The outer surface of it? A. Yes, sir.
Mr. Dean: What was the reason that the wound was not dissected? A. We did not consider it necessary.
Q. Could you tell what the nature of the instrument was with which it was inflicted without dissection? A. I could not.
Q. Would dissection enable you to do it? A. No.
Q. Would dissection help you in coming to a conclusion? A. Yes.
Q. But you did not think it necessary? A. I did not think it necessary to dissect that wound, but only to dissect the wound in the neck, showing in what manner and way the carotid artery was cut.
Q. With what instrument was the wound in the neck inflicted? A. With a sharp instrument.
Q. A knife or dagger? A. I cannot say.
Q. Was it an instrument sharp upon both sides, or only one? A. I could not say.
Q. Sharp at the point or not? A. I should say sharp, most decidedly.
Q. Bnt you did not dissect far enough to see whether the instrument had a blunt edge or not?. A. No; we judged from the external appearance of the wound and the cuts internally.
Q. But you did not dissect to get at the depth of the wound at the end? A. No.
Q. Are you able to say whether the instrument that caused this wound one inch from the left nipple had two edges or one? A. I am not able to say precisely.
Q. Would dissection help you to do that? A. It would help.
• Q. But you did not do it? A. No.
The Omrt: Did you make any examination of the clothes to see? A. Yes, sir, and that is embodied in that report.
*494 Mr. Dean [addressing] the court: We shall require to have the clothes produced.
The Judge: If you desire any direction upon that subject I will give it to you.
Mr. Dean: Q. Between which ribs was this wound one inch from the nipple? A. It is in the report; I think it was between the fourth and fifth ribs.
The Court: That is what Dr. Francis said. ■
Mr. Dean: Q. Would such a wound, if deep enough, be a mortal wound? A. That depends which way the instrument goes.
Q. Rightly pointed, is it not the place to reach the heart? A. The wound upon Burdell’s body did reach the heart.
The Court: But it could be reached from other points? A. Yes. [Illustrating on diagram and marking the position of the wound which went into the fourth and fifth ribs.]
Mr. Dean: This wound went into the ventricle of the heart, and was therefore mortal, as I understand you? A. I considered it a mortal wound.
Q. The mere fact that a wound is made in the heart does not necessarily make it mortal, does it, unless it reaches either of the ventricles? A. A wound may be made in the heart and yet a man live for some little time.'
Q. Is the other point in the heart a mortal wound necessarily? A. Not necessarily, but it would be speedy if inflammation were produced.
Q. Now, as to this wound we have spoken of—if it had gone in a different direction it would not have been mortal-going through the fourth and fifth ribs—unless it reached the heart; it was a fact that it reached the heart, and piercing it made it mortal? A. Yes.
The Court: I suppose there is no doubt about that? A. None.
*495 The Court: The point it reaches' of course determines the materiality'or immateriality of the wound? A. Yes.
Mr. Dean: Now as to the wound in the right shoulder, near the clavicle—was that wound also directed to a mortal part? A. It penetrated the pleura.
The Court: Is there an artery under the clavicle? A. Yes, the subclavian artery, and if that had been severed it would have been a mortal wound.
Q. It could not have been tied? A. It" could have been tied.
Q. But not in time? A. No.
Q. You did not dissect that wound? A. No.
Q. And you do not know how near that artery the knife went? A. No.
Q. Now, sir, in view of these circumstances—this wound in the carotid artery, in the heart, and this particular wound in the right shoulder, I ask you what your- opinion is, as to whether the person who struck those blows, was acquainted with the anatomy of the human body? A. It would be impossible to say whether he was acquainted with the anatomy of the human body, but they certainly were very accurate wounds; but this might have been done by accident. ■
, Q. I ask you for your opinion? A. My opinion is that it might have been done by accident.
The Court: But the wounds were calculated to produce mortal results? A. Yes, they were very accurate wounds, but, at the same time, they may have been mere matter of accident
Mr. Dean: Did not you and Dr. Wood say, in that room, that those wounds were singularly accurate? A. I might possibly have made such a remark.
The Court: He thinks that they are singularly accurate, but, at the same time they might have been matter of accident.
Q. In your judgment, as a medical man, taking a hundred *496 deaths caused by violence by some sharp instrument, would wounds be as accurate as in this case by a person not acquainted with the anatomy of the human body? A. I have not the statistics.
Q. I want to know your opinion? A. It may occur once and may occur again.
Q. I ask you your' opinion—whether you agree with Dr. Francis and Dr. Wood. A. I should say that taking all the points together they would be rather more accurate than in a large number of deaths caused in that way.
Q. What amount of force would be sufficient to inflict such wounds? A. A person of lesser strength might inflict them. I cannot say exactly how; it is impossible to say which way they were inflicted; his body and arms bore marks of resistance.
Q. Do you mean to say, as a medical man, that a person of lesser strength than he could have inflicted those wounds, and have received no marks of violence? A. I think not, unless he was surprised—taken unawares.
Q. By taken unawares, I suppose you mean that the person had struck him, and had got the advantage, so that he could not resist? A. Yes, sir; or, having inflicted those wounds, which rendered him incapable of resistance at once.
Q. A person coming from behind and holding him fast might have done it you think? A. I cannot answer that question exactly.
Q. In your judgment, looking at that room, where was the first blow struck? A. In my opinion—and this is mere matter of opinion—I think the first blow received was upon the right shoulder. ■
Q. Where was he? A. Probably sitting down.
Q. By Ms desk near the sofá, on the east side of the room? A. Yes.
Q. Was that blow, if struck by a person from behind, a right or left-handed blow? A. It might be either.
*497 Q. Depending upon the place where the person striking the blow stood? A. Tes; I do not know the exact direction of the blow, except that it was downward, and penetrated the cavity of the pleura.
Q. Would the blow not naturally be in the left shoulder if struck by a left-handed person coming up from behind? A. Not naturally; it might be in the right.
Q. Why? A. I cannot say; it might be in either shoulder-there would be choice. I say that a man coming behind another in that position might be guided by circumstances —but whatever they might be I do not know—and strike on one shoulder or the other. If you say “ naturally,” I would say that you would strike the right shoulder with the right hand, and the left with the left. From the wound itself nothing can be determined whether the blows were given with the right or the left hand; my opinion is that the wound in the neck was given from behind.
Q. Do you agree or disagree with Dr. Wood upon that subject? A. I agree with him.
Q. Did he not testify that it was the other way? A. He was under the impression it was given from the back.
Q. On what facts do you base that opinion. A. I think the party was endeavoring to escape from the door.
Q. You mean Dr. Bur dell? A. Yes.
Q. And you .think the party was endeavoring to stop him? A. Yes, was in pursuit, and came up behind and inflicted this wound.
The Court: That wound, I understand you, would be mortal? A. Yes. I should judge that he was sitting between the two windows, by his small instrument case, when the party came up and inflicted the wound upon the shoulder; there was blood on the chair by the instrument case—the case between the two windows looking back; I cannot say distinctly whether there was blood on the chair by the east side.
Q. Suppose he was sitting there, and the blow was *498 struck, would not the blood be traced all the way to the door? A. He might be and might not; blood may or may not escape.
Q. I understand you to say that one wound was made by a left-handed person—which was that? A. I think not; I do not recollect saying so.
The Judge: No, he said no such thing.
Q. Well, then, I will ask him now, could all the blows found on the body be inflicted by a right-handed person? A. I think that the wound on the carotid artery must have been given by a left-handed person.
Q. Why do you think so? I should say, in my opinion, there is a probability of its being a left-handed blow, if not given from behind.
Q. Would it not depend upon the position of the parties? A. Yes, the position of the parties indicated that the blow was from the left.
Q. Well, but would the fact whether it was from the left or the right, not depend as much on the position of the parties, as whether I should strike you on the right or left shoulder? A. Of course, if the position was known.
Q. Then you mean to say that unless you knew the position of the parties you cannot determine whether it was a right or left-handed person? A. I mean to say, in this case, that no person could state with certainty whether it was inflicted by a right or left-handed person, but in my medical opinion—
Counsel: We don’t ask you that.
Witness: But you did.
Counsel: I ask you whether, not knowing the position of the parties, you could determine whether the blows were right-handed or left-handed? A. In answer to that I say that I think in my medical opinion—
Q. I don’t ask you what you think. I ask you whether, from your knowledge of the position of the parties, you know whether that blow was right-handed or left-handed?
*499 A. I can tell from the measure, by the indications on the wall, and— '
Q. I don’t ask you that. I ask you whether, without knowing the position of the parties, and from the wound itself, you can determine whether the blow was right-handed or left-handed? A. No, sir.
Q. When did you first hear about this left-handed theory? A. I don’t recollect.
Q. It wasn’t on the inquest, was it? A. The opinion was advanced by a great many.
Q. You and Dr. Wood were both examined? A. Yes, sir.
Q. Did you and he say anything about a right or left-handed person? A. Not as I am aware of; I will not speak certainly, but I think not.
Q. In whatever you did, on that inquest, theVe, you acted under the directions of the coroner? A. Yes, sir.
Q. In your examination of this body, and in your treatment of Mrs. Bur dell’s family? A. Yes. sir.
Q. Both herself and her daughters? A. Yes, sir.
■ Q. Any examinations that were made were made by his directions? A. Yes sir.
Q. Do you know whether the clothes were on when you made this examination? A. Yes, sir.
Court: He has stated that already.
Witness: We removed the coat, I think, on the examination of the body.
Q. \By the-Court:] What clothes had Dr. Burdell on? A. He had a black cloth dress-coat, black cloth vest, linen shirt; I am not positive whether the under-shirt was woolen.
Q. Flannel or knit? A. I think it was knit.
Q. What were his lower garments? A. They were black cloth pants.
Q. Wooleil? A. Yes.
Q. What under them? A. Drawers, I suppose; we did not remove his pantaloons.
*500 Q. Do you know whether he had drawers on under his pantaloons or not? A. I am not certain; we only removed his pantaloons for the purpose of ascertaining the nature of the wounds in the abdomen.
Counsel, resuming: This wound in the abdomen was also mortal, was it not? A. It would prove mortal, in all probability.
Q. Did the wound that you speak of, that reached the heart, go through the lapel of the coat, and the ordinary thickness of the coat, and all this lining, through the lapel of the vest, then through this cotton or linen shirt, then through the flannel shirt, and then through the cartilage between the fourth and fifth ribs, and then into the heart? A. Yes, sir, through the lapel of the coat, the lapel of the vest, the shirt and under-shirt, and through the body.
Q. Would it require considerable force to make the-wound? A. I cannot say what amount.
Q. Was that wound inflicted from before or behind? A. From the front.
Q. Was that wound inflicted with the right hand or with the left, supposing the party standing in front? A. I could not say.
Q. If they stood face to face, would not the natural * direction of the blow of a right-handed person be to reach the left side of the other party? . A. I could not say whether it was the right or left hand.
Q. I don’t ask which it was. I only ask which would be the natural direction of the blow of a right-handed person? A. It might be done naturally by either the right or left hand. If a person was left-handed, he could strike naturally in the same direction in front as a right-handed person.
Q. There would be nothing in the wound then to show which? A. No.
Q. You would then suppose the party struck to stand still and not resist? A. Well, in my opinion, the wound *501 in the heart was inflicted whilst the body was either on the floor or sinking; it would be one of the last wounds given.
Q. The wound was upward? A. If a person was standing over him, in that way, the wound would naturally be downwards and upwards.
Q. If the party was on his face you could not make that wound? A. No, sir.
Q. You were not there to see how it was struck? A. No, I have said I was not.
Court: That is his speculation, of course. •
Counsel: I did not ask him his opinions as to that.
Re-examined by District Attorney: Q. Where is Dr. Wood now? A. He is in Nashville, Tennessee.
Q. He is not in this city? A. No, sir.
Q. You are his partner? A. Yes, sir.
Q. How old a man is he—he is an old practitioner, isn’t he? A. Yes, sir; he has practiced a long time; some twenty odd years.
Court: I suppose his position and standing as a surgeon is not contested?
Mr. Dean: Not at all.
Q. As to this deposition which was so much examined about. Were you present when Dr. Van Burén and Dr. Childs, as well as Dr. Uhl, were examined in regard to it?
Mr. Dean: What deposition?
Court: The results of this post mortem examination.
A. Yes, sir.
Q. You have been asked who Dr. Gillman and Dr. Carnochan were. Do you know Dr. Childs? A. Yes, sir.
Q. Did he concur in this deposition?
Counsel for defense objected.
The district-attorney said he merely wished to show in reference to the attempt at a sneer that was got up in this case, to show—.
Court: I don’t think that is necessary, unless we are called upon to rebut sneers by evidence.
*502 Mr. Dean: Dr. Van Burén is a competent witness, and we want to have him on the stand. He is the man who first put a stop to this mode of conducting a post mortem.
Dr. Thompson was recalled by counsel for defense, and asked if he had seen Mrs. Cunningham eat, carve, and write? He said he had, and she carved very much about as other people did; he never noticed any difference; she appeared to be right-handed; she certainly wrote with her right hand; he had dined with her several times and had seen her write, so that he had opportunities of judging. To the district attorney he said his attention had never been particularly called to that; and to a juror he stated that his residence was No. 199 West Twenty-seventh street.
John Connery testified that he was present at the search of Mrs. Cunningham’s apartments, and saw her bureau examined. He thought Mrs. Cunningham said jbo the officers and himself, that they would find nothing in the bureau. They did find some weapons—a dagger, a lancet, and a small five-barreled revolver, four of the barrels loaded. The pistol was found in the third drawer, the dagger in the second drawer of the bureau; the safe key was found in a bag in the attic, along with some letters addressed to Mrs. Cunningham. [The weapons, named were produced and identified.]
Cross-examined by Mr. Clinton: Q. Who was present besides yourself during this search? A. Officers Davis and Moore.
Q. Were you the coroner’s deputy? A. I was employed as such, and considered myself acting as such.
Counsel repeated his question, but the district attorney interfered on the ground that it had already been sufficiently answered, and so the court ruled.
Q. Did you act, during that inquest, otherwise than as the deputy of the coroner, and by his order? A. Certainly not.
Q. You were in the room of Mrs. Burdell quite fre *503 quently, during the holding of that inquest, were you not? A. Yes, I was, quite often.
Q. You took the chief management in directing affairs in her family? A. I did not, sir.
Q. Did you order her to deliver up to you her daguerreotype, and those of her children? A. I did not, sir.'
Q. Did you request her? A. No, sir.
Q-o Do you swear that you did not tell her and her daughters to get their daguerreotypes for you? A. I did not, sir, undoubtedly.
The Court asked what was the materiality of this. This witness had been called only to identify the weapons produced.
Mr. Clinton: This witness is called to prove a declaration of the prisoner.
Court: I see. Go on,, sir.
Q. Did you get their daguerreotypes?
Witness: What daguerreotypes?
Counsel: The daguerreotypes of the prisoner and her ' daughters? A. I did not, sir.
Q. Or either of them? A. Nor either of them.
Q. Did you ask for either of them? A. No, sir; I did not ask for either of them.
Q. Were their daguerreotypes demanded in your presence, by yourself or any one else acting under you or the coroner? A. No, sir.
Q. And you swear that you never said one word to her or her daughters on the subject of giving you or giving other persons, in your presence, their daguerreotypes? A. I do, sir.
Q. Did you have anything to do with selling their daguerreotypes? A. No, sir.
Q. Do you know who did? A. No, sir.
Q. Were you present when Mrs. Burdell was stripped naked?
The Court [emphatically]: I won’t permit this.
*504 District Attorney: I don’t object to it, because I have an object in permitting it to go on. It is for the court, however, to act on its own discretion.
Mr. Clinton believed there was one point of view in which his honor would certainly permit it.
The Court could see nothing yet developed in the case which showed the propriety of any such question.
Mr. Clinton: There will be, after the opening of the defense.
Court: Then you had better suspend until you have opened your defense.
Cross-examined:. Q. Have you been very active in this matter, sir?
Witness: In what matter, sir?
Counsel: In this Burdell case, since the inquest? A. No, sir; not since the inquest, I have not.
Q. Do you know anything about counsel being denied access to her during the first week of that inquest?
Court: That question comes under the same category as the last.
Mri Clinton denied that it did, and went on to argue the point.
The Court ruled that the defense had a right to show anything that he did towards restraining her on the Saturday before her refusal to go down before the coroner, but not afterwards. [Exception taken.]
Mr. Clinton then, with a view, he said, to show the feeling of this witness, asked: Did you keep this lady in custody at that place (No.-31 Bond street), until she was taken to the City Prison?
The Court again ruled out the question.
Q. Did you say you have taken no part in this case since the inquest was concluded? Have you taken any part in the matter? A. No, sir,' I have not taken any part in it further than to hear parties talk' of it once in a while.
Q. Did you go to the Tombs to talk the case up with *505 Mary Donahoe? A. I was at the Tombs, but I had no consultation with her.
Q. Did you talk to her about this case? A. I did not talk to her about the case.
Q. Did she talk to you about the case? A. No, sir; she spoke—
Q. Did you see her at all? A. I did.
Q. Did you talk with her? A. I did.
Q. Where did you see her? A. I saw her in the Tombs.
Q. In what room or cell? A. I did not see her in the cell.
Q. Where did you see her—in the office? A. I saw her in a front room.
Q. In the counsel room? A. I don’t know what the counsel room is.
Q. Did you see her inside the prison? A. I saw her in a room that is inside the counter, opposite the office you speak of.
Q. Well sir, that is not inside the prison, by any means. Do you know where the prison is, there? A. I do.
Q. Do you know where the prison is? A. I do, sir.
Q. When did-you see her, in the prison or out of it? A. I did not see her in the prison.
Q. Then why did you not answer me that before? A. You asked me about the room before; not about the prison.
Q. Was there any one else present at that time? A. There was.
Q. Who? A. Mr. Waring.,
Q. Nathaniel F. Waring? A. Yes.
By the Gourt: Of Brooklyn? A. Yes.
By the District Attorney: Who is counsel for your father in the investigation before Judge Daly? A. Yes.
Q. Do you swear that you did not say one word to her, or she to you, on the subject of this case? A. I swear I never spoke a word to her about it.
*506 Q. Did she speak to you on the subject of this case? A. She told me—
Q. Did she speak to you on the subject of this case? .
The Court: Let him answer.
Witness: She told me that Hannah had something to say that she did not say before the coroner; that is the only conversation she had with me, or I with her.
Q. Did you not see Hannah, also? A. I did not.
Q. Have you, then, seen Mary Donahoe more than once? A. Ho, sir.
Q. Is that all you have done in this case? A. I may have spoken of it to some friends; that is all I have done, to my knowledge.
Q. Have you not attended at the Surrogate’s court every time the case was up there? A. Hot every time.
Q. Have you not generally attended? A. Ho, sir; since I was subpoenaed there I have.
Q. Have you ever been subpoenaed there? A. I have, sir.
Q. Have you ever given any testimony there? A. Hever, sir.
Q. Have you been subpoenaed for more than one day? A. I got a subpoena, and was told not to attend until I was called upon.
Q. Did you ever have a subpoena for more than one day? A. Ho, sir.
Q. How many times have you attended there? A. Three times.
Q. Did you generally manage to sit close by the counsel for Mrs. Burdell, so that you could manage to hear what they said among themselves? A. Ho, sir, not particularly.
Q. That accidentally occurred? A. Yes,, if ever it occurred.
Q. Had you the direction of the police officers in regard to the custody of Mrs. Burdell, at Ho. 31 Bond street? A. I had not; they were under the direction of the coroner.
*507 Q. Did the coroner give you directions to give them? A. Sometimes he did. i
Q. Were not «the directions generally given through you? A. No, sir.
Q. They were not? A. No, sir.
, Counsel announced that at a subsequent stage of the case he would, within the intimation of the court, claim the right to cross-examine this witness further.
The Court: I understand that.
Re-examined by the District Attorney: Q. Did you not go to the prisoner with Counselor Waring, of Brooklyn, to see Mary Donahoe, and have a conversation with her in relation most particularly to the investigation before Judge Daly, as to your father’s case? A. I did, sir; Mr. Waring asked me.
District Attorney: That is all I want—the object of your going there.
Re-cross-examined; Is Mr. Sheehan a brother-in-law of. yours? A. He is.
Q. Do you know whether he thrust himself upon Mrs. Cunningham, as her counsel, at the beginning of the inquest?
The Court refused to admit the question.
■Mr. Clinton said it was admissible in answer to certain statements made by the district attorney in his opening.
The District Attorney disclaimed having ever made such an ungallant speech as that charged upon him in his life.
Mr. Clinton renewed his question.
Q. Have you not a brother-in-law who assumed to act as counsel for Mrs. Cunningham during any portion of that inquest?
The Court: I exclude that for the present.
Q. At this interview at the time with Mary Donahoe, was Mr. Sheehan present? A. He was.
Q. As counsel also for the coroner? A. As counsel for the coroner.
*508 Dr. David Uhl was next examined. He stated that he was a teacher of jurisprudence in the New York Medical .College. He assisted in the post mortem examination before the coroner.
Gross-examined by Mr. Dean: Did you hear Dr. Francis testify? A. I did not.
Q. Did you come to Bond street on the morning of the 31st January? A. I did, to visit a patient at No. 55; I went to No. 31 Bond street, having been told what had occurred; I saw blood marks on the walls; it seemed to me,, at the time, that it was ablood mark made by a finger; I noticed several marks of blood upon the stairway; they appeared as if they had been made by a person placing a hand against the wall, in passing down stairs; they were quite distinct, and appeared to be blood; I went into the room where Dr. Burdell’s body was lying; I stepped into a pool of blood; the body was lying on the floor, perfectly naked; the coroner told me to walk in; I asked if Dr. Finnell had made the post mortem examination; I was told he had not; I found Drs. Francis and Knight in the front room, engaged in writing at a table; Df. Knight is a son-in-law of coroner Connery; there was no post mortem examination of the body made in my presence; there was never such an examination made, to my knowledge; the examination.which I made with other doctors, took place on the Monday following; I do not know whether the wounds in the body were made before death or after-wards, only from appearances; I consider it highly essential to have post mortem examinations in cases of death from violence; I have attended over fifteen.hundred examinations of persons who have died violent deaths, but post morteros were not made in all these cases; I had no charge of the examination of Dr. Burdell’s body; I only assisted at it; the direction of the majority of the wounds could not be ascertained, as the body had been opened, and the viscera taken away; without a thorough dissection of the *509 parts wounded, a perfect anatomical description of the wounds could not be made; I know no reason why it was not made in this instance.
Cross-examination resumed: The fact that the wounds were inflicted by an instrument sharp on both sides, might be determined without anatomical examination. The wounds could not have been inflicted by the lancet and dagger found in Mrs. Cunningham’s bureau. A chemical analysis was made of the spots found on the ladies’ dresses; no venous or arterial blood was found on any of those dresses; Dr. Gouley, Professor Child, Dr. Van Burén and Professor Dorémus conducted the, examination.
Edward E. Connery was next called and testified that he was the coroner who held the inquest over the body of Dr. Burdell. He also identified and proved the deposition of Mrs. Cunningham taken on that occasion.
The subjoined extract is the concluding part of it, the words in parenthesis being erased: “I was married to Mr. Burdell by a minister in a private house. (I don’t remember the name of the clergyman or the house)—here Mrs. Burdell produced a certificate of marriage, which was solemnized by the Bev. Uriah Marvin, of the (Presbyterian) Reformed Dutch Church, in Bleecker street, on the 28th day of October, 1856. The certificate was given on the 29th day of October, 1856. This marriage took place subsequent to the period When Mrs. Burdell said a portion of the property belonged to her and another portion to Mr. Burdell.
“E. A. BURDELL
“Taken Jan. 31, 1857, Edw. D. Connery, coroner.”
Q. Look at that, and see whether that at the end is the evidence of your certificate of what took place? A. That is my official matter and not her testimony.
Q. Please explain why that erasure is there in that line? A. It was on a further inquiry that I changed “Presbyterian” into “Reformed Dutch.”
*510 Q. But there is a whole line there—the long line that is erased?
Witness: The words “I cannot remember the name of the clergyman or the house” are erased.
Q. Was that done by you? A. It was done by me, I think, to the best of my memory, no,w, because she further remembered the clergyman’s name.
Cross-examined by Mr. Dean: The witness testified that he was a doctor of medicine in practice, and that he was fifty-two years of age; that he arrived at the house 31 Bond street, on Saturday the 31st January, between nine and ten o’clock in the forenoon and found there one or two policemen, Dr. Francis and somebody else; he could not recollect who; that he proceeded at once to summon a jury and hold the inquest; that it might have been twelve o’clock when he got the jury there; that he ordered a post mortem examination to be conducted by Dr. McKnight, a physician in the city of New York, and, that Dr. McKnight was assisted by Dr. Woodward, Dr. Francis and others; that he caused the house to be searched; that, on the afternoon of that day, he directed the officers to keep Mrs. Cunningham in custody; that, by the advice of the jury, he sent for her to testify as a witness; that he was informed she would not come down without first consulting counsel.
Q. Did you give directions that she should come down, or to bring her down? A. I gave directions that she should come down with the officer.
Q. Did you mean that she should be brought down if she resisted? A. Not to my knowledge.
Q. How? A. I did not, sir.
Q. Didn’t you know that every person accused of crime could not be-compelled to answer? A. I did not.
Cross-examination resumed: Q. About what time of The day was it that Mrs. Burdell came down stairs? A. I think it was in the afternoon—sometime in the afternoon.
*511 Q. In the afternoon or evening? A. I cannot exactly say the hour; probably it was between three and four o’clock; I cannot fasten my mind upon it; I cannot remember. it now.
Q.- Wasn’t it after the gas was lit? A. I don’t remember the exact time; I think it was in the evening sometime,
Q. You speak here of a marriage certificate. I see you have down here (in the deposition): “I was married to Dr. Bur dell by a minister in a private house; I don't remember the name of the clergyman or the house” That line (in italics) is erased. Did she say that or did she not? A. I think she said that, and subsequently altered it, on referring to the certificate.
Q. Did she not say that she forgot it (the certificate), but she could get it in a moment, and would go and get it, and you refused to let her? A. Ho, sir; the certificate was produced.
Q. Did you not refuse to let her go for it? A. Ho, sir.
Q. When did she get it? A. I don’t know.
Q. Did sh,e not go up stairs and get it before the deposition was finished? A. I think she sent, to the best of my recollection.
Counsel read the last sentence of the deposition beginning “ this marriage took place subsequent to the period, &c.,” as above, and asked, whose was that? •
Witness: I understood that from the witness.
Q. Look at that and see whether that is the certificate she produced? [Marriage certificate produced.] A. This is similar; I cannot positively swear that it is the exact one.
Q. Did you mark it, or do anything to know it again? A. Ho, sir; I made no mark.
[The certificate was handed to the jurors for inspection.]
Attorney General Gushing: Is this to be taken as a part of the evidence?
*512 The Court: The certificate is to be taken as part of her statement only.
Q. Did you, before the deposition was taken, tell her that you wanted her to give you her confidence, and that you would protect her? A. No, sir; I said nothing of the kind.
Q. Did you tell her that you would do everything for her interest? A. I said that I would do everything to make her comfortable in the house, and not for her interest, which I did.
Q. Did she not tell you, during this deposition, under oath, when she referred to this certificate, and produced it, that Dr. Burdell got the certificate, the next daj after the marriage, from Dr. Marvin? A. She may have said so, but I do not remember it.
Q. What do you mean by saying that the certificate was given on the 29th day of October, 1856? A. I suppose she gave it in testimony.
The Court: What is the date of the certificate?
Mr. Dean: It is' the 29th, and they were married on the 28th.
Q. She gave as part of her testimony upon that occasion that she was married to Dr. Burdell on the>-z28th? A. It was a volunteer thing on her part.
Q. Was it not a part of her statement? A. Not by my request.
Q. Was it part of her statement under oath? A. Yes, sir.
Q. Did she tell you, and was it a part of her statement, that that marriage was to be kept a secret until June or spring? A. I do not remember any such thing.
Q. Was there any statement of that kind made? A. I do not remember it.
Q. Are you accustomed to taking testimony in courts of justice? A. Yes, sir.
Q. In. what courts? A. I have taken testimony when I *513 was connected with the press; in Ireland', I took testimony frequently in court.
Q. As a member of the court or reporter? A. As a reporter.
Q. Did you take it in short hand? A. No, sir.
Q. Were these taken stenograph]*eally [referring to the depositions taken at the inquest]? A. I waited for each answer to the questions, and took them down.
Q. Were the questions put down in writing? A. Generally speaking they were not, but a few questions were put down.
Q. Subsequently the questions and answers of other witnesses were put down? A. I only took the answers at any time, to the best of my memory.
Q. Did you file them all? A. Yes, sir, and marked them every day.
Q. I see this one is marked the first day and second day also? A. I think it must be the first day.
Q. Look at it hnd see how it is marked—the deposition is marked on the back? A. [Witness examining it.] I should imagine that it is a mistake, and that the handwriting is that of my clerk.
Q. Do you not know your own handwriting? A. Yes, sir.
Q. Is not that your handwriting? A. Let me look at it again more carefully. [After examining it.] I think it is my handwriting.
Q. Both the indorsement first and second days? A. The “ second day ” is in my handwriting.
Q. The “first day” how was it? A. I presume I gave orders to have each day’s proceedings marked.
Q. Can you give any reason for writing that “ second day” when it was not? A. I cannot; Mrs. Burdell was examined the first day.
Q. You cannot give any reason for writing “second day ” on the back? A. No, sir.
*514 Q. Did you not ask- this question of Mrs. Burdell upon the examination after you had asked her name, and when she told you that her name was Emma Augusta Burdell, “ By what authority do you call yourself Mrs. Burdell?” A. I do not remember that I ever did.
Q. Did you say “You do it upon the promise to marry?” A. I never did.
Q. Did she say in answer to the question put “No; I was lawfully married, and will get a certificate if you will let me?” A. I do not remember that she said that she would get a certificate if I would let her.
The Court: Do you remember any words of that kind? A. I do not remember any particular words she said, except that she would get a certificate, and did get it.
Q. Did you refuse to let her go up and get it? A. I did not.
Q. Did you send up an officer with her? A. There were officers attached to every room to prevent persons from going up stairs, and to prevent the interference of witnesses-.
Q. Were there male officers in every room with the females? A. No, sir; they were at the outside of the door.
Q. You made a thorough examination of the house, did you not? A. I gave orders that a thorough examination should be made.
Q. What instruments did you find in the house capable of being used in the murder of Dr.—
The Court: We went over that ground last evening, and the remark then made by the court in reference to this matter, must be satisfactory to the defense.
Q. Did you also have an examination made of the person of Mrs. Cunningham? A. I had orders from the jury to examine the heads, necks, shoulders and arms of Messrs. Snodgrass, Eckel and Mrs. Cunningham.
Q. It was made by the direction of the jury? A. They instructed me to do so.
*515 Q. You made the order? A. I did.
Q. Did you make the order to have her daughter Helen examined? A. Ho, sir.
The Court objected to the question as being irrelevant.
Mr. Dean: I want to state, if your Honor please, and show.not only that the house had been searched, but that no person had been found there capable of committing this homicide. I want to show now, and I will prove by medical evidence to be introduced by the defense, that it was impossible with the amount of resistance that is shown to have been made by Dr. Burdell, that the person who committed that deed should hot have borne some marks of violence upon the next day. I want to show that every person in the house was examined.
The Oourt: I cannot permit anything except in reference to the defendant here. There is no accusation against the daughters of Mrs. Cunningham, and I will not permit any to be assumed for the purpose of being rebutted by the the defense.
Q. What did you'do with this certificate? A. After the inquisition I had the papers tied up every day and left them in the usual office for the use of the district attorney and the grand jury.
Q. Is that the only post mortem examination you have made [handing up a paper to the coroner] ? A. There were several post mortem examinations after the post mortem examination made by Dr. Knight, in the presence of Dr Woodward and several other doctors, whose names I do now recollect; subsequently by order of the jury, when the instruments were produced in the court, the doctors were again ordered to try the exact size of the wounds, and to impress those instruments in the wounds, so as to be able to give a clear and decided answer whether such instruments would make such wounds.
Q. Then you mean to say that there was another post *516 mortem examination? A. I call any other examination of the body a post mortem examination.
Q. Was there any other examination besides .this [referring to the paper produced]? A. This is the only one I ordered.
Q. In the first plaee, this paper is dated Feb. 3, 1857. One sheet of it is marked Wednesday Feb. 11, 1857, and not signed by anybody. I wish you to look at it, and see whose handwriting it is on the back, “ Feb. 11, 1857.” A. This is the handwriting of the clerk.
Q. Your son? A. Yes, sir.
Q. You do not know when your clerk marked it so? A. I presume he marked the papers every night; I' gave him orders to mark them every day.'
Q. Do you know when Dr. Burdell was buried?
The Court: The witness need not answer the question. It is of no importance.
Q. Did Mrs. Burdell desire repeatedly to see the body of Dr. Burdell? A. Not to my knowledge.
Q. Did she not ask you to let her see it? A. I believe she asked my clerk; I do not remember as she asked me to see it.
The Court: You did not hear her say it? Á. Not to my knowledge.
Q. I want to ask you in which room she was when she gave her testimony Saturday evening? A. To the best of 'my recollection, I think her testimony was given in the back room of the second floor; the body was in the front room.
Q. Did she, in the presence of the jury, ask of you the privilege to go in and see the dead body, then, and did you refuse it? A. Her then counsel spoke of her wish to go into the room and see the body, and he .said it would be improper for her to do so.
Q. Who was her counsel? A. Mr. Sheehan.
Q. Is he your son-in-law? A. Yes, sir; but he was there without my knowledge. I did not bring him there.
*517 Q. Did you refuse her the privilege of seeing the dead body? A. I did not refuse anything of the kind.
Q. Was she permitted to see it before the day of the funeral? A. She was.
Q. Did you send for an artist during the inquest to take a sketch of Mrs. Cunningham and her daughters? A. I do not wish to answer that question.
The Court: The witness need not answer it.
Andrew L. Byrnes was then called, and in answer to the district attorney, stated that he resided in 35 Bleecker street, which is about directly in the rear of Dr. Burdell’s house, and that from the room which he occupies in that house in Bleecker street, he could see the third story and attic of Dr. Burdell’s house, but not the windows of the second story; he had. been examined before the coroner, and was then asked whether he had, on the night of the murder of Bur dell, seen the second story windows in the rear of that house, to which he replied he had, but he had made a mistake as to the windows referred to, inasmuch as he meant the windows on the third floor; there was a board fence and a stable between the rears of the two houses, so that he could only see the upper story of the house No. 31 Bond street; on that Friday night he saw, at half-past two o’clock,, a light in the upper story in the rear part of the house; he did not notice it particularly; it was the very fact of seeing it in the rear part of the house at that time that had caused him to look at it; he was certain he saw it in Dr. Burdell's house, and that it was in one of the two sets of windows—the third story or dormer, but he believed it to.be in the third story window.'
To the court the witness answered that he fixed the hour by the facts that he had been in Brooklyn at a party from ten till half-past one, that he had got up to his house at two, and that he sat in the hall for a while before he went to bed.
Cross-examined by Mr. Clinton: My house is next to Dr. *518 Scott’s; it is three stories high; the room I occupied is on the second floor, and in the rear.
Frederick Fredericks testified that he resided at No. 33 Bleecker street, which is one door nearer the Bowery than the house of the gentleman who had just testified; his bedroom, on the night of the murder, was on the third floor, counting the parlor floor as the first; from his room he could see easily the rear of the houses Nos. 31 and 29 Bond, street, because of the sharp turn Bleecker street takes at Crosby street; on that Friday afternoon' he had been out at Yonkers, where he went every Friday afternoon for six months, to teach dancing in the boarding schools; his usual time of leaving there' was half-past six, and of arriving here was half-past seven; but on that afternoon, in consequence of the bad road, he did not get home till nearly nine; after taking his dinner, he sat down to read, and did hot go to bed' till half-past eleven; he saw his time by his parlor clock, which was a moment or a minute before the half hour when he left to go to bed; after getting up to his room he sat down on a chair to take off his clothes, and caught a glance of a light in the window of,the second story of one of those two houses, Nos. 29 or 31 Bond street; his eye was caught by a reflected light, or a light of some kind that was moving, the same as if a rocking chair or a polished chair had received the light of gas, or something of that kind, and he saw this going as if it were rocking; he was positive this light came from the second story.
Oross-exaniined by Mr. Olinton: The night was so obscure I could not see whether the shades of the windows in that house were down; I thought it was snowing or raining very hard then, and believed that would make the light more apparent; the next day was so very stormy I did not go out.
Mrs. 8chwartzwaelder testified that she resided with her husband, Col. Schwarfzwaelder, in No. 29 Bond street, the *519 second story back room of which is their sleeping room, and adjoins Dr. Burdell’s office, on the same floor uf the next.house; on the night of the murder she went up to her bedroom at five minutes past eleven, which she knew by looking at her watch, and went to bed about half-past eleven; the lower shutters of the windows in that room were of solid wood, and usually closed at night; they were closed on the night in question; before going to bed she turned down the gas so as to leave very little light in the room—the gas not being more than about a quarter of an inch high, just so that it would burn; up to the time she turned the light down the shutters were closed.
Cross-examined by Mr. Clinton: The hall of Dr. Burdell’s house separated his room and witness’ bedroom on the same floor; witness after going up there remained alone until about twelve o’clock, when her husband came up; he did not remain up any time, but went right to bed; she was awake when he came up; during that evening she did not hear any unusual noise from the room of Dr. Burdell; she remembered the Saturday evening prior to the sale of Dr. Burdell’s furniture; whilst in the basement of her house she heard very loud noises that evening, and heard them afterwards, very distinctly, when she went up stairs to her room; the noises were apparently as if some person was crying “murder.” [Counsel for defense stated that these noises were the results of certain experiments that had been instituted at the time and place referred to, and informed the court that witness’. attention had not been called to them in advance.] Four gentlemen, witness said, came into her house; Mr. Stafford was one of them; another was Mr. Uhl, whom she now recognized by his countenance [he being in court]; the other gentleman she did not know; they asked permission to go up to the second floor; the noise was heard in the early part of the evening in the basement, and afterwards, when the gentlemen had come in and gone up stairs, it was heard in the room in which *520 she slept; she thought she could hear the noise of a person falling, though she did not, at that time, take particular notice; the cry was very distinct; during all the early part of the evening of the 30th of January witness had been in the front basement of her house, and heard no noise, nor did she hear any noise at all that night; the first she knew of the homicide was next day; she did not smell anything particular that night.
Gol. Christian Schwartzwaelder, the husband of the last witness, returned to his house that night [the 30th of January] about twelve o’clock, and went up stairs to bed; the light of his sleeping apartment was very dim, and there was hardly any light in the room.
Gross-examined: The night was dark and foggy, but witness did not think it stormed at the time he went into his house; he did not smell anything unusual in the atmosphere, either in the house or out of it, and heard no noise after he had got to his room, to which he retired immediately after getting home; the gas was lighted in the hall on the second floor, but he could not say whether the shutters were closed or opened.
The Court suggested that to ascertain that fact the counsel had better ask the lady.
The last witness [Mrs. S.] was accordingly inquired of as to whether the shutters were closed in the hall the whole way up the window on that night, and she replied in the affirmative.
Counsel elicited further from the witness on the stand that he could not tell whether he turned out the gas in his room this night or not, but that he turned out the gas in the hall; he probably turned up the other light enough to see to undress and prepare for bed; he generally turned off the gas finally before he went to bed.
Oapt. DiTks was recalled and examined as to certain experiments- he had been requested to make, and which he did make last week, in reference to the extent to which *521 the rear of the house, in Bond street, could be seen from the rear window of Mr. Fredericks’ house, in Bleecker street. He said he could distinctly see the rear of the houses Nos. 29 and 31, from it; those houses were very similar in appearance, save that they were painted of different colors; the only object he had in going there was to locate the houses that were in sight.
Mrs. Foster was next examined by the district attorney. She said she was one of the matrons of the City Prison, and had been since its first organization; Mrs. C. had been under her charge by day, and she had had occasion to notice how Mi*s. C. used her hands; she observed her sewing with her left hand, and when, upon one occasion, she spoke to her about it, Mrs. C., in reply, said that she had been troubled with the rheumatism for-several months, and she was obliged occasionally to use her left hand on that account.
Cross-examined by Mr. Clinton: Q. Have Mary Dona-hoe and Hannah Conlan been under your charge? A. Yes, sir.
Q. Have you been to them to ask them questions as .to what they would testify? A. At one time they made some remarks to me about some words spoken in the house the evening previous to the murder; I told them not to say anything to me about it, as I did not wish to hear anything of the Idnd.
Mrs. Lavinia Phelps was then examined by the district attorney, and testified that she was the night matron of the City Prison, and, as such, Mrs. C. had been under her charge. Witness had noticed that Mrs. C. used her left hand aptly while sewing and cutting, and when she used the scissors, needle and thimble.
Cross-examined by Mr. Clinton: Q. Did not Mrs. C. complain of being ill a part of the time? A. Upon two or three nights she did.
Q. Did she complain of rheumatism? A. Not particu *522 larly of rheumatism then; she said that she had had rheumatism.
Q. Did she complain of her right hand? A. She said that some time ago she - had had rheumatism in her right hand.
Q. Did she give that as a reason why she used her left hand? A. She said that she had had rheumatism some time ago and had disabled her hand.
Q. Did she give that as a reason? A. She said that she had had the rheumatism, which caused her to use her left hand.
Q. Did she not admit that she was left-handed? A. I do not recollect that she did.
John W. Blivens was then called by the prosecuting attorney, and testified that he was attached to the Fifteenth district police station, and was ordered, on Saturday morning, to the house No. 31 Bond street; he reached there about half-past nine o’clock, and he went into the room, where the doctor was killed, and while there he touched the body. On returning to the station-house he found his left hand was bloody, and he washed it. He remained in the house perhaps ten minutes, but not longer, and he then went back to the station-house to make his report; went out of the front door.
Cross-examined hy Mr. Clinton: Q. What part of your hand was bloody? A. The whole face of it and the fingers that I used to turn the body over.
Q. Did you not rub the bannisters on your way down stairs? A. No, sir.
Q. Or the wall? A. My impression is that I did not.
Q. Who' were in the room when you got there? A. There were three gentlemen.
Q.. Are you left or right-handed? A. Left-handed.
Q. In going out of the front door, did you take hold of the knob of the door? Á. Yes, sir; I took hold of the knob to open the door.
*523 Q. Did you take hold of it with your right or left hand? A. With the right hand.
By a Juror: Is there any probability of your having got blood on your right hand? A. No, sir; there was no blood where I put my right hand on the body.
By a Juror: Were you award that your hand was bloody when you went out? A. Yes, sir; I was very careful not to touch anything, because I knew my hand was bloody.
Dr. David Uhl then took the stand, and the cross-examination of this witness was resumed.
Q. When you went to No. 31 Bond street, did you notice the appearance of blood in the room and oh the premises in that neighborhood? A. I did, carefully.
Q. You have already stated that you had large experience in examinations in cases of coroner’s inquests? A. I have made a large number of such examinations.
Q. For that reason your attention was called, of course, to the material points in reference to the blood found here? A. I have made it a point during the last few years to examine all cases to which I had access, and I did it in some manner in this case.
Q. I want to ask you if you looked into the little closet to which reference has been made [pointing it out upon the model] ? A. I examined every part of it carefully, and did not find a single spot of blood there.
Q. Was there anything that had a semblance to blood? A. Nothing of the kind.
Q. You examined it with a great deal of care? A. I did, because I supposed a person might have been secreted in that room.
Q. Were the diagrams which represent the doctor’s room, and the spots of blood found there, made under your direction? A. Yes, sir.
By the Oourt: Do they give an exact representation of the spots of blood, as you found them there? A. They are very correct.
*524 Q. Who was the artist that made them? A. A gentleman by the name of Bensen. Dr. Mayne went with me and placed the furniture in the exact position in which he found it on the Saturday morning. I remained with the artist to see that he took the blood-spots correctly, and was present during the whole time he was making the sketches.
Q. Just describe to the jury the blood-spots in that room; first, the location of the furniture, and then where the blood-spots are on the furniture?
Dr. Uhl, by means of the painting, then described minutely to the jury the location of the various articles of furniture in the room, and pointed out the stains of blood which were found upon the furniture, doors and wall of the room.
Q. What was the distance between the secretary and the chair that had the blood on it? A. I think it was about ten inches.
Q. What was the distance between the centre-table and the chair? A. It was about sixteen inches.
The Oourt: Was that the chair which stood in front of ■ the secretary—the one spoken of as being turned round toward the door that leads into the hall? A. Yes, sir.
■ The Oourt: Will you not describe where the blood was on the chair? A. It was on the inside of the back, and also on the top of the chair; there was not much on the outside.
Q. Was there any other chair in the room except this one, a rocking and a dental chair? A. I did not see any other.
Q. Was the rocking chair seated west of the centretable? A. It was towards the fireplace.
Q. Was there any blood upon that? A. None whatever.
Q. Was there any blood upon the sofa? A. There was none.
Q.' Was there any blood upon the centre-table or upon anything that was on the centre-table ? A. There was blood on the newspaper that lay on the centre-table.
*525 Q. Just state how much blood there was there, and what was its character? A. There was very little, and it was in round drops.
Q. It did not look like spurted blood? A. No, sir.
The Court: Could a person sitting in that chair by the secretary, see to read from the gas burner, if it were burning at the space between the two windows? A. Very readily; I lit up the room one night, and I was satisfied that a person could read there.
Q. Making the location here with this chair which had the blood on it, and going to the south part of the room, what traces of blood are there in the room towards the window? A. Tracing it from the paper on the table towards the little desk under the glass, there were round spots of blood on the carpet.
Q. Were there many drops of blood there? A. Not many; there were a few drops of blood on the leaf of the table.
Q. Starting then from that table and going towards the body, were there any indications of blood? A. There were also a few drops of blood in that direction.
The Court: Ask the doctor rather from what he saw in the room where he supposed the deceased was, and the course he took to get to the place where the body was found, where were the drops of blood ? A. They were outside of the rocking chair, between it and the grate.
Q. Were there any marks of blood in this part of the room? A. I did not discover any.
Q. From the secretary round to this map [referring to it in the drawing], there were more or less drops of blood on the wall? A. There were.
Q. And none upon the side on which the fireplace was, and none at the end except upon the leaf of the table where this newspaper was? A. Yes, sir.
Q. In your medical judgment, I ask you from the position of the furniture in the room and the drops of blood, *526 where the first blow was struck on Dr. Burdell? A. I think it was struck when he was sitting in the chair by the secretary.
The Court: Which blow was the first one? A. The one'" in the right shoulder in the clavicle.
Q. In your judgment then in which direction did Dr. B. and the parties go? A. Towards the door leading to the hall, judging from the spots of blood and the evidences of the struggle.
Q. Where were the parties ■ when the blow in the left carotid was struck; the doctor and the person who struck him? A. It is impossible to tell where they were standing.
The Court: Judging from the appearances, you can give your opinion? A. I think they were standing in front of the door a little one side.
Q. How near the door? A. They must have been very near it.
Q. Was that blow given when the doctor was standing or when he was upon the floor? A. While he was standing, no doubt.
Q. The evidence of the blood on the wall settles that fact? A. Beyond question it does.
Q. If struck in the neck, and by a blow from a person standing in front intercepting him at the door, what would have been the natural manner for him to have thrown his head and neck? A. Away from the blow of course; that would account very satisfactorily for the spots of blood upon the wall.
Q. Would the blood spurt until the dagger was withdrawn? A. It would not, the hand and the dagger would prevent.
Q. When the dagger was withdrawn there would be ■ spurted blood? A. Tes, sir.
Q. Would the time which it would take for the jet of blood to come out depend upon whether the person was *527 inhaling his breath or not? A. It would depend upon the pulsation of the heart to a greater or less extent.
Q. I ask you medically for your opinion as to whether one person of equal strength with Dr. Burdell could have inflicted those wounds upon him with the resistance which would result without himself or herself having marks of violence? A. I can only judge by probabilities; it is probable that he might receive marks of violence.
Q. Would you expect to find marks of violence upon the person who committed the act ? A. I should undoubtedly.
Q. Did you look particularly at Mrs. Burdell that day to see if she had any marks of violence upon her? A. In the evening I did.
Q. State to the jury whether you saw any? A. I went up to the house and was in her room. My suspicions were very much excited against her. I observed her very .closely, and when I left the room I shook hands with her on purpose to get very near her person. I did not discover any marks of violence upon her. She had on a fur cape which dropped off from her shoulders.
Q. Were her shoulders bare so that you could see? A. Yes, sir.
Q. What kind of a day was it? A. A chilly day.
Q. Were people running into the house continually? A. Yes, sir.
Q. Did you look at her neck and hands to see whether there were any marks of violence upon them? A. I looked at all the parts of her body exposed to view.
Q. You observed no marks of violence? A. I did not observe any.
Q. You had been acquainted with her for some time? A. Professionally.
Q. Were you acquainted with Dr. Burdell? A. Intimately, and I knew Mrs. C. professionally very well.
Q. You say that the reason you made this close obser *528 vation was because your suspicions were fixed upon her? A. Through the day things occurred there that induced toe to think'that some person in the house committed the murder. I observed everything with especial care for that reason.
Q. I wish you would state what traces of blood you found after you got into the hall? A. As you go out of the door there was a spot of blood on the door sill.
Q. Similar in character to the round drops of blood here [pointing to the drops of blood as depicted in the drawing]? A. Yes, sir, there was a round drop of blood on the outside.
The Court: Was it on the sill or in the hall? A. It was on the sill of the door, and there- is no question that the door must have been closed during the struggle.
Q. The drop must have got there after the door was opened? A. Yes, sir.
Q. Where did you next observe any traces of blood? A. Going down stairs, in the upper hall, on the right hand - side.
Q. Which flight of stairs? A. The first short flight.
The Court: How far up from the floor was this blood? A. It was on.fhe .base moulding of the stairs.
• [The witness here pointed out on the drawing the exact locality.]
Q. Where next did you see any traces of blood? A. The next I saw was on the right hand side of the wall.
Q. Would it be a place where a person going down stairs would naturally put his hands to the wall, if going-down in the dark? A. Yes, sir.
. Q. Where next did you see any drops of blood? A. On the base moulding, just back of the parlor door, on the right hand side, as a person would go towards the basement; there was also a spot of blood on the opposite side, by the mahogany railing on the base board, about the middle, right by the bannisters; the next spot of blood *529 which I discovered was on the door at the foot of the basement stairs, leading into the basement hall; on the basement front door there was a finger mark in blood on the hinge side, very much like a spot which one would have made feeling for the knob of the door with his fingers.
Q. Did you go into the basement and see if you could find any blood there? A. I could not discover any there.
Q. Where did you find blood first? A. I found a drop of blood near the inside hall door, on the floor, right by the sill.
Mr. Dean: Point it out on the diagram to the jury, if you please.
The witness then pointed out the locality,
Q. Will yoUj in your judgment as a medical man, tell the jury how the drops of blood in Dr. Burdell’s room, to the south and west of the centre-table, got there [referring to the spots on the floor near the window, and on the paper on the centre-table]?
Attorney General Cushing: That hardly seems to be a medical question. It is not a matter of medical experience to tell how a drop of blood comes upon the floor.
The Court decided that the question might be put.
Q. I ask you how to account for the drops of blood in the part of the room to which I have referred? A. They must have come from the person who committed the deed; they could not have come from the doctor.
The Court: You refer, I suppose, to the drops of blood in the room, which you found going round from the secretary towards the window, and towards where the body was found. Do you also include the drops of blood found upon the newspaper? A. Yes, sir.
The Court: Do you apply your remark also to the drops of blood that you found in the hall, and on the stairs, and upon the basement door? A. That was the conclusion I formed.
Q. Would the clothing of the person who committed *530 the deed absorb the blood, so that it would not drop from the clothing?
Question objected to by the prosecution.
The Court: You may ask him the question whether, if this blood was spurted on a person, it would be absorbed by the clothing?
Q. If the blood was spurted upon the person, would it drop off the length indicated by these maps, which show the blood in the room and the wall? A. I should judge that the blood would likely be absorbed by the clothing.
The Court: The blood, if spurted on a person, would be absorbed by the clothing? A. Very rapidly; these drops were very peculiar, and were round; I examined them particularly, and called the attention of other persons to them.
Q. They were not marks of the foot? A. No, sir.
Can any opinion be formed as to whether these blows were inflicted by a right or left-handed person on the body of Dr. Burdell? A. The examination of the body was so miserably conducted that it is impossible to tell with certainty, in my judgment, whether the blows were inflicted by a right or left-handed person, for, in all cases of this kind, everything depends not only upon ascertaining the external position of the wounds, but also their direction and depth, and these things cannot be accurately ascertained without a very careful examination; there are a few instances on record where such a matter has been determined, but it has always been with the greatest care, and by an accurate dissection, performed by very able men.
Q. What was the condition of the body at the time of the post mortem examination—was anything removed? A. I understood that the viscera, stomach and heart had been removed.
Q. With the viscera, stomach and heart removed, could anything be told by a probe? A. Nothing satisfactory at that period.
*531 Q. I want to ask your opinion, as a medical man, whether these blows were inflicted by a person who had a good knowledge of the human body? A. I never yet examined a body where there were so many accurate blows given.
Q. I ask you, then, for a full answer to the question— what degree of anatomical knowledge did the party giving the blows evince? A. He must have had a pretty fair knowledge of anatomy.
Q. If but one blow had been given which was fatal, this blow, for instance, in the neck, you might have thought that accidental? A. I should have thought nothing of it particularly; we have frequent examinations of bodies where a great many blows were given, but we hardly find more than one blow that reaches the vital point.
Q. I ask you if, in your judgment, the blows in this case were accidental, or were aimed by the party inflicting them at a vital part, judging from the wounds on the body?
The Court: The witness has stated already that they were very accurate blows, and that he thought they were inflicted by a person having considerable knowledge of anatomy.
Q. You have had a large experience in post mortem examinations at coroners’ inquests—where persons attempt to commit suicide, how is it? A. In nine cases out of ten they hardly ever reach the artery, and fail to accomplish the object they have in view.
The Court: I do not consider that it is hardly necessary for us to enter upon the subject of suicide here.
Q. The blow in the right shoulder, how was that as to its being aimed at a vital part? A. The subclavian artery, directly under the clavicle, is a vital part.
Q. Do you know whether the subclavian artery was wounded in this case? A. I do not.
Q, Was there any mark of violence upon his face? A. There was a slight abrasion upon the bridge of his nose.
*532 Q. How was that probably caused? A. It looked like a bruise, as if he had fallen against something; it was a contusion more than anything else; it might ha.ve been caused by falling against any substance upon the floor.
Q. I want you to state whether your attention was called to the mark upon the neck, which has been referred to in the progress of the trial? A. My attention was particularly called to it.
Q. State the time when your attention was first called to it? A. Immediately after Dr. Francis had offered his testimony before the coroner; it was between eleven and twelve o’clock in the morning; I examined the neck closely, and made tip my mind that the appearance about the neck and face by lying upon his face during the entire night, with his head twisted a little to one side; the appearance on the neck would have been caused by the pressure of the handkerchief; my attention was so much called to this subject that through the inquest I asked several who came to examine the neck, and they all agreed with me.
Q. You say your attention was particularly called to this, and that you examined the neck—state what examination you gave? A. I got down on my knees by the body and examined it with my fingers; Hooked at it carefully, and examined it from day to day with reference to that point, until the body was buried.
The Court: Did this mark upon, the neck grow very faint from day to day? A. There was no appearance of it after the first day, and it all disappeared.
Q. Would an anatomical examination of the brain have determined the question of strangulation? A. It would have done so, if there had been any considerable examination.
Q. There was no anatomical examination of this body? A. Not to my knowledge.
Q. I want to call your attention to the wound in the left arm, which has been spoken of by Dr. Francis and *533 which he says he did not particularly examine himself. I ask you if you examined it yourself and saw the wound probed. Give the position of the wound, if you please? A. I do not think the wound was probed in my presence; it went between the bones of the forearm, just below the bones of the elbow.
Q. How was that blow inflicted, and in what position would Dr. Burdell have been? A. That blow was given as he held up his arm to ward off other blows.
Q. Would that blow necessarily require a good deal of strength to give it force? A. I should judge so.
Q. I ask you whether the instruments which were shown you last night could have inflicted the wounds? A. No, sir.
By Attorney General Gushing: Q. Are you the family physician of Mrs. Cunningham? A. I have been.
Q. For how long a time? A. For a year and a half.
Q. You spoke of the post mortem, examination not being a proper one. Did you have reference to the manner or the time in which it was done? A. The whole manner of the examination.
•' By Attorney General Gushing: Q. Was it or was it not done correctly? A- I do not think any of it was done correctly.
Q. Did you see it go on during its progress? A. I did not.
Q. What was the object of this examination? A. It was to determine the external appearance of the wounds, their length and to decide if possible whether the knife which was shown the last night could have produced the wounds; that one part of it was not correct.
Q. What else did you want to do? A. We wanted an examination to determine the depth and length of the wound.
Q. Can you not determine their direction and length by a probe? A. You cannot accurately.
*534 Q. When you went into the house you say you saw Mrs. C., that your suspicions of her were aroused, that you examined her, that she had a cape around her neck, which fell off when you shook hands with her? A. Tes, sir.
Q. How was she dressed? A. In a dark merino dress.
Q. How low? A. It was not what we call a low-necked dress. It appeared to be very much like the dress which she has on at present.
Q. Did your examinations amount to anything whatever, except that upon shaking hands with her you saw nothing? A. I merely looked at her closely but did not observe anything.
Q. In reference to these drops of blood which came from the persons around, you mean to be understood that in your judgment they did not come from Dr. Burdell? A. I think they must have come from the persons who walked around in that direction.
Q. Whether they might not have come from persons who walked around there an hour or two after his death,' you do not know? A. No, sir.
Q. In reference to the knowledge this person must have had who inflicted these wounds, could you strike as correctly yourself fifteen times? A. I doubt it very much.
Q; So then it depends upon either skill or knowledge of the fact? A. It does in a great degree; but.at the same time I might strike those blows in that way.
Q. Did you ever see as many bad blows in a body as this?
Witness: What do you mean by bad blows?
Counsel: Those that are struck at random, as Dr. Francis stated? A. I saw a body once that had twenty-five wounds in it, and only one mortal wound.
Q. Stabs? A.' Stabs.
Q. Where was this? A. That was down in Trinity place.
Q. As to this wound under the arm, can you tell whether *535 that was made before or after the wound in the heart and the neck. Is there anything you can judge from anato-. mically, or in any other way, as to how that was? A. No, I cannot tell now, because I did not dissect the wound, and I could not tell if I had dissected the wound.
Q. Evidently, when that blow was struck, the doctor did not have hold of anybody? A. No; I think in his struggles he held up his hand to ward off the blows.
Q. You don’t know whether he had his head down or not; all we want to get at is whether he could not have had hold of the assailant’s hand at the time, or could not have been grasping any object? A. I cannot say that he could not have been grasping any object.
Q. Well, is it not probable? A. I think, as I stated before, that the blow was given as he was holding his hand up; the direction of the blow, the place and situation, and the natural appearance of the wound, all combined, and everything else, lead me to believe that.
Q. Then your idea that there must have been a struggle, and that the person who committed the • act must have received some personal violence, depeúds altogether on whether the doctor made any struggle to get hold of the other? A. All those circumstances would modify it.
Q. You assume that a man of his- physical strength would have made resistance? A. I assume that naturally.
Q. And if he did and had got hold of the person, he would undoubtedly have left marks on him? A. Yes, sir
By a Juror: Q. The leaf of the table was turned down you say—was the blood on it stains, or what? A. There were several little round drops.
Q. How would it drop? A. They were round drops; T only tell you the facts of the case.
Q. The leaves might have been turned down after the drops got on? A. I don’t know what might have been.
Q. Did the furniture or anything in the room exhibit *536 any evidence of a struggle? A. There was nothing upset.
The witness withdrew.
The district attorney said that he would now put in as evidence paper No. 11, found in Eckel’s secretary. He read it to the court, as follows:
“ In consideration of the settling of the two suits pending betwixt myself and Mrs. Emma Augusta Cunningham, I agree.as follows: 1st. I agree to extend to Mrs. Emma Augusta Cunningham, and her family,' my friendship through life. 2d. I agree never to do anything to the disadvantage of Mrs. Emma Augusta Cunningham. 3d. If I continue to occupy the premises No. 31 Bond street, I will rent to Mrs. Emma Augusta Cunningham the rooms she now occupies at the rate of $800 per annum.
“HARVEY BURDELL.”
The district attorney then read the following admission in evidence:
“It is admitted that, on the 15th of October last, Mrs. Emma Augusta Cunningham, the present prisoner, commenced two actions against Dr. Harvey Burdell; one in the Superior Court of the city of New York, and the other in the Supreme Court; and that one action was for breach of promise of marriage, and the other for slander; that the defendant was arrested in each of the said actions, and held to bail in the aggregate sum of $12,000; that both those actions were, on the 22d day of October, discontinued by agreement of the parties to said actions.”
The Court urged the counsel for the defense to proceed to open their case. The district attorney said that he had another witness, Dr. McGuire, to call, who was not in court, but promised to be in attendance on being sent for. The judge said he might be examined afterwards, whereupon,
Mr. Dean rose and said: If your honor please, we have a motion to make. It is that this prosecution be dismissed.
District Attorney: If the court please, before any argument is made upon that, I must object.
*537 The Court: It is a very unusual proceeding.
District Attorney: Excuse me, if your honor please, I will state my objection and then take my seat. The common law, and the statute based on it, provide that when two defendants are indicted together, and aré on trial together—and such has been the law ever—a motion may be-made to the court to instruct the jury then and there, at the termination of the evidence for the prosecution, that in the judgment of the court no case has been made out against one or other of the prisoners on trial, with the view of enabling the other party thus joined and thus put upon trial, to be put upon the witness stand and made a witness of. But, sir, when a party is alone upon trial, when a party is alone upon an indictment, and the prosecution rest their case, the jury must pass upon it, and the defendant may or may not put in his testimony. The case may go to the jury upon the testimony of the prosecutiork, but I never heard of such a thing as a motion to non-suit in a case of this kind.
The Court: I will hear the other side.
District Attorney: Well, sir, I have a still further objection, and that is, that under the guise of a motion to dismiss this case, which is either a legal motion or not, as the object is stated, that any argument should be heard.
The Court: You will take your seat, sir; I deny the motion.
Mr. Dean: If the prosecution will wait till we state what the motion is—
District Attorney: I apologize to my learned friend on the other side. I heard him distinctly state that he would now move to dismiss the case.
Mr. Dean: Unless—
The Court: So I understood Mm.
District Attorney: But without any qualification. I deny the right of the counsel to make the motion under any qualification whatever.
*538 The Court: I will hear the counsel.
Mr. Dean: I have no doubt but that I can refer the public prosecutor to a case which he remembers very well, and in which this motion was not only made, but the action of the court was in conformity with it.
District Attorney: By consent of the parties; You mean the Lutener case, in which Mrs. Hayes was the defendant.
Mr. Dean: No, not the Lutener case. Our motion is this, that your honor direct an acquittal of this prisoner, on the evidence as it now stands, unless the public prosecutor calls as witnesses Mr. Snodgrass, Mr. Eckel, Augusta Cunningham and Ellen Cunningham—parties who were in the house at the time of the homicide, who were capable of committing it, and who were witnesses before the coroner. I would say that this is far from being an unprecedented motion; that it is a motion that was made in the Austin case, before his honor Judge Edwards, in a Court of Oyer and Terminer, held in this very building, and granted.
One of the witnesses happened to be in Illinois, and that was admitted as a sufficient excuse for not calling him. And if there is any question about this being a rule of law, I will refer your honor to the case of The Queen v. Bowen, reported in, I think, the 9th of Carrington and Paine, where the public prosecutor took the same ground, viz: That he was not obliged to call everybody who might know about the case, and the judge who presided on that trial replied that the object of a criminal trial is not a conviction, but to arrive at the truth, and if the public prosecutor neglects to call those witnesses who are supposed to have a knowledge, or whó are in a position where they, themselves, might have committed the offense, not themselves being indicted, the court will put them on the stand and give to the defense the right to a cross-examination of them. Now, your honor will see the propriety of this rule. Here are persons who were in that house; there is *539 no evidence in this case, and there is no pretense of any evidence.
The Court: You need not discuss what the evidence is. It would not be proper on the ground on which you put your motion.
Mr. Dean: I put it upon this ground—
The Court: Because if you are satisfied to let the case go to the jury, I can dispose of it in the charge I am prepared to give them.
Mr. Dean: The question is whether we have not a right to compel the prosecution to put those persons on the stand.
The Court: If you will show me any authority which will satisfy the court that it has a right to compel the prosecution to put witnesses on the stand, whom they do not see fit to place there, I will hear you.
Mr. Dean: The case of Austin.
The Court: I should feel very unwilling myself to take the case out of the hands of the prosecuting counsel and the Attorney General of the State. I require a decision of the Supreme Court, on argument, for that. . My judgment is that it would be an improper interference by the court with the duties which the law has confided to others, who are responsible for the manner in which they discharge them. I am satisfied when I have discharged mine.
Mr. Dean: Then your honor will not be bound by the the authority of the Court of Oyer and Terminer?
The Court: No, sir.
Mr. Dean: I can show an authority in England directly on the point.
District Attorney: I will just say this, that in England there is, as many gentlemen know, a peculiar rule by which the King’s counsel must call- every witness whose name is indorsed on the indictment.
The Court: Certainly, and there, too, all criminal prosecutions are prosecuted by private parties and not on behalf of the people, as they are here.
*540 Mr. Dean: I am aware of that. The Attorney General however, has to conduct the prosecution.
The Court: No, sir; it is done by private counsel. The Attorney General is very often counsel for the defendant.
Mr. Dean: The question here is one of practice, and that practice we say is the practice of the Court of Oyer and Terminer. We come here and apply to have it followed up.
The Court: I shall not do it in this case.
Mr. Dean: Well, we take an exception, of course, to that. Now we move to dismiss the case, .on the ground that this court is not legally constituted.
The Court: What is the ground of that motion?
Mr: Dean: That I merely state.. I do not mean to argue it. We want it to merely appear properly on the record.
Mr. Dean stated his objection to the authority of the Court to be based on that law which required two aider-men to sit on the Court of Oyer and Terminer with the judge.
The judge overruled the objection, and the counsel for the prisoner excepted.
Benjamin F. Maguire was then examined by the district attorney, and said he was a dentist by profession; he was acquainted with Dr. Harvey Burdell, and had often seen him write; was very well acquainted with his handwriting. ' The district attorney directed his attention to the papers found in Eckel’s secretary. After examining them, he said that No. 1 was not in Dr. Burdell’s handwriting; he thought No. 2 was; No. 3 did not purport to be in the doctor’s handwriting; No. 4 was not in his handwriting; the body of No. 5 was not, but the indorsement was in Dr. Burdell’s writing; No. 6 was in his handwriting; the filling up of the printed lease (No. 7) resembled the doctor’s writing, but witness did not think it was his; No. 8 was in his writing, as was also No. 9; Nos. 10 and 11 were also written by Dr. Burdell.
*541 The revolver found in Mrs. Cunningham’s rootn was then produced and shown to the witness. He said it precisely resembled the pistol which Dr. Burdell purchased four years ago in his presence; he had often seen Dr. Bur-dell shoot with it; to the very best of his judgment it was the same revolver.
Cross-examined by Mr. Clinton: On the cross-examination the witness stated that his mother and Dr. Burdell’s mother were sisters; that he was not on friendly terms with him, and had had a litigation with him; that he was not on speaking or visiting terms with Dr. Burdell at the time of the homicide; the witness also gave evidence tending to show that other relations of Dr. Burdell were not on friendly terms with him.
The district attorney then proved by the witness that he had used the pistol shown him; that he and Dr. Burdell had practiced with it in shooting at a candle in his cellar.
The prosecution here rested their case.
The defense was then opened to the jury by Henry L. Clinton.
The Rev% Luther F. Beecher, of Saratoga Springs, was called as the first witness for the defense, and was examined by Mr. Dean. He testified that he resided at Sara-toga Springs; was a teacher, and of the Baptist denomination; -he knew Dr. Harvey Burdell, and became acquainted with him at Saratoga Springs in June, 1856; he knew the prisoner at the bar, and became acquainted with her at Saratoga Springs on the 26th July last; Dr. Harvey Bur-dell introduced her to him at the depot in Saratoga Springs; she boarded at the same house with witness for .three weeks; he saw Dr. Burdell at Saratoga two or three times during that time; was not certain where he boarded, but saw him at the house where Mrs. Burdell boarded; on one occasion they rode out together, and witness put them in the carriage; a daughter of Mrs. Burdell is now in witness’ school; the house in Saratoga where Mrs. Burdell *542 boarded was attached to the institution as a boarding house for the pupils; during the summer vacation, however, it is used as a boarding house for visitors of a high grade at the Springs; Mrs. Burdell’s daughter went to the school in the last week of September last, and has been there ever since; her name is Georgiana; witness was in New York on Friday, the 30th of January last, and was at the house No. 31 Bond street, on that day, at about one o’clock; saw there Mrs. Burdell, Miss Van Ness, Dr. Burdell and a boy who admitted him; the interview was in the back parlor; Dr. Burdell came in after witness entered; when the doctor came in there was no one in the room except Mrs. Burdell and witness, and witness noticed nothing in the doctors manner nor in Mrs. Burdell’s that was unusual; he made an appointment with Mrs. Burdell to take her daughter to Saratoga with-him the next day; Mrs. Burdell was to send Georgiana to the Hudson River Railroad depot at 11 o’clock the next day, and witness left her with that understanding; he was not certain that Dr. Burdell knew of this appointment.
Q. Do you remember whether Mrs. Burdell, on that occasion, invited you to return to the house and dine that day, and to stay all night?
The district attorney objected to this, as a leading question.
The question was waived.
Q. In December last, were you paid for the tuition of Georgiana? A. Not directly, but I received money—
The District Attorney: I object.
. Q. Yoii were paid indirectly? A. Yes.
Q. Who paid you? A. My brother, Wm. A. Beecher.
Cross-examined: Q. You have called the prisoner Mrs. Burdell; did you- know her as Mrs. Burdell on the day when you were at the house No. 31 Bond street? A. No, sir.
Q. As Mrs. Cunningham? A. Yes.
*543 Q. You had never, up to that time, known her by any other name? A. No.
Questions as to Dr. Burdell’s knowledge that Georgiana was to be sent to Saratoga, were ruled out.
William A. Beecher, sworn and examined by Mr. Dean, stated that he was a brother of last witness, and had heard his testimony; he had given his brother a check for money for the tuition of Georgiana Burdell, and received that check from Dr. Burdell, upon the Artizan’s Bank; the check was for sixty dollars, and dated ahead a few days.
Br. John F. Camochan, sworn and examined by .Mr. Dean, testified that he was Professor of Surgery in the New York Medical College. He was asked his age and the length of time he had practiced his profession. The doctor stated that he practiced for eighteen or nineteen years. He was present at No. 31 Bond street on the Monday succeeding the murder, and saw the body of Dr. Bur-dell, but did not examine it manually at all. He had read the medical examination, as signed by Drs. Uhl, Woodward and others, and saw two or three of the wounds measured. He noticed the wound in the neck, and considered it a very dangerous one—very likely to prove fatal. The vital organs which are located in the region where that wound was given are the large blood vessels of the neck and the nerves of the neck; the large nerves which lead from the brain to the stomach and lungs, and other nerves. Of the wound in the right shoulder, witness was proceeding to speak, when he was interrupted by the
District Attorney: If the court please, we should be happy to hear Dr. Camochan on any point of which he has medical knowledge; but we must require him to confine himself to what he saw. Unless comparisons of medical testimony were accompanied by simultaneous observations, we object to this evidence.
The Court decided that counsel for defense might put a hypothetical case and take the doctor’s opinion.
*544 Counsel produced the physician’s report of the medical examination, and read it section by section. Dr. Camochan answered the questions put to him as follows:
1. The wound in the left breast, below the nipple, between the fourth and fifth ribs, he considered dangerous, most probably fatal.
2. Wounds in the heart are almost invariably fatal, but not so immediately fatal as a wound in one other part would be. This part was at the junction of the head with the spinal column. A wound given there kills, instantly; but a man may live for a short time after receiving a wound in the heart.
3. A wound directed so as to pierce the right ventricle of the heart would most certainly prove fatal, particularly if the instrument with which it was inflicted were drawn out.
4. The wound in the right shoulder would be likely to prove fatal. One of the large arteries in proximity to the heart passes there, and a blow there would be one of the most'dangerous wounds that could be inflicted.
[Witness showed, by a series of anatomical plates, the position of the principal wounds.]
Q. Do you consider that these wounds, looking at them professionally, were inflicted by some person who had a good knowledge of the anatomy of the human- body? A. The fact that so many wounds were inflicted at such points induces me to believe that there must have been knowledge in regard to those localities.
Q. Do you, from the evidence in this case, supposing it to be true, consider that these wounds were accidental in their position, or intentional? A. From so many wounds having been directed to important points, I should say they were intentional; that is the inference in my own mind.
Q. You have had considerable practice as a surgeon, in looking at wounds inflicted by violence? A. A great deal; *545 I am surgeon to the largest hospital in the country, I believe, and besides, in private practice, I have seen a great deal of surgery.
Q. Have you ever known a case where so many wounds were inflicted in vital parts? A. I never have.
Witness further stated that he had been in the room where the murder was committed since his first visit, and was in company with Drs. Uhl and Boberts in examining the blood and marks. He gave it as his opinion that the first blow received by Dr. Burdell was given in the shoulder, while the doctor was sitting at his desk near the door, on the right hand side going out, and that it was inflicted by a person standing behind him. The natural inference is that the person struck jumped up, panic-stricken, and made towards the door, that the assailing party tried to intercept him and prevent him from getting out; and that while standing face to face, or Dr. Burdell a little to one side, the left side of the neck was wounded. The relative position of the parties when the left side of the neck was struck, according to witness’ theory, would be, that Dr. Burdell’s face was towards the door, or perhaps slightly turned, and that the person who struck the blow had his back to the door.
Q. Do you think this was a left or right-handed blow? A. I should judge the right; I judge from the position of the spot of blood on the wall.
[Witness illustrated positions by a diagram of the room.]
Q. Suppose there had been but one person to inflict those wounds, and that there were evidences upon Bur-dell’s arms and person of a stout resistance on his part, should you judge that a person of less strength than he could have inflicted those wounds without showing marks of the struggle? A. No; I should say not.
Q. Suppose that one person were a woman, would the probability of marks being left upon her person be greater than on the person of a man? A. Females show bruises *546 much more easily than males, that is, they show signs of a bruise more easily.
Q. Owing to what? A. The tissues are more delicate.
Q. Is it not a fact that a lady’s arm, even when moderately pressed, will show marks there next day? A. That is the inference, certainly.
Q. Is it not the fact that the female tissues, being more delicate, will show marks the next day, in case the marks were made on the neck or on any part of the person committing such an act as this? A. Yes.
Q. How long would such marks appear? A. A week at least-
Q. Are there any indications that these wounds in the neck were inflicted by a left-handed person? A. None that I have seen or read of.
Q. Can you, professionally spealdng, judge of the probable size and strength of the parties who were engaged in the struggle?
The district attorney-objected.
The Court allowed this question to be put in this shape: Was the person who inflicted the blow in the neck taller" or shorter than Dr. Burdell? A. The inference is that the person was as tall at least as Dr. Burdell.
Q. Have you made any experiments With reference to this trial, to see the amount of force necessary to inflict certain wounds? A. I have.
Q. Would there be resistance to a blow where there was woolen clothing to be cut through? A. There would, very considerable resistance.
The doctor detailed his experiments. They consisted in placing a cadaver naked in a sitting position on the floor, then striking it with a small dagger (produced in court) in the neck, while naked, and in this posture—the force required to pierce the body being very small—then throwing a dissecting coat over the body and repeating the process with considerably increased force, when the dagger *547 recoiled, from the resistance of the woolen substance. The experiments were conducted "under the doctor’s supervision by two of his assistants.
Sundry questions to the same import were asked concerning the wound in the arm of Dr. Burdell, and answered similarly.
A question having arisen between opposing counsel as to the admissibility of evidence concerning witness’ knowledge of the odors evolved from burning clothing, the court ruled it in order—remarking that similar testimony was admitted on the trial of Dr. Webster, in Massachusetts, by Chief Justice Shaw.
The Attorney General: This very trial may be cited as authority.
Q. Dr. Camochan, have you ever' made any experiments in burning clothing in a house, and if so, state the time when they were made and the effect? A. I have; the effect of the burning of articles of woolen clothing in emitting an odor which would permeate the apartments of a house, would depend upon the quantity of the material burnt; a large amount would produce a very perceptible odor, as in the case of bed clothes, blankets, &c., taking fire; such an amount of burning wqolen would produce an odor which would permeate the contiguous rooms and remain for some time; it might necessitate the cleaning out of rooms, and ventilating them for several days; I was called to see the case of a person burned by the bed clothes getting fire, and my clothes were so saturated with the odor that I had to undress when I went home; the bed clothes were considerably burnt in that case.
Q. Suppose the burning clothes were saturated with blood, would that add to or detract from the odor? A. I do not know that it would have much influence.
Gross-examination: The question has been asked how, among the wounds spoken of, so many were fatal. Will you state what spot there is in the human body, between *548 the hips and the top of the head, where a . wound eight inches long and ojtie and a quarter deep, could be inflicted and not be dangerous, whether inflicted before or behind? A. Some wounds are more dangerous than others.
Q. Yes; but where could such a wound be inflicted and not be dangerous or fatal? . A. Many persons are wounded in the abdomen and chest and recover.
Q. Tell me a point where such a wound would not be fatal? A. On the right side of the chest; a pistol bullet may pass through the chest and the man live.
Dr. W. B. Roberts was next sworn and examined by Mr. Dean. He said that he was a dentist, residing at Ho. 55 Bond street, and had known Dr. Burdell three years; had been acquainted with Mrs. Cunningham since August, 1855, when he was introduced to her by Dr. Burdell, at Congress Hall, Saratoga Springs; he had since that timé had intimate business relations with Dr. Burdell up to the day before his death; was frequently at his house, and was there. on the Sunday prior to his death; Dr. Burdell on that occasion showed a daguerreotype which he very recently had taken; Mrs. Cunningham and her daughters were present; Dr. Burdell showed it to them and asked if it looked like him; witness was in the habit of going into Dr. Burdell’s office and calling upon the family very frequently.
Within a year past he had often seen Dr. Burdell and Mrs. Cunningham together; they went out together; he had met them in the street together frequently, arm in arm; they were at Saratoga Springs together last July; witness met them on the boat and went to Saratoga with them; they supped together on the boat; when they arrived at Saratoga Dr. Burdell went to Congress Hall and Mrs. Cunningham went to Dr. Beecher’s; witness was- with them when they took a ride out to- Saratoga lake; Augusta Cunningham went with them.
Q. You were speaking, doctor, of the relations that *549 existed, so far as you knew, between Dr. Burdell and the defendant—have you seen them at other places than at the house No. 31 Bond street together, and at other places than where you named? A. I think I have seen them together at No. 2 Bond street on two or three different occasions.
Q. When? A. A year ago last winter; I have seen them together at private houses, of which 1 do not wish to give the names or number; the people would rather "their names would not be given.
The Oourt: You have no right to disclose the private ■ affairs of persons not interested in this suit.
Q. When and how often? A. A year ago last fall, on two or three different occasions, and during the winter, and in the street quite often; I would state that where I board is at number 2 Bond street, and my office is at No. 55, consequently I passed their house from my meals for the last three years, and most every time in passing I have met them coming out and going in a great many times.
Q. At the times when you have-called at the house 31 Bond street, and have seen the defendant, was it an ordinary thing to see him with her? A. During the past winter, or since she has lived in the house, I would see them perhaps oftener together than during the time they boarded there, because I called about the time that the doctor went to his dinner, and he would often come into the parlor and stay a few minutes, and say that he was going out, or going to dinner; and most generally spoke to Mrs. Cunningham to inform her that he was going out.
Q. Do you know anything about that lock on the door? A. I have seen it there, and have passed through on several occasions.
Q. How did you get in? A. I rang the bell.
Q. Who came to the door? A. A boy that attended the doctor’s office, named John.
Mr. Dean: He has had different boys.
*550 The District Attorney: He has had three, and they were all Johns.
. Witness: Sometimes the girls Would admit me after office hours, sometimes the little boys, sometimes the young ladies; sometimes, if the young ladies were sitting at the window and saw me coming in, they would open the door; on two occasions I rang the bell and took hold of the door knob and found it open; that was two or three weeks before the death; it was after the lock had been remodeled; on one occasion I found that it was not bolted at all; always after that, whenever I did go there, I always caught hold of the knob, if it was opened I walked in and waited until some of them came into the parlor.
Q. Did Dr. Burdell ever come to the door when you rang the bell? A. Yes, sir, a good many times.
Q. In the day time or in the night time, or both? A. Generally in the daytime; the doctor generally went out evenings.
Q. At these times, when you found the door so that you could open it, were thfey in the daytime or in the evening? A. Yes, in the evening.
Q. Do you know whether the doctor ever took the defendant to places of public amusement? A. I know upon one occasion.he took her.
Q. What was the place? A. It was, I think, last spring, some time after she had taken the house; it was at the Broadway Theatre.
Q. At what time on the morning of Saturday did you hear of the death- of Dr. Burdell—under what circumstances? A. I was informed by Mr. Snodgrass coming and ringing my bell at No. 55; I was not up myself; it was rung very hard; I had been out late the night before, and I lay rather later than usual, not expecting any one. in on such a rainy morning.
Q. Till what hour? A. I was at the Academy of Music at the opera, and I suppose it broke up between eleven and twelve o’clock.
*551 Q. You came down directly? A. I came, down the Fourth avenue and the Bowery to Bond street, and turned off to my house.
Q. Did you smell anything? A. No, I did not, though it was a hazy night.
Q. In consequence of the information you received from Snodgrass, what did you do? A. I dressed myself as quick as possible, and went to 31 Bond street; as I was coming down stairs I met Hannah, the cook, and I went on over to 31; I ascended the stairs to the doctor’s door, and there I found Dr. Mayne’s student at the door with a key upon the outside; he had locked the door, and was standing by the door, and Dr. Mayne was just at the foot of the stairs leading into the third story; I think that Mr. Staples was either at the door or just beside me; I then looked into the doctor’s room and saw the doctor; I looked round the room and saw some spots in the hall, and closed the door; I then went up stairs after looking into the room; I went up stairs where the ladies were.
Q. Did you at that time make a minute examination of the room? A. Not at that time.
Q. What condition did you find the defendant in when you went up stairs? A. I opened the door; I found her sitting in a rocking chair by the side of the bed; Snodgrass was holding her; she was crying, and the first remark I think I heard her say, that if the doctor was dead, she could not live; that in the spring he had promised to make everything right.
Q. What then? A. She said she knew that he would do it; I tried to quiet her, and I told her that if he was dead it could not be helped; she made a remark then, “you don’t know the secret,” or, “there is a secret you don’t know; ” I think those were the words:
Q. Was there any further conversation before you left the room ? A. I remember that, because it startled me exceedingly, not knowing what she referred to at that time.
*552 Q. You never at that time had heard of any marriage, or of any pretended marriage? A. No, sir.
Q. She said nothing about it in that conversation? A. No, sir; we then laid her on the bed; we lifted her with full force and laid her on the bed, and I being so startled at the “secret,” immediately went back to the room; at that time the police officers had got there; we then entered the room; the body was then lying.
The Oourt: Is it worth while to have this all over again? We have had it from Dr. Francis, Dr. Mayne and Dr. Uhl.
Mr. Bean: I want to call your attention to the spots of blood you saw south of the centre table.
Witness: I turned him over, the policeman and myself, and some one else I think assisted us, to ascertain the cause of death.
Q. Give a description of these spots of blood? A. I traced the blood immediately leading from the doctor’s head, between the chair and the centre table, to the desk, on the instrument case which set between the two windows; these drops of blood were mostly round drops, as if dropping from above.
Q. You distinguished them as drops rather than spots made by touching? A. They were darker: they looked more like venous blood than the drops on the ceiling; at the instrument case the drops had the appearance of having fallen for a considerable length of time; this stood right in front of the glass; from this point drops were traced round the rocking chair to the body; you only want the drops in the room.
Q. Were there any other drops outside? A. Not drops, but like a brush;- the outside knob had a very little blood on it; then there was another slight brush, which perhaps could not have been perceived when Dr. Uhl got there; it was just as if a person had swept a coat sleeve slightly on the right side of the casement going down stairs, , that seemed to be arterial blood; I saw that particularly.
*553 Q. You observed the drops which Dr. Uhl described? A. I did; but at this time I took particular notice, because it had been remarked that the policeman might have got it there by wetting his fingers when turning him over; I went there and found that the blood was dried just the same as in the room and in the hall, and on the front floor.
Q. What was the situation of the. doctor’s room when you went in, as to the shades and shutters?
The Court: You have it before you there shown on the drawings.
Witness: I would also state that in this corner, beyond the operating chair, is another chair, and there is another chair still; there were three red chairs in the room, which we could not get in this drawing—one behind the operating chair and another behind the sofa, that you cannot see.
Q. I want to ask you how the front room was? A. The two doors through to the front room were open.
Q. How, describe the front room? A. It was as usual, I suppose; the window was dropped about six inches; the front window toward Broadway.
The Court: How was the door that led out into the hall from that room? A. It was shut.
Q. Was it locked? A. I cannot say about that.
Q. That was the only door leading out into that room? A. There was another door leading into the bedroom.
Q. How was that? A. Think that was shut; there was not that minute inspection made of that that there was of the others.
Q. Did you'find any traces of blood at all in that front room? A. Hot any, sir; there was one little spot of blood —perhaps that has not been mentioned here—that might be of importance; that is a spot of blood, about six inches from this map, in behind the map on the wall.
The Court: It spurted in? A. Yes, spurted in.
*554 Mr. Dean: It was in the line of that jet on the wall—■ were you present when the doctor’s clothing was removed? A. I was.
Q. What was done with it? A. I believe that John Connery searched his pockets first, and then took his clothing off—took out a knife and ripped them open.
Q. The fact I wanted to get at was whether the clothing with blood on it, was thrown against the wall so as to make marks? A. Yes, sir; you can see a spot of blood upon this baseboard between the two closet doors; the clothing was piled up there.
Q. You have looked at the room a great many times since? A. Yes, sir.
Q. Are the spots now the same as they were then with this exception? A. Now you can see the traces of finger marks; there is another spot that I have discovered since examining this room that was not there at the time of the first examination—a spot as you go into this closet door where it has been flung open and put a spot of blood right on the wall.
Q. Did you look into the closet? A. Yes, sir, where the washbowl was.
Q. Was there any blood there at all? A. No, sir.
Q. What was found on the doctor’s person? A. There ■ was a little purse with a few shillings in it.
Q. Any bills? A. No, sir.
Q. Not a single bill? A. I think not; and his- watch; a jackknife, pencil or something; I do not recollect the particular articles,
Q. Did you look into his bank-book that laid on the desk—was there any money in that? A. That laid on the secretary; before my attention was drawn to that, somebody shut up that secretary—lifted the lid right up.
Q. Do you know in what condition the safe was? A. It did not have the appearance of being disturbed.
Q. It was not open, at any rate? A, No, sir.
*555 Q. The safe-key was in his pocket? ■ A. They took out something that they called the safe-key.
Q. Did Dr. A. T. Smith come to that house? A. Yes, sir.
Q. Did he have a night-key? A. I don’t know.
District Attorney: We will admit that he and his son, each of them, had a night-key. That accounts for the two night-keys.
Q. Were you up stairs when John Connery came up and asked the defendant for her name? A. I do not think I was; I did not hear it.
Q. Were you in the room when the defendant produced her marriage certificate? A. I was.
Q. Where was it ? A. This was after the coroner had arrived; I. stepped into the room again, and she told me.
Q. Was the coroner, or deputy John, in the room? A. I do not know.
•Q. At what hour of the day was it? A. I should think about half-past one o’clock.
Mr. Dean: The point I wanted to get at was, why she came to make the announcement.
The Court: It is no proof that she stated it very early that day; she produced that certificate—is it not so, gentlemen?
Several Jurors: I think Dr. Mayne testified to it.
Mr. Dean: I want to know whether the jury are to visit' the premises?
The Court: I have been consulting with the gentlemen, and they think that they understand it so fully that there is no need of their going there.
Mr. Dean: This south room, in the rear, is the room that was ordinarily occupied by the two daughters, Augusta and Helen; this is their bed, with one single dormer window in the rear; then there is an open hall in the centre; in this corner is where the bag that had the safe-key in it was found; this is the room where the cook slept; this the little room where the fire was made, and this is the *556 little room where Snodgrass slept; over each of these three doors leading into the hall is what is called the fanlight.
The District Attorney: It is those lights which light the centre, instead of a dome, which is the modern custom.
Witness: This is a very correct model, with the exception of three lights over each of these three doors.
Q. When were you shown the marriage certificate, and under what circumstances? A. Some time after the coroner had come there, and commenced taking evidence, she informed me that there had been some one up there, and she told me that she could not give her name as Mrs. Cunningham; I asked her why; she said that she was married; I asked her if she had a certificate; she said she had; I asked her for it, and she took it out of some of her drawers and showed it to me; I read it, and when she handed it to me she said: “ The doctor gave it to me himself—he brought it up from the bank and handed it to me himself;” I read the date and handed it back to her; that is the last time I saw it.
Q. Did she at that time say to you, after showing that: “ That is the secret?” A. Yes, sir.
Q. What is the situation of the house No. 31 Bond street, as to the entrance into the rear—is there a stable in the rear? A. There is.
Q. What is the access to that stable? A. I could not tell you; I never was there; there is an alley-way that enters between Dr. Francis’ house and Dr. Parmly’s.
Q. Is there a door in that stable leading into that yard? A. I never was in that yard to my knowledge, except to go to the cellar way, and never beyond the grass plot.
Q. How many houses are there on the south side of Bond street that have these dormer windows, and present the same appearance as this? A. Nos. 53 and 55 are square roofed, but nearly all the others present the same *557 general appearance; there is some discrepancy in the heights, and I do not know but there may be in the roofs; I could not say.
Q. Were you present at No. 31 Bond street on Saturday in March, the 26th, or Saturday night prior to the sale of the doctor’s furniture?
The Court: The only possible ground upon which those things would be admissible would be to show that the persons in the house did not hear; that don’t prove anything; it is of no materiality; there can be no accusation brought against them if not hearing. I am quite willing to admit anything and everything that shall have even a remote bearing upon the issue.
Mr. Dean: Your Honor will recollect that we are trying only one .issue, whether this prisoner is guilty or innocent; it may be urged, possibly, that if she didn’t do it with her own hands, yet if she was in the«house and had any guilty knowledge, it makes her a principal, and we all know that the popular mind has become possessed of an idea that such a struggle could not go on without being heard by the family.
The Court: It is not necessary to prove anything here to rebut any impression of the popular mind; the law presumes her to be innocent until she is proved to be guilty.
Mr. Dean: She and her daughters and her sons have got to live in this community.
The Court: She is not charged as an accessory, and I cannot see how any presumption can be raised in this case on the question of hearing any sound.
The District Attorney: There is either a theory that this was done silently or with noise. The whole current of this testimony is that it has been done by strangulation; so far we have no testimony of noise. I should think-we ought to have something to build upon before this testimony is admissible.
Mr. Dean: These experiments were made with refer *558 ence to the testimony taken before the coroner, which we supposed would be introduced here.
The Court: I hope the proceedings before the coroner will not be alluded to again.
Cross-examined by the District Attorney: Q. Are you a married man, doctor? A. I am not.
Q. You have been in and out of Mrs. Cunningham’s house a great deal, I take it from your testimony, during the last three years? A. Ever since she lived there, and for a year and a half previous I have been in and out considerably.
Q. When you went to Saratoga you went in company with Mrs. Cunningham and the doctor? A. I did, sir.
Q. Who else went? A. Her daughter Augusta, and a lady friend of their’s.
Q. Dr. Mayne had been up in the room before you got there? A. So he informed me.
Q. I understand that there were three of you who assisted in turning over the doctor? A. I did think there were three.
Q. After that time he had been left upon his face? A. He had; there was a little discrepancy in Dr. Mayne’s testimony and- as I saw him first, the doctor informed me that he pulled his hands from under him, and when I saw him first he had his hands by his side.
Q. Was the instrument case open when you saw it? A. - The instruments were on the top.
Q. When Mrs. Cunningham produced this alleged certificate, she showed it about, and you read it? A. I did."
Q. You had known previously of the suits between her and the doctor? A. I had heard her speak of it and Dr. Burdell, and I also saw the bond that was given.
Q. What time did you hear of the suits from Mrs. Cunningham? A. It was about the time that they settled.
By a Juror: It is in testimony here that that light in the back room was in full blast in the morning, as discov *559 ered by Dr. Mayne; would that shine through in the front room? A. It would, sir, undoubtedly.
Q. As you found the shades in the morning, would that light be seen from the street? A. I could not say how the shades were; the light was only about two-thirds turned on, I should think.
George D. Cunningham sworn and examined by Mr. Dean. Q. George, what is your age? A. I am ten, sir.
. Q. This is your mother in court? A. Yes, sir.
Q. Where do you live now? A. I live at Ho. 31 Bond street.
Q. How long have you lived there? I don’t know, sir.
Q. Have you lived there ever since your mother was there? A. Yes, sir, I have.
Q. With your mother? A. Yes, sir.
Q. Were you there on Friday, night, when Dr. Burdell was found dead the next day? A. Yes, sir.
Q. Where were you on Friday evening? A. I was in the parlor with my mother and Mr. Eckel, sir.
The Court: At what time did you get your dinner; was it about dark? A. It was night; yes, it was dark.
Q. Did you get your dinner about the usual time? A. Well, we would have our dinner; sometimes we would have it at five o’clock, sometimes at six and sometimes at eight.
Q. That night you did get it at about the usual time? A. I guess we did, sir.
Q. Where were you from that time until the time you went to bed? A. I was in the parlor with my mother and Mr. Eckel. Then my mother rang the bell for Hannah, and called her up and told her what to have. She talked about some hot cakes.
Q. Was your brother with you? A. Ho, sir, my brother I believe was in the parlor.
Q. Where were you? I was in the hall with my mother when she was giving the orders to the cook.
*560 Q. What bell did your mother ring for the cook to come? A. She rang the back parlor bell.
Q.. After that where did you go? A. Then I went to the parlor with my mother.
Q. Where did you go next? A. Then Mr. Eckel went up stairs, and I went up to my mother’s bedroom, and Geo. Snodgrass and Mr. Eckel.
Q. What was done in there, do you remember? A. I believe Mr. Eckel and my sister Augusta were sitting down to the fire, and putting some seed in some bottles for the birds next morning.
Q. Were these birds in that room? A. Yes, sir, there were quite a good many.
Q. What kind- of birds? A. They were canaries.
Q. Well, George, what occurred afterwards? A. Then Mr. Eckel went into his bedroom, and I returned up to bed. 1
Q. Who went up to bed with you? A. I and my brother went up first, sir.
Q. What room did you go into? A. We went into the front room.
Q. Which way? A. Toward the Bowery.'
Q. In which story? A. The third story.
Q. The upper story of the house? A. Yes, sir.
Q. Had Hannah gone up to bed before or after you? A. I believe she went up after us.
Q. Did you hear her? A. Yes, sir, I heard her.
Q. Did you and your brother stay in the room? A. No, sir; we came down stairs'-and told mother.
Q. You, after going to bed, heard Hannah, and went down stairs again? A. Yes, sir.
Q. When you got down into your mother’s room what occurred? A. Then my mother told us to wait for George Snodgrass.
Q. Who were in your mother’s room then? A. My mother and Augusta and Helen.
*561 The Court: Did you know where George Snodgrass was at the time? A. He was in my mother’s room marking some clothes; my sister was going to boarding-school mext morning.
Witness proceeded to state that he staid in his mother’s room till George Snodgrass went up stairs with him to bed. They had a light to go to bed by; they used to use sperm candles in the attic. It was only a little while, about fifteen minutes, from the time witness went up first with his brother till he went up again with George Snodgrass to the bedroom. Witness slept in that room that night. George Snodgrass and his brother slept in the same bed with him. He heard no noise and smelt nothing that night. He was at breakfast next morning; beside himself there were also his mother, Augusta, William, and Mr. Eckel. George Snodgrass was at breakfast also. Witness believed there was a letter brought for Mr. Eckel the night before; he believed his mother took it; he did not know who brought it, but supposed it was brought by the postman. He did not know what time it arrived, and did not remember opening the door for a person who brought any bird seed that evening.
Here the direct examination closed.
The Attorney General observed that the prosecution had been assailed for not putting this witness on the stand, and -the coroner had been assailed because he did put him on the stand. He could see nothing in his evidence, however, which required cross-examination.
Dr. Enrich Parmly, sworn and examined by Mr. Clinton, testified that he resided at No. 1, Bond street, and was the son of Dr. Eleazer Parmly, and the nephew of Dr. Samuel W. Parmly, who had testified on this case in court. Dr. Samuel W. Parmly had a conversation with witness on the Monday evening after the murder. Witness called at his uncle’s house about seven o’clock in the evening, and there heard from him the statement as conveyed to *562 counsel in the note which he (witness) had sent him. He (Dr. Samuel W. Parmly) stated that between nine and ten, o’clock on the evening of the murder, he went out to take a walk, and noticed a very strong smell as of something burning and he thought the basement carpet must be on fire, but thinking that he did not smell this until after he opened the front door, it must have been on the outside of the house. He said he went and took a walk of about twenty minutes and returned, but said nothing that witness recollected about perceiving a different smell in the evening. Witness did not recollect his (Dr. S. W. Parmly’s) saying anything of having seen a flickering light in the attic window of No. 31 Bond street, that night.
The Court: Dr. Parmly did not say that he told him so.
Mr. Clinton: I believe your honor is right.
Rev. Dr. Wm. D. Snodgrass, sworn and examined by Mr. Clinton, testified that he was a clergyman, and that his present residence was Goshen, Orange county. He formerly officiated as clergyman of the Presbyterian Church in this city. He had known the defendant and her family since the year 1844 or 1845, he was not certain which. He had been in the same house and at the same table on a few occasions with the defendant on and after the 13th of December last, when he was,a few days at her house. He arrived at her house on Saturday morning, the 13th of December, and left on the Monday or Tuesday after, certainly not later than Tuesday after breakfast. He left his wife there, and then she returned on the Thursday of the same week. He did riot go for her, but she followed him herself. Witness never noticed whether Mrs. Cunningham was left-handed; he thought he had opportunities of noticing if she used her left hand in eating or carving, but had not noticed that she did. During part of the time he was there in December, he saw Dr. Burdell and the defendant together two or three times, but was not very confident about how often. When he saw them together he heard *563 them converse. [A question as to whether their conversation was friendly, or whether he had observed anything quarrelsome in their language was ruled out and exceptions taken.] He observed nothing in their demeanor that attracted his attention different from what might be expected, from the relations, he supposed them to sustain towards each other. The demeanor of each to the other was not inconsistent with her residing in Dr. Burdell’s house as a tenant, and he residing in the same house as a dentist. That was witness’ meaning. He saw them together on Monday morning between nine or ten o’clock. The occasion was that of a conversation .on the part of Dr. Burdell, witness’ wife, Mrs. Cunningham and witness himself, in relation to some professional business which the doctor was to do for his (witness’) wife. Mrs. Cunningham had nothing to do with the professional business of Dr. Burdell and himself and wife, that he (witness) was aware of. He did not think he could repeat correctly a sentence uttered by any one of the party. It was a general conversation relative to the arrangement of a piece of work that Dr. Burdell was to do for witness’ wife, and which caused her to remain behind- him. Mrs. Cunningham had visited witness’ house, in Goshen, about seven years ago, shortly after his removal from this oily to Goshen. She then spent some two or three days with his family. The residing of witness’ son in Mrs. Cunningham’s house was with the approbation of his wife and himself.
The witness was not cross-examined.
Samuel H. Gatlin was next examined by Mr. Clinton. He described himself as a physician, residing in Brooklyn; he had known Mrs. Cunningham for five years, and was her family physician during the lifetime of her husband, Mr. Cunningham; three years ago she was attacked with inflammatory rheumatism, which affected both shoulders, but more particularly the right shoulder, the right elbow and the right hand; the effect upon the joints of her hand was *564 to enlarge them; those joints were not at present in a natural condition; the right hand was especially affected, and the joints of both hands were stiffened and weakened; she had not the same power of grasp now as before she was afflicted; the strength of the parts affected would naturally be very much diminished. •
Cross-examined by Mr. Edwards: Q. Doctor, when did you cease to be the regular medical attendant of the Cunningham family? A. About two years ago, when she removed from Brooklyn.
Q. When was the last time that you attended her professionally, and what did you notice on that occasion? A. I do not know that I attended her professionally after she left Brooklyn.
Q. Have you examined her hands within that time? A. I have, within the last two years.
Q. "Were her hands at that time in the same state as when you attended her professionally? A. They were not so much swollen.
Direct examination resumed by Mr. Clinton: Q. How recently have you examined her hands? A. Within three weeks.
The witness was directed to examine Mrs. Cunningham’s hands in the presence of the jury. He did so, and explained their present appearance.
Cross-examination resumed: Q. Did Mrs. Cunningham wear rings when she was under your care for rheumatism? A. I have no recollection.
Q. You remarked that she now wears rings—look at them now and see if they are the ordinary size for her fingers? A. [After examination.] I should say they are of a proper size for her fingers as they are now.
Q. Are her fingers swollen at present from their natural size? A. They are enlarged, but not to any considerable extent.
Edwards Pierrepont was next examined. He said he *565 was a lawyer, and knew Dr. Burdell, but- had never seen Mrs. Cunningham - till in court this morning. The judgment that had been spoken of, in connection with the name of the witness, had been canceled, and Mrs. Cunningham had never any interest therein; there was no assignment.
George Vail Snodgrass was sworn and examined by Mr. Clinton, as follows:
Q. You are the son of Bev. Dr. Snodgrass? A. I am.
Q. What is about your age? A. I am nineteen years old in June.
Q. Do you know the defendant? A. Yes," sir.
Q. How long have you known her? A. I cannot say how long; I have been intimately acquainted with her since the last of July.
Q. But prior to that how long were you acquainted with her, or with any of her family? A. I have not the least idea.
The Oourt: He did not know them until the last of July.
. Q. Were you acquainted with them when you and they resided in Irving place, when you were quite a boy? A. I believe I was, although I do not remember at the present time.
Mr. Qlinton: That is all upon that point. At the time of the homicide in question you resided at No. 31 Bond street, I believe? A. Yes, sir.
Q. For how long previous to that time had you resided there? A. I think from the middle of November to the first of December; I think it was then when I came there.
The Oourt: In other words, you came there the last of November? A. Yes.
The Oourt: He means he went there about the last of November.
Witness: Yes.
Mr. Clinton: For how long did you continue to reside there? A. Up to the 31st day of January.
*566 Q. At that time you and Mr. Eckel were taken into custody, I believe? A. Yes, sir.
Q. You subsequently have been put under bonds to appear as a witness in this case by the prosecution? A. Yes, sir.
Q. State how you came, Mr. Snodgrass, to reside in that family?
The Court: I do not see the materiality of that; he was living there,- and that is enough. It must be presumed that he lived there for an innocent and lawful purpose. •
Mr. Clinton: Certainly, your honor.
Q. Were you engaged in any occupation at that time? A. Yes.
Q. Were you a clerk in a store? A. Yes.
Q. In Mr. McMurray’s store? A. Yes; but not at the time that I went to Mrs. Cunningham’s.
Q. But during the latter part of the time? A. Yes.
Q. Where is Mr. McMurray’s place of business? A. At No. 252 Pearl street.
Q. Is his a hardware store? . A. No, a brush store.
Q. Did you see Dr. Burdell, when you resided in that house, at different times? A. Yes, sir.
Q. State whether you saw him on the Sunday preceding his death? A. Yes, sir.
Q. Did you see him in the presence of the defendant? A. I cannot say, sir, as to that.
Q. Did you see the defendant during the day—the Friday—on the night on which it is alleged this homicide was committed? A. I did, sir.
Q. About what time, as nigh as you can recollect, did you come home to dinner that day? A. About half-past six or seven o’clock.
Q. Were you in during the evening?. A. A portion of the time, sir.
Q. Well, from half-past six until about what time were you in the house—before going out, I mean? A. I think it was about half-past seven when I went out.
*567 Q. With whom, and for what purpose? A. Miss Helen Cunningham wished me to go out and purchase some things with her.
Q. To purchase a veil? A. Yes.
Q. Where did you go for that purpose? A. We went up Broadway, and over to Fourth street in the Bowery, and from Bond street to the house.
Q. Did you stop any longer than to enable her to purchase the veil? A. No, sir; but we purchased other things at different stores.
The Court: You did not stop except to make purchases? A. No.
Mr. Clinton: Were you long at the • store at which you stopped? A. I do not think we could have been outside above three-quarters of an hour.
Q. You then returned to the house No. 31 Bond street? A. Yes, sir.
Q. When you returned, where did you go to? A. Into the back parlor, sir.
Q. The back parlor, first floor? A. Yes.
Q. Where was Mrs. Burdell when you returned? A. I have no distinct recollection whether she was in there or not, although she might have been; I think she was; I think herself and the two boys were there.
Q. George and Willie? A. Yes.
Q. State whether you remained in the house from the time you returned as you have stated until the next morning? A. Yes.
Q. Did you at any time go up stairs into the front room in the third story that evening? A. Yes.
Q. About what time, as nigh as you can recollect? A. I should judge it to be about half-past eight o’clock, sir.
. Q. About how long did you remain there? A. I staid there until eleven o’clock.
Q. For what purpose was that room used?
The Court: We have that already most distinctly.
*568 Mr. Clinton: I wish to prove that it was the sitting-room for all the members of the family.
Mr. Qlinton: Q. Who was there? A. The whole of the family, excepting the servants.
Q. Enumerate, if you please, those who were in the room during the time, or any portion of the time, you were in there? A. Mrs. Cunningham, her two daughters, her two sons, Mr. Eckel and myself.
Q. About what time did Mr. Eckel come in? A. He came in very shortly afterwards.
The Court: Shortly after you went in?
The Witness: Yes; but I cannot say the time.
Q. State about what portion of the time, from half-past eight to eleven o’clock, the defendant was in that room? A. All the time, I think, sir.
Q. All the time? A. I think so, sir; I have no distinct recollection.
Q. About what time did the parties in that room separate for the purpose of retiring? A. I think the boys went to bed about nine o’clock—it might have been a little after—say half-past nine.
Q. Did they come down afterwards? A. George did.
Q. At eleven o’clock your whole party separated for bed? A. Yes."
Q. Did Mr. Eckel go out? A. Yes.
Q. Did you? A. Yes; before I went to bed, however, I went down stairs.
The Court: Where did you go, and what did you do? A. I went down to the kitchen for the purpose of getting some cider and some water; I was unable to get the cider, and so I brought the water up stairs.
Q. For whom ? A. Mrs. Cunningham and her two daughters.
Q. About what time was that? A. That was about eleven minutes or a quarter before eleven o’clock.
Q. Was the hall lamp out at that time? A. It was *569 totally dark; I lit the hall lamp adjoining Dr. Bur dell’s room at the time.
Q. You lit the gas? A. Yes, adjoining his door.
Q. As you went down? A. Yes.
The Oourt: What had you in your hand as you went down, a candle or light of any kind? A. ¡No.
Q. Then how did you light the gas? A. With a match.
Mr. Olinton: State, when you returned, whether you did anything in reference to the gas? A. I put it out.
The Oourt: At which door was it—at the door of the front or back room? A. The door at the back room, right at the head of the stairs.
Mr. Olinton: And you put it out as you returned? A. Yes.
Q. About how long was it before you returned ? A. Three minutes.
Q. Were you gone any longer than to go down, get the water, and come back—did you tarry? A. lío; I tried to get the key to open the door where the cider was, but could not find it.
Q. When you came back, where did you return? A. Immediately to the bedroom, and I put out the light as I returned.
Q. You went to bed exactly at eleven o’clock? A. Exactly at eleven, as I have said.
The Oourt: When you returned to the defendant’s room, who was in that room? A. Mrs. Cunningham and her two daughters; I think Mr. Eckel was, although I am not certain whether it was before or after I went up stairs from the basement that he returned, I cannot say; I think it was before.
Q. You think he left the room before he went down stairs? ■ A. Yes.
Mr. Olinton: And then you went up stairs to bed? A. I did, sir.
' Q. State who slept with you—in the same room with you? A. The two boys, sir.
*570 Q. - Georgy and Willie? A. Yes.
Q. Have you occupied a room separate from them at any time previously in that house? A. Yes, sir. >
Q. And subsequently changed it for what reason? A. It was so cold, sir—that is all.
The Court: I want to ascertain which room it was. Was this the front room in the attic nearest to the Bowery? A. Yes.
Q. What kind of a partition was there between those two rooms? A. A wall partition.
Q. Lath and plaster? A. Yes.
Mr. Clinton: You stated that you had formerly occupied another room in the attic—which room was that? A. The one at the left hand.
The Court: The one where the fire-place was ? A. Yes, sir.
Mr. Clinton: Do you Imow when you went to bed that night in the. attic whether you closed the door' or kept it open? A. I think I left it open when I went to bed; but I am not certain that I left it open.
Q. Is there any circumstance by which you can recollect that? A. Yes.
Q. State it? A. I was going to get up to shut it, on account of losing some coats, and from Mrs. Cunningham making the remark that she wished the door to be locked or shut.
The Court: Did you get up and shut it? A. No.
Q. Why not? A. It was too cold, sir.
Q. You thought of it, and did not do it? A. Yes, sir.
Mr. Clinton: Did you hear of any noise that night? A. Not a particle, sir.
Q. Did you sleep in the same or a different bed with the little boys? A. In the same bed, sir.
Q. About what time did you get up the next morning? A. Half-past seven to eight o’clock, sir.
Q. Did you breakfast with the family? A. I do not *571 know whether the whole family were there or not; I breakfasted with a portion of the family.
The Court: Where did you breakfast—in what room in the house? A. In the front basement, in the dining room.
Q. Was the defendant present? A. Yes, sir, she was there, and a portion of the family came to breakfast at that time.
Q. Do you recollect who? A. I think the two daughters and mother; I do not think the children, the boys, were there; at any rate, not until after we had got through.
Q. State whether you observed anything unusual in the appearance of the defendant?
The Court: Let him state what he observed.
Witness: Nothing at all, sir, except that she said that she would like to have known that Mr. Eckel had been going out so early, for then she would have got breakfast for him; she was not aware of his going out.
Q. Did you go to business that day? A. No, sir.
Q. Do you know anything, or recollect anything, in respect to a light in the open attic? A. I have an indistinct recollection as to that.
Q. What is that? A. That light was standing on a large chest that stood against the the wall in the attic.
Q. For what purpose? A. It was left there for me.
The Court: When you went to bed? A. Yes.
Q. I think you stated that the boys went up before you? A. Yes, sir.
Q. State whether the family were doing anything particularly the night before with reference to the departure of any member of the family? A. Everything, sir.
Q. When I say the night before, I mean the Friday night? A. They were doing everything.
Q. For what purpose? A. To facilitate the travel the next morning; they were getting the things of Miss Helen ready to send her to school at Saratoga.
Q. State whether they were packing or what they were *572 doing, with reference, I mean, to packing trunks, or anything of that kind? A. I think the mother was occupied in packing trunks; she was getting some other things for her daughter.
Q. They were engaged about that matter a good deal that night? A. Yes, sir.
Q. Did you hear in court the testimony of Mary Dona-hoe, or Hannah, the cook, in respect to some remark at the breakfast table in reference to Dr. Burdell?
The Court: Did you hear her testimony?
Witness: Ho, sir. .
Mr. Clinton: Did Eckel, at the breakfast table, at any time you were present, make a remark in reference to Dr. Burdell: “ By jingo, I would like to be at his stringing up if I had not to pull the cord too tight to kill him?” A. I never heard any such remark made.
Q. Hothing of that kind? A. Ho, sir; he said, I think, that it was a shame for him (Burdell) to abuse me.
Q. Abuse you, in what respect—did you let him in.that night? A. Yes, that is the reason.
Mr. Clinton: State the circumstances about that?
Attorney General: This has nothing to do with the matter.
The Court: Yes. This is to explain the remark that was made at the table, and I admit it only so far as it is necessary for that purpose.
Mr. Clinton: And it is only in that point of view that 1 offer it.
The Court [to Mr. Clinton]: Ask him what was stated at the table as to anything that passed between him and Dr. Burdell.
Mr. Clinton: I want to prove, first, the act of the party letting alone the declaration, the act of letting Burdell in that night.
The Court [to the witness]: What did you state at the breakfast table?
*573 Mr. Clinton: Your honor misunderstands us, or we have misunderstood the previous ruling. We wish to know a fact to which allusion was made by other witnesses, who could not know the fact, as they were not present. I stated explicitly in my opening what the facts were.
The District Attorney: Do I understand you to admit the conversation that ensued between Dr. Burdell and this gentleman?
The Court [to the witness]: Did you let him in on a certain night? A. Yes.
Mr. Clinton: At what time? A. I suppose in the neighborhood of two o’clock.
Q. Why do you judge it was that hour?
The Court: It is sufficient that he has stated it. We will assume it.
Mr. Clinton: I want to ask how he came to let him in.
The Attorney General: I do not see the materiality of this.
The Court: It is enough as it now stands.
Mr. Clinton [to the witness]: You did go down and let him in? A. Yes, sir.
Q. Was the conversation to which I alluded a moment ago, with reference to that subject? A. Yes, sir.
Q. State, if you please, all that was said at the table in reference to that matter.
The Court: Ask him thus: Whether he stated at the breakfast table what had transpired between him and Dr. Burdell.
Mr. Clinton: Q. Did you state at the table the next morning, or was anything said as to what had transpired between you and Dr. Burdell on the night that you let him in?
The Court: Tell the whole story.
The Witness: I said that Georgie, Willie, my brother and myself, came down to let him in, and he was in a great state of excitement, swearing and cursing, and he *574 (Burdell) said that he would knock my head in. I told him that I did not know how the door became locked, but I was certain that it was not locked at the time I opened it. He called me a liar, and said that he.would knock me down.
Q. Now, what did Eckel say in reference to that? A. Nothing whatever, excepting that he (Burdell) ought to be ashamed of himself; no threat whatever was made.
Q. What did the defendant (Mrs. Cunningham) say? A. She said it was just like his abuse to her—similar to his abuse to her.
Q. Was that all that was said as far as you recollect? A. That is all, I think.
Q. Was anything said in regard to his being a passionate man, but that he would get over his passion very soon? A. Mrs. Cunningham may have said something of that kind, but I have no distinct recollection of it, sir.
Q. Did you perceive any offensive smell at that time, like burnt woolen, or burnt rags, or burnt leather? A. None whatever.
Q. Are your smelling powers in good order? A. Excellent, sir.
Q. I will ask you this: Do you know anything in respect to the discharge of Mary Donahoe? A. Yes.
Q. State what you know of your own knowledge upon that subject? A. I know she came in very much intoxicated, or she did not come in intoxicated one moring, but you could see the effect of the liquor.
The Court: She came in showing the effect of intoxication? A. She. came in one morning, after an absence of about four days, I think, and much marked and bloated, I think.
Q. Marked and bruised? A. Yes.
Q. Well, then what transpired? A. Mrs. Cunningham threatened to discharge her, and she began to cry and beg, and so forth.
*575 Q. Did she go down on her knees to Mrs. Cunningham? A. I think she did.
Q. What did she do? A. I think she went down on her knees, but I am not sure; she made a great time there; this was a long while before the murder—some three or four weeks.
Q. Some three or four weeks before the homicide? A. Yes, sir; I think so.
Q. State, Mr. Snodgrass, the first intimation you had of the death of Dr. Bur dell? A. From the cook, sir.
Q. Hannah, the Cook? A. Yes.
Mr. Clinton; State the particulars.
The Court: You need not go over that again. It is not necessary.
Mr. Clinton: Did you see the corpse? A. I did, sir.
Q. Did you go for any one, and if so, whom? A. For Dr. Roberts.
Q. You went for Dr. Roberts? A. Yes.
Mr. Clinton [to the court]: I do not know, your honor, how far it is necessary to go over details.
The Court: It is not necessary unless you have some new fact.
Mr. Clinton: I was about questioning the witness as to the conduct of the defendant.
The Court: That seems to have been very fully gone into, and it is unnecessary to go into it unless there are some new facts yon desire to elicit. If anything occurs to you, Mr. Clinton, you can ask it afterwards.
Mr. Clinton: Oh, yes. [To witness]: How is it in respect to there being a stable in the rear?
The District Attorney: Do you know anything about that? A. I believe there is.
Mr. Clinton: Is there a building in the rear? A. Yes, sir, and it looks like a stable at any rate.
Q. You have never been through it? A. No, sir.
Cross-examined by the District Attorney; Q. You said that *576 you closed the door, or thought of closing it, because of the stealing of the overcoats? A. I do not think that would make any impression, sir, upon my mind at all; I was not afraid of anything of that kind, ■
Q. Then what was the impression that caused you to do it? A. Nothing at all; it was only that Mrs. Cunningham made the remark to me about closing the door.
Q. But it made no impression upon your mind? A. It made no .impression upon my mind.
Q. Therefore you did not get up to close the door? A. I did not, sir.
Q. How long before this was the incident of the overcoats being stolen? A. I could not say, sir.
Q. Was it while the old lock or the new one was on the front door?
The Gourt: Before the alteration? A. I think the coats were taken twice, and the second time was when the new lock was on; the door was open at that time.
Q. Previous to your going on this last visit to Mrs. Cunningham you had known very little of herself and the doctor? A. I had not seen a great deal; before that time I had seen very little of them.
Q. I think you stated that you knew of no unfriendly feeling existing between Mrs. Cunningham and Dr. Bur-dell? A. I did not know of any.
Q. When you went out the evening in question, the Friday night, where did you first go to? A. I think it was at the corner of Amity street and Broadway, or the corner of Fourth street and Broadway.
Q. And you left the house at what time? A. I do not know; perhaps in the neighborhood of eight o’clock.
Q. Did you wear a watch at that time? A. Yes.
Q. Was your time then matter of supposition or of recol lection, from seeing your watch? A. I may then have worn a watch, but I do not know that I did.
Q. What is your idea of the time that you left this *577 house on this Friday night? A. I should judge, sir, it was near eight o’clock—not the time that I left; that was about half-past seven, I should think.
Q. Did yon walk with this young lady (Miss Helen) to the corner of Broadway and Fourth street at a slow or at a rapid pace? A. At my general gait, sir.
Q. You walked with her, at your general gait, as you would do when you are alone? A. Yes.
Q. Is that gait of yours, sir, slow or rapid? A. It is not very rapid or very slow.
Q. How long were you in the store at the corner of Broadway and Fourth street? A. Ho longer than time enough to purchase some writing paper.
Q. How long was it? A. Two or three minutes.
Q. And from thence where did you go to? A. We went from there down to. Fourth street.
Q. That is towards Washington square? A. Yes, and to the Bowery.
Q. It would be what we call, in Knickerbocker language, over to the Bowery? A; Yes, sir.
Q. Did you turn the corner of Bowery into Fourth street, up or down? A. Up.
Q. How far up? A. Hot over two blocks.
Q. Where did you stop, if anywhere? A. I do not know; we stopped in a dry goods store.
Q. How long were you there? A. We were there some little time.
Q. About how long? A. I do not know, sir.
Q. One minute, or twenty minutes? A. It was not twenty.
Q. Was it fifteen? A. I should judge not.
Q. What were you purchasing there, if anything? A. A veil, I think, sir.
Q. Were there many patterns looked to, or not? A. Two or three, I should think.
Q. Were you there ten minutes? A. We may have been that length of time, but I do not know.
*578 Q. But there was some looking at patterns, however? A. Yes.
Q. You then left there together, and where did you go then? A. To No. 31 Bond street.
Q. You went through the Bowery to Broadway,, and down Bond street to the house again? A. Yes.
Q. And from there you went up stairs, as I understand it? A. We went into the hack parlor.
Q. Were you furnished with a night key for the house? A. Yes.
Q. Did you have one or two? A. I had one.
Q. What time the next morning was it that the cook came up into the room? A. Nine o’clock, as far as I could judge.
Q. Did you notice how her hands were? A. There was dough upon her hands.
Q. You were in the house nearly all Saturday, were you not? A. Until I was taken to the station house.
Q. And you were in custody during the coroner’s inquest? A." Yes, sir.
Mr. Clinton: Now, as to the night keys that you have spoken of—do you not know that Dr. Smith and son had night keys? A. Yes, sir.
A Juror: Did you strike a light next to the doctor’s door? A. Yes, sir.
Q. How did you find the way down stairs? A. The light was sufficient for me to go into the kitchen.
Q. Did you light the gas in the kitchen? A. Yes, sir.
Mr. Clinton: Did you put it out when you left? A. Yes.
Q. Where is the cider kept?
The Court: Never mind that, sir; that is not important.
Mr. Clinton: Very well; it is a little fact of locality, and that is all. [To the witness:] Have you ever seen Mrs. Cunningham eat and carve? A. Yes.
Q. Did she use the right hand or left? A. As far as I perceived she used the right hand.
*579 Q. Have you ever noticed that she was left-handed? A. Never did.
District Attorney: She carved as well with the one as with the other? A. Yes.
Mrs. Hester Van Hess was next called by the defense. She said she was acquainted with Mrs. Burdell and her daughters, and had known her, more or less, since her eldest daughter, Augusta Cunningham, was two years old; she first saw Dr. Harvey Burdell two years ago in Twenty-fourth street, at Mrs. Cunningham’s house; since that occasion she had often seen Mrs. Burdell and the doctor together; she had been with them to Saratoga; she once remained there a week with Mrs. Cunningham; Dr. Burdell called on her every day, sometimes twice a day, and generally spent his evenings with her; he rode out with Mrs. Cunningham and witness; she had also seen them together at Mrs. Cunningham’s house in this city; had never observed anything that indicated unpleasant feelings between them; she understood they were engaged to be married, and their conduct was in harmony with such an understanding; Dr. Burdell had alluded to the marriage in her (witness’) presence; he used to talk to Mrs. Burdell about her dress; wished her to throw aside her mourning and dress in colored gowns; he one day expressed his satisfaction that she had cast off “ her black rags,” and put on a brown dress; one afternoon, in the latter part of last fall, witness was in the basement of No. 31 Bond street, with Mrs. Burdell; the doctor came down, and they conversed together; there was nothing to show that their former pleasant relations had changed; witness was in the house twice on the Friday prior to the doctor’s death, the first time at one o’clock p. m., the second time at four o’clock; Bev. Dr. Beecher, of Saratoga, was there on the last occasion; witness first heard of the doctor’s death about nine o’clock on Saturday morning; little George came for her; she went to Mrs. Burdell’s room; Mrs. Burdell was *580 there with her two daughters, Snodgrass, Dr. Roberts and a lady who was bathing Mrs. Burdell’s forehead; Mrs. Burdell was lying on the bed; she appeared insensible, and took no notice of witness for some time; afterwards, when witness took her hand, she opened her eyes and said, “ Oh, isn’t this horrible I ” witness could not recollect what happened during that day, so many persons were in and out of the house, and there was so much excitement; there was all the excitement and alarm that such a scene would naturally occasion.
Cross-examined by the District Attorney: Q. Where do you live, Mrs. Van Ness? A. At No. 107 Fourth avenue.
Q. Are you not a friend of Mrs. Cunningham’s family? A. I am.
Q. You are her dressmaker, are you not? A. I have been employed as such.
Q. Do you know Dr. Roberts? A. I have met him at Mrs. Burdell’s house a few times.
Q, He went with you to Saratoga, did he not? A. He did.
Q. In what month was that? A. In July.
Q. I notice that you call the defendant Mrs. Burdell; did you know her by that name prior to the murder? A. I did not; I only knew her then as Mrs. Cunningham.
Dr. Daniel D. Smith, was then examined by Mr. Clinton. He said he was a doctor of medicine and resided at No. 35 Bond street, two doors from Dr. Burdell’s. For a long time he had been, in concert with his son, conducting some experiments with a view of testing the power of the electric current on various articles, such as alcohol, phosphorus, &c. He had occasion, in these experiments, to use pieces of leather, and shellac, for joining tubes, and scraps of woolen rags, for cleaning instruments. The woolen and leather so used, became saturated or impregnated with chemical fluids. When a quantity' of leather or rags accumulated, it was his custom to burn them up. On the *581 afternoon of Friday, January 30th, intending to spend the night out of town, he gathered a heap of woolen rags and pieces of leather, and threw it upon the remains of an anthracite coal fire, opened the window of the room wide, locked the door, went off and took the cars. The room in which he burnt these rags was the front room third story, adjoining No. 33. On his return to the house, the next morning, he found that the smell of the smouldering rags and leather pervaded the whole premises, and so strong and unpleasant was it, in the room in which they had been consumed, that he had to fumigate it. It was a mixed smell of burning leather and woolen, saturated with chemicals.
Cross-examined by the District Attorney: Doctor, what time do you say you left your room that afternoon? A. About half-past three o’clock.
Q. How was the fire when you left it? A, It was low, and was not replenished.
Fernando O. Smith, the son of the last witness, was next called. He said that on the night before the murder of Dr. Burdell was discovered, he came home between ten and eleven o’clock, wearing a large gray shawl and a cap; he remembered the offensive smell in his father’s room the next morning; his father, he stated, was in the frequent habit of making chemical experiments, and used woolen rags and pieces of leather in making them. These rags were burnt when they accumulated; he had burnt them himself often.
Mrs. Catharine Dennison was next called. She testified that she was a cousin of Dr. Bur dell’s; that she had long known him prior to his death, over twenty years. The first time she ever met Mrs, C. was in 1856, and she had seen her frequently since in company with the doctor; had seen them together at No. 31 Bond street frequently, and had seen them together at her own house in Brooklyn, in the winter of 1856. The witness testified that their relations to each other were of a most friendly character, and she *582 detailed at some length, a conversation which took place on one occasion between the doctor and Mrs. C. in her presence, at No. 31 Bond street. She never observed anything that was quarrelsome between the doctor and Mrs. C.; had been at No. 31 Bond street eight or nine times.
Herbert W. Treadwell was next called and examined. Said he had walked in company with four other gentlemen in Bond street, the Friday night on which the murder occurred. It was • about twenty minutes after twelve o’clock when he got into Bond street from Broadway; he remained on the corner of Bond street and the Bowery from fifteen to twenty minutes; noticed nothing unusually offensive in the atmosphere; it was a dark and obscure night.
Mr. Dean: I would like to have it determined now whether the jury are to have the privilege of visiting the premises.
The foreman of the jury remarked that the jury had no objections to going.
The Court announced that there would be a private arrangement made between the jury and the court to visit the premises.
Helen Cunningham, being sworn, testified as follows:
Q. You are the second daughter of the defendant? A. Yes, sir.
Q. Where have you resided for the last year? A. No. 31 Bond street.
Q. Are you there still? A. Yes, sir.
Q. Had you made arrangements to leave home the Sat urday after the murder? A. Yes, sir.
Q. Were you home Friday, at the house, with your mother? A. I was a short time away, from half-past two in the afternoon until four; with that exception I was in the house all day and evening.
Q. At what time did you dine that day? A. I think it • was about six o’clock, or a little after.
*583 Q. During the day, what persons do you remember seeing at the house? A. I saw Dr. Beecher a few moments in the parlor, and Mrs. Van Ness; I do not remember seeing any one else that day.
Q. Do you remember having a dressmaker in the house? A. Yes, sir; Susan Cary.
Q. Was she there all the day? A. She was there until dinner.
Q. You were out shopping in the afternoon? A. No, sir; I was taking music lessons in the afternoon.
Q. You went out in the evening? A. Yes, sir.
Q. Can you tell about the time you went out? A. I think it was about seven o’clock.
Q. Who accompanied you? A. George Snodgrass.
Q. Where did you go? A. I went out to buy a veil; I purchased it and then came back.
Q. Who were to dinner that day at your house? A. My mother, Augusta, George, William, Mr. Eckel and Susan Cary; George Snodgrass came in after we got through our dinner.
Q. Did he eat his dinner? A. Yes, sir.
Q. It was after he had done his dinner that you went out? A. Yes, sir.
Q. Do you recollect where your mother was when you went out? A. I think she was in the front room, third floor.
Q. When you came back with Mr. Snodgrass, where did you find her? A. I found her in the front room of the third story.
. Q. What did you do the rest of the evening, from the time you got in; do you recollect whether your brothers were out when you came home? A. They were both out.
Q. From the time you came in, I wish you would state what occurred in the house, as near as you can recollect. A. I brought in the veil and showed it to mother; I then went to folding up some of my clothes and putting them in the trunk which I was to take away with me.
*584 Q. Do you recollect what next occurred? A. After I had been in the house a short time, mother returned with Mr. Eckel and the two boys.
Q. After Mr. Eckel came into the room what occurred? A. Mother brought up some candies and oranges to send to my sister, who was at school.
Q. Do you recollect about your brothers going up to bed and coming back? A. Yes, sir; they came back, and mother told them to wait until George Snodgrass was ready to go with them, and they did wait.
Q. Do you know at what time George and your brothers started to go to bed? A. I think it was very near eleven o’clock.
Q. When you returned from the street after getting your veil, did your mother have on the same or a different dress from that she wore when you went out ? A. She was dressed in the same way.
Q. Did she wear that dress until she went to bed? A. She did, and she had it on since morning.
Q. What kind of a dress was it ? A. It was a black silk one.
Q. Was it the same dress she had on the next morning? A. It was and she wore it until the coroner had it taken off.
Q. Where did you sleep that night? A. I slept with mother in the front .room on the third story.
Q: Who slept there besides you and your mother? A. Sister Augusta.
Q. What time did you retire? A. I think it was about a quarter past eleven o’clock.
Q. Did you go immediately to sleep? A. My sister and I laid awake and talked a short time.
Q. In what position did you sleep? Who slept in the middle? A. My mother.
Q. Did your mother get up from the time you retired to your knowledge? "A. No, sir.
*585 Q. Did you observe any unusual odor in the house? A, I did not.
Q. When you got up in the morning did you notice any unusual odor? A. I did not.
Q. Did not notice anything unusual until after you heard of the doctor’s death? A. I did not.
Q. Did you breakfast with the family? A. Yes, sir.
Q. Who was at breakfast? A. My mother, George, William and George Snodgrass, they were at breakfast together, and then Augusta came down a few moments afterwards.
Q. Did Mr. Eckel take breakfast with you that morning? A. No, sir; he went out before breakfast.
Q. Did your mother go down before breakfast was ready that morning? A. She did not; I went down with her when she went down stairs in the morning.
Q. Did your mother eat her breakfast? A. Yes, sir.
Q. Do you remember what you had for breakfast? A. I do not.
Q. When did you hear of the death of Dr. Burdell? A. On Saturday morning, the 31st of January, about half-past eight or a quarter of nine o’clock.
Q. Was it after breakfast and after you had gone up stairs? A. It was.
Q. In what room were you when the announcement was made? A. In the front room of the third floor.
Q. Who first announced it? A. Hannah the cook; that was the first I heard of it.
Q. Had you any intimation of it before? A. None at all.
Q. Do you recollect what was the language in which Hannah announced it? A. I do not remember it; I remember hearing her say, “Dr. Burdell is' dead,” or “murdered;” I do not know which word she used.
Q. You have no recollection of what followed immediately afterwards? A. No, sir.
Q. Were you in court day before yesterday when a *586 «police officer was sworn as to singing in No. 31 Bond street, on some Sunday after the death of Dr. Burdell? A. I was not.
Q. Was there any singing in the house the first Monday of February, succeeding the death of the doctor? A. There was not.
Q. Was there any on Sunday morning of the second Sunday? A. There was.
' Q. I wish you would state what it was, at what time, and under what circumstances it occurred? A. I had taken up my prayer book, and after reading my prayers my eye fell upon a hymn that I knew, and I took up the book and •sang the first verse.
Q. I wish you would state what you sang? A. It is the first verse of the twelfth hymn in the Booh of Common Prayer (indicating the place in the book, which was handed up for inspection).
Mr. Dean then read as follows:
“ God moves in a mysterious way His wonders to perform,
He plants His footsteps on the sea,
And rides upon the storm.”
■ Q. Is that'the verse you sang? ' A. Yes, sir.
Q. Did you or your mother sing anything else that morning? A. I do not recollect that I did; I was the only person that sang; mother did not sing any.
Q. Have you any knowledge of the way or manner in which Dr. Burdell’s death was caused? A. I have not.
Q. Have yon any knowledge as to the time in which he was killed? A. I have not.
Q. Have you any knowledge as to the person who killed him? A. I have not.
The direct examination being closed, the district attorney said he would not avail himself of his privilege to cross-examine the witness.
Smith Ely was then sworn, and testified that he was *587 engaged in the leather business in Ferry street, and that he was acquainted with John J. Eckel; called at his boarding place, No. 31 Bond street, on the evening of the 30th of January, between half-past seven and eight o’clock, and left a note for him with Mrs. Cunningham; did not know what had become of that note.
Q. [By Mr. Dean.] Did Mr. Eckel meet you the next morning?
Question objected to by the district attorney.
The judge decided that counsel might ask the question, although he could not see the importance or relevancy of it.
Q. Did you see Mr. Eckel on Saturday morning? A. Yes, sir, shortly after eight o'clock, at his place of business in Stanton street.
Witness further stated that he merely delivered the note to Mrs. C.; had no conversation with her except such as simply related to the delivery of the note; noticed nothing peculiar in the manner or appearance of Mrs. Cunningham.
John Smith was next called. He testified that he lived at No. 54 Great Jones street; knew Mr. Eckel and premises No. 31 Bond street; he delivered, in the latter part of October last, at that house, for Mr. Eckel, a rosewood bookcase bedstead; saw at that time Dr. Burdell, Mrs. C. and her two daughters, and before he came away saw Mr. Eckel; it was between five and six o’clock that he delivered the furniture, and it was very near six o’clock before he left the house; he put up the bookcase in Mr. E.’s room, and was assisted by Dr. Burdell; he presented the bill receipted to Dr. Burdell, dated the same day he delivered the furniture, and he received from the doctor a check on the Market Bank for the amount; Mr. Eckel came in after he had received the check from the doctor; he was engaged about half an hour in putting up the bedstead in Mr. • Eckel’s room, which was on the third floor; Dr. B. said to him while he was assisting him: “ Every knock you give *588 my wall I shall charge you five dollars for;” he (Dr. B.) spoke about the wall being newly painted.
Miss Margaret Augusta Cunningham was then called and ¿worn:
Q. Do you reside at JSTo. 31 Bond street? A. I do.
Q. Were you there on Friday, the 30th of January last? A. I was out all day from home, until between four and five o’clock in the afternoon.
Q. Did you go out in the morning? A. Yes, sir. •
Q. Were you at. home to dinner with the family? A. Yes, sir.
Q. After dinner what did you do and where did you go? A. I went immediately up stairs, to the third story, front room.
Q. What did you do after that? A. I think I went to the attic shortly after that, where my mother and brothers were.
Q. Were your two brothers in the house the entire evening? A. Yes, sir.
Q. Who else were in the house that evening? A. Mr. Eckel, Mr. Snodgrass, besides one of the servants, Hannah.
Q. Is your mother right or left-handed ? A. Bight-handed.
Q. During the evening did a portion of the family leave the house? A. Mr. Snodgrass and sister went out.
Q. Did Mr. Eckel go out? A. He did.
Q. About what time did he return? A. I do not remember the time exactly, but I think it was somewhere about nine o’clock.
Q. Do you remember the fact that he did return? A. Ido.
Q. Where did you first see him after he returned? A. In the third story front room.
Q. Where had your mother been up to that time? A. I think she had been only up stairs in the attic.
Q. After Mr. Eckel came in and went up into the front *589 room, third story, do you recollect who were there? A. I think all the family were there.
Q. Whom dó you mean by family? A. Mother, sister, my two brothers, Mr. Eckel, and I think Mr. Snodgrass were there.
Q. Do you recollect whether Mr. Eckel brought anything when he came home? A. He brought some candies and oranges.
Q. Do you remember anything that was done by any one after Mr. Eckel came in? A. Mr. Eckel was mixing some seeds for the birds.
Q. How many birds were there in that room? A. I cannot state exactly, but I think there were sixteen or seventeen canaries; there might have been more,
Q. To whom did they belong? A. To Mr. Eckel.
Q. After mixing this seed for the canaries, what then occmTed? A. I cannot really state.
Q. Do you remember whether Mr. Eckel or Mr. Snodgrass left the room to retire to bed? A. I really cannot say.
Q. Did they really both of them leave the room? A. Yes, sir.
Q. Where was your mother when they did leave the room? A. She was in the room.
Q. When .the boys left, where was she? A. She was in the' room.
Q. After Mr. Eckel left, do you recollect anything about a note being left by Mr. Ely? A. Yes, sir.
Q. What was done with it? A. Mother took it to Mr. Eckel’s room door and gave it to him.
Q. After the boys had left the room, do you remember this circumstance, whether the boys went up stairs to bed -and afterwards came back? A. I do.
Q. After they came back, did they remain in the room or go back with Snodgrass? A. I think they went back with him.
*590 Q. Do you know whether a light was left in the attic during the time they were down stairs waiting for Snodgrass to go up? A. I do not.
Q. Do you sometimes leave a light on the chest in the attic?
[Objected to by the district attorney.]
Q. How long was your mother at Eckel’s door in delivering the note? A. I think it was scarcely a moment.
Q. She came immediately back? A. Yes, sir.
Q. After she came back, into what room did she come? A. In the third story front room.
Q. What became of her after that? A. We then all three retired into one bed.
Q. Do you remember the relative positions you occupied in the bed—who was in the middle ? A. Mother was.
Q. Can you give about the time you retired? A. I think it was somewhere about eleven o’clock.
Q. Have you any data to fix the time? A. I have none; but I think it was about that time.
Q. Did you go immediately, to sleep ? A. I think mother did, but sister and myself lay awake sometime talking. • '
Q. Did your mother leave that bed from that time until the next morning? A. Not to my knowledge.
Q. From her position in the bed, with reference to you and your sister, could she have got out without disturbing you? A. I do not think she could.
Q. State the location of the bed, if -you please? A. The head of the bed was against the wall, and the foot of it close by the fire-place.
Q. Was that the usual position of the bed ? A. Yes, sir; and it had stood there ever since' I had been in the house.
Q. What dress did your mother have on during that evening? A. A black silk basque and skirt.
*591 Q. Did she change her dress during the evening? A. She did not.
Q. What dress did she put on the next morning ? A. The same basque, but a different skirt.
Q. What became of that basque? A. The coroner took it.
Q. During the whole of the evening,'from the time you returned, did you leave the house until the next morning? A. I did not.
Q. During the early part of the evening, where were you before you went up into the third story—were you in the parlor any time? A. I was in the parlor awhile before dinner, but no person was there.
Q. Do you recollect whether, during the evening, you were in the parlor? A. I was not.
Q. Were you the next morning when your mother got up? A. I think I was.
Q. Did she go down stairs before breakfast was ready— was she called at breakfast? A. I cannot really say.
Q. Were you at breakfast that morning? A. I was.
Q. In going down to breakfast, did you notice anything unusual? A. I did not.
Q. During the night, at any time, or in the afternoon, from the time you returned until morning when you went down to breakfast, did you hear any unusual sound? A. I did not.
Q. Did you perceive any unusual odor? A. I did not.
Q. When did you first hear of the death of Dr. Burdell? A. It was in the morning shortly after breakfast.
Q. Where were you when the death was announced? A. In the third story front room.
Q. Was your mother present? A. Yes, sir.
Q. Who announced the death? A. Hannah, the cook.
Q. Prior to that time, had you any knowledge or intimation whatever of his death? A. I had not.
Q. Have you any knowledge of the time of his death? A. No, sir.
*592 Q. Have you any knowledge of the person who was the cause of his death? A. No, sir.
• Q. Have you any knowledge or information upon the subject, except what you have given in your testimony as a witness here or before the coroner? A. No, sir.
Q. Have you any knowledge of any clothing, or wearing apparel of any kind or description being destroyed or burnt in that house? A. I have not.
Q. Have you any knowledge of any shoes or leather having been burned in the house that night? No, sir.
Q. Has any dress of your mother’s been missing after that time? A. No, sir.
Q. She had the same dresses as before? A. Yes, sir.
Q. Do you know of any persons having been let into the the house that night? A. No, sir.
Q. Were all the dresses of your mother and the other occupants of the house submitted to the examination that the coroner caused to be made? A. They were.
Q. Was the back room attic used to dress in? A. It was.
Q. Was it used at this particular time, do you recollect? A. It was not—we had no wood then of the size to fit the stove there.
Q. Did you sometimes have a coal fire in the attic nearest Broadway? A. Yes, sir.
Q. For what purpose? A. For sister and myself to dress by.
Q. Was it an ordinary or unusual thing to have, a fire made there? A. We had a fire made there quite often.
Q. For what purpose was the third story front room used by the family? A. It was a general family sitting-room.
Q. Is there a window looking directly into the room where Mr. Eckel’s trunks were kept? A. Yes, sir.
Q. When you heard of the death of Dr. Burdell, there ■was an outcry on the part of Hannah? A. Yes, sir.
*593 Q. Do you recollect what occurred immediately upon that announcement? A. I really cannot say.
Q. Were you concious of what occurred immediately upon that announcement? A. I do not remember anything else, at present, except that I was standing by my sister • by the bed; she was faint.
Q. Who was the first person you saw in the room after the announcement? A. I think it was Dr. Mayne.
Q. There are windows over each of the doors in the attic? A. Yes, sir.
Q. A light in the centre of the attic would, of course, be seen in either of the rooms? A. Yes, sir.
Q. Have you any recollection whether a light was left in the attic on Friday night by anybody for" Snodgrass and your brothers to go to bed? A. I have not.
Q. Is there any bolt to the back door on the floor level with the parlors—the door leading off the back stoop? A. I think there is nothing but an ordinary lock.
Q. Is there a stable directly in the rear of the house? A. Yes, sir.
Q. Is there a door to that stable opening on the yard to your house? A. There is.
Q. Do you know whether there was any examination made that morning to see whether that door had been locked over night? A. I don’t.
Q. Where does that door lead to? A. Off to the back stoop.
Q. On the back stoop what is there? A. There is a laboratory where Dr. Smith and his son and others went, and the door leads out into the yard.
Q. This stable connects directly "with the yard of the .house? A. Yes, sir.
Q. Who occupied the stable? A- I do not know.
Q. It was not occupied by your family? A. It was not.
Q. Do you know whether the stable door was kept locked, or sometimes kept open? A. I do not know.
*594 Q. Is there more than one door leading into your yard?
A. Only one.
Q. Do you know whether the window in the hall of the second story is kept bolted, or whether it was so that it ■ could be shoved up or down? A. I do not.
Q. You had nothing to do with fastening the house? A. No, sir.
Cross-examination: Q. Was there a mantel-clock in your mother’s room? A. Yes, sir.
Q. Whose was it? A. Mr. Eckel’s.
Q. Was there any other clock in the-house that night? A. No, sir.
Q. What furniture was in the front room nearest Broadway, Friday night, or about that time? A. I cannot really say.
Q. When did you last have fire in the grate in the attic? A. Some time the first part of that week.
Q. Was it before Wednesday? A. I could not say.
Q. You did not use it on Thursday? A. I did not.
Q. How long had you occupied it? A. For several months.
Q. Were you up in this room on Friday night? A. I was not there at that night.
Q. Where did you dress on Friday morning? A. I think it was in that room.
Q. You say when Hannah came into the room and announced that Dr. Burdell was killed, you went by the side of your sister, who was fainting? A. Yes, sir.
Q. Where were yon when Hannah, announced it? A. I was seated by the window sewing.
Q. Where was your sister? A. I cannot say.
Q. Do you remember what it was that Hannah said? A. She said “the doctor was dead, or murdered,” or something to that effect.
Q. Where was your mother then? A. I think she was sweeping the room out near the door;
*595 Q. How long did you continue standing by the side of your sister? A. I could not state the time.
Q. Who was the next person that came into the room after Dr. Mayne? A. I think it was Dr. Roberts.
Q. Who else came into the room? A. I don’t remember.
Q. Did the bureau in your mother’s room stand between the windows? A. Yes, sir.
Q. Were there curtains or shutters? A. There were wooden shutters.
■ Q. Do you remember when Mr. Ely’s note arrived? A. I do not.
Q. Did you see the note in the back parlor? A. Ho, sir.
Q. When did you hear first about it? A. When my mother spoke about it up stairs.
Q. Did you and Helen go up to your sleeping room that night? A. Hot to my knowledge.
Q. What was the reason for your sleeping down stairs that night? A. For the reason that sister was going away the next morning to school.
Q. Who gave the pistol to your mother—the pistol which has been spoken of? A. Dr. Burdell.
Q. Was it while you lived in Twenty-fourth street, or after you came to Bond street? A. It was while we lived in Twenty-fourth street.
By a Juror: Q. Does you mother sew with her left hand? A. Sometimes she does.
Q. Do you know the reason? A. On account of rheumatism.
Q. Was she right or left-handed previous to the rheumatism? A. She was right-handed.
John PerMns was the next witness called. He testified that he was a jobber in boots and shoes at Ho.' 29 Cortlandt street; his residence was now at Ho. 92 Second avenue, but he resided at the time of the homicide at Ho. 32 Bond street; did not know Dr. Samuel W. Parmly by sight or otherwise.
*596 Q. Do you know anything about Dr. Parmly’s dog, of the King Charles breed?
The Judge: I do not think that the dog has anything to do with this case at all.
■ Mr. Olinton: We want to show that the dog frequently went with this witness.
The Judge: I cannot permit any testimony of this kind
Henry 8. Smith was next called to the stand and sworn. He testified that he had been, since the recess of the court, to the rear of the premises No. 31 Bond street; there was a shed covering the piazza immediately under the windows of Dr. Burdell’s room; the distance from the shed to the window was about six feet or less;- the height of the shed was about fifteen feet, and the width of it was, perhaps, not more than eight feet; there was a fence dividing lot No. 31 from that of No. 33, which ran up to within four feet of the top of this shed; there were three windows on the second story near to that shed, and there were other sheds immediately adjoining, of diverse heights, but nothing to prevent access from one to the other; the door of the stable in the rear of the house No. 31 was fastened by three or four nails on the inside; there was an entrance to the stable from Bleecker street; witness also noticed a ladder in rear of the premises.
By a Juror: I want to know whether you observed how far a-person could pass each way over these sheds?
The Judge: That is speculative, and is not legal evidence.
Mr. Clinton then asked little George Cunningham to state to the court and jury whether there was any ladder in the yard in the latter part of January last.
The district attorney objected to the question, first, because it was exceedingly illegal in tone; and second, because it should not be asked of a child whom the prosecution had purposely abstained from cross-examining.
The Judge then suggested that one of the daughters *597 should be asked the same question. It was put to Helen Cunningham, and she said there was a step-ladder in the yard, and it was the same one which is there now.
Mr. Clinton now proposed to introduce evidence to show that Mr. Eckel had been separately indicted from the defendant for the same offense.
The fact was admitted by the prosecution.
Counsel for the defense then announced that they had no further testimony to offer.
The district attorney, after a brief consultation with the Attorney General, informed the court that they did not see anything in the defense which called for a reply.
The Court then said it would assign four hours to each side in which to sum up, and he would leave to counsel to arrange among themselves as to the distribution of the time.
The counsel for the defense having requested the prosecution to furnish them with their points, Mr. Edwards read as follows:
Many of the most important legal principles in criminal law, which attach to a conclusion of guilt, lay hold of the prisoner, Emma Augusta Cunningham.
1. Crime may be committed where resentment is dissembled, while legal presumptions are powerful against an accused party, where revengeful impulse is so ardent and active as to be exhibited in expressions.
These partake of the state of mind and heart, and show motive from its source, and the law inquires for motive. (People v. Henrietta Robinson, 1 Parker's Criminal Rep., 649; People v. Lake, Id., 502.)
2. A declaration of criminal intention goes very far in law towards a conviction, when it is followed by the fact of a violent death; and it becomes all-controlling when coupled with the fact that such violent death clearly occurs within the very home or house of the accused.
Such declaration shows an ill will which the person *598 uttering it is prepared, on a fitting occasion and with secreted means, to carry into effect.
3. Positive threats come even nearer conviction. Here desire and purpose legally assume their strongest form. (Harris’ Case, 12 State Trials, 841—846.)
4. Preparation for the commission of crime, whether auxiliary' or otherwise, is even more powerful against a prisoner than words, for it amounts to intention expressed by acts. (Earl Ferris’ Case, 19 State Trials, 904.) A female servant, living with the prisoner, was sent out to walk- with the children. In the present case the servants were sent off to bed. In Harris’ Case (2d Chandler Amer. Crim. Trials, 353, 386), a deliberate attempt to create an alibi, evidently in advance of crime, was made.
„ 5. Opportunity and facilities include the possession of means, and form together positive criminative circumstances. Here it grew out of existing circumstances and relations. The relation of mistress and keeper multiplied almost indefinitely the opportunities and facilities.
6. A loaded revolver or pistol found in the possession of a woman, in a peaceful neighborhood, who has used threats against a man found murdered in her house, under circumstances like the present, raises a presumption against her, although he may have been killed by another weapon, not found (Commonwealth v. Williams, 2d Cushing, 582), especially when it clearly appears that such pistol was once his property, and there was time to dispose of the killing weapon.
7. Circumstances in this case attach against the prisoner, as well where these circumstances preceded as where they followed the crime.
8. Here was proximity of the accused to the scene of the crime at the very time of its committal, made more near by a false key and lewd intercourse. This raises a legal presumption of participation in the criminal act, especially when coupled with threats.
*599 9. Guilty actions are so often attached to a secret manner of committal of crime, that the law is satisfied with, a conclusion drawn from evidence of mere circumstances, and from these alone, and without a single requirement of direct testimony, save the production of the dead body. The commission of the act charged may be fairly presumed by the jury. (Russell on Crimes, 726.)
And a conclusion of guilt may depend upon a number of circumstantial links, which alone may be weak, but taken together are strong and able to conclude. (McCann v. The State, 13 Smedes & M., 471.)
10. Where medical evidence shows that a more mortal wound might have been given than any of those which were inflicted in this case (namely, where the spinal cord commences), the idea of a wounding by a person possessed of anatomical knowledge is much weakened. While the facts of random and helter-skelter cuts, and several mortal wouuds, are against the idea that the deed was done by one who was schooled in or had studied surgery or anatomy, as such a one would not have done the former, nor found the latter necessary.
Jurors are to take post mortem experiments with great caution, and as possessing no weight. Thus, experiments by blows on a dead body lead to no just conclusions, as common sense tells us that there is a total want of resistance, and an entire relaxation of muscles, while the living man is made up of active substance and principles of resistance.
11. When a palpable murder has been committed, legal circumstances may attach and be sufficient to convict without the necessity of finding the weapon which caused it. The law may require a dead body to be produced before a conviction for murder can attach; but, being produced, and the violence apparent, it does not insist on a sight of the weapon. It can deal with the accused without it.
Mr. Dean then addressed the jury, and was followed by *600 the district attorney, Mr. Hall. Mr. Clinton made the concluding address to the jury on behalf of the defense, and was followed by the Attorney General.
Judge Davies then proceeded to charge the jury, as follows:
Gentlemen of the Jury: The prisoner at the bar stands charged with one of the highest crimes known to the law, that of taking the life of a human being, Harvey Burdell, on the night of the 30th of January last. You have heard, with commendable patience and attention, the evidence in support and in refutation of this accusation; and you have listened to the comments and scrutiny of the learned and eloquent counsel engaged in this cause upon the testimony thus adduced./ It now remains for the court ' to state to you the principles of law applicable to this case, and render you such aid as may be in its power, in classifying and arranging the tesmony, and indicating the proper weight belonging to its various parts in your consideration of it. It can be hardly necessary for the court to remind you, gentlemen, of the solemn and important responsibilities resting upon you. The oath which you have taken demands of you that you will true deliverance make between the people of this State and the accused, and its fulfillment solemnly requires of you that you divest your minds of all sympathy for or prejudice against the prisoner, or any of the various persons connected with this startling tragedy. You must close your minds to all external influences or considerations—divest them entirely of all bias or knowledge, even so far as you are capable, of .the party charged with this crime, except as it appears in the testimony which has been given since you were impanneled in this case. Above all, gentlmen, you must not forget that, although you are sitting upon the life of one who belongs to that sex which instinctively appeals to your’s for protection and support and sympathy, and "which forms *601 the tenderest ties and associations of life, you are to shut your eyes and steel your hearts to those considerations. Crime knows no sex, and justice, in its administration, is no respecter of person, age or condition. All stand alike equal in its temple, and those who are called on to minister at its sacred altar, but bring ineffable disgrace upon its purity and their holy office if they can be swerved from their duty by improper influences or illegitimate considerations. The Revised Statutes of this State (2 R. S., 656-7, §§ 4 and 5), declare the “ killing of a human being, without the authority of law (unless it be manslaughter or excusable or justifiable homicide, as thereinafter defined), to be murder, when perpetrated from a premeditated design to effect the death of the person killed, or of any human being,” and in some other cases, which are not material to be stated for our present purpose. That the homicide in this case was either justifiable or excusable cannot be for a moment maintained. If there is evidence in this case that sufficient deliberation was had to form a design to take life, and to put that design into execution by destroying life, then there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow, -or whether it be contemplated for months. It is enough that the intention precedes the act, although that follow instantly. The law has no favor to extend either to the rapid or slow execution of the design. Malice aforethought, or premeditated design to kill, may be conceived at the moment the fatal stroke was given as well as at any time before. Malice aforethought, or premeditated design, means intention to kill, and if such means are used as are likely to produce death, the legal presumption is that death was intended. So in the present case, if you are satisfied that such means were used by the person or persons who inflicted these wounds upon the deceased, as were likely to produce death, then such killing is murder, and the party who *602 caused that death is guilty of that crime. Assuming, then, that you will find that the deceased was murdered, the next and the momentous inquiry in this case is, did the prisoner at the bar inflict those wounds which caused the death of the deceased, or aid in the infliction of them? This question must be met in this case with calmness and a firm determination on your part to meet all its responsi- . bilities. Public justice demands that the guilty, if ascertained, should make that expiation to the offended majesty of the laws which their violation demands. The peace and good order of the community, and the security and safety of our domestic firesides, alike demand that this great offense, if the offender can be ascertained, should meet its punishment. But these reflections, while they are powerful incentives to the discharge of our duty, and our whole duty, must not lead us to be the instruments of wrong, or confound the innocent with the guilty. There are two modes of ascertaining and proving a state of facts: First, either by positive evidence; or, secondly, that which is in its nature circumstantial. The distinction between them is this: Direct or positive evidence is when a witness can be called to testify to the precisé fact which is the subject of issue on the trial—that is, in a case like the present, that the party accused did cause the death of the deceased. Whatever may be the kind or force of the evidence, this is the fact to *be proved. But in this case no one was present at the time of the commission of the offense. - No one saw the act performed which caused the death of the deceased, consequently there can be no direct or positive testimony by whom the offense was committed. It is wholly unsusceptible of strict legal proof. But experience has shown that in such a case resort may be had to circumstantial evidence—that is, that a body of facts may be proved of so conclusive a character, when taken into connection and as a whole, as to warrant a firm belief of the facts, quite as strong and certain as that upon which prudent *603 and discreet men are accustomed to rely in relation to their most important concerns. It would be fatal to the administration of justice if such proof could not be availed of in judicial proceedings, for if it was necessary always to have positive evidence, how many criminal acts committed in the community, destructive of its peace and subversive of its order and security, would go wholly unpunished ? Strong circumstantial evidence in cases of crimes of murder, committed for the most part in secret, is the most satisfactory of any from whence to draw the conclusion of guilt—for men may be seduced, and often are, to perjury, by many base motives, to which the secret nature of the offense affords peculiar temptations. But it can scarcely happen that many circumstances, especially if they be such over - which they could' have no control, forming together the links of a transaction, should all unfortunately occur to fix the presumption of guilt on an individual, and yet such a conclusion be erroneous. And in a case of circumstantial evidence, when no witness can testify directly to the fact to be proved, it is arrived at by a series of other facts, which by experience have been found so associated with the fact in question that in the relation of cause and effect they lead to a satisfactory and certain conclusion. As when foot-prints are discovered after a recent snow, it is certain that some animated being has passed over the snow since it fell, and from the form and number of the foot-prints, it can be determined with equal certainty whether'they are those of a man, bird or quadruped. As a familiar illustration, we find an apple on the ground; we know it is - certain, there can be no doubt of it, that that apple once grew upon a tree—that it did not grow upon -the ground. Toil find it lying in the street or on the grass. The conclusion inevitably is that that apple came from some.tree, and that it grew there. This kind of evidence is the result of experience and observed facts and coincidences, establishing a connection between the true *604 and proved facts, and those sought to be proved. The advantages of evidence of this kind are, that as it is generally obtained from several and distinct sources, a chain of circumstances is likely to be prepared and arranged, and falsehood and perjury are more likely to be detected and fail of their purpose. The disadvantages are, that a jury have not only to weigh the evidence of facts, but after you have deemed the facts established by the evidence, to draw the just conclusions from them, in doing which, gentlemen, in this case, you must not be led by prejudice or partiality, or from any want of due deliberation or sobriety of judgment, to make hasty and false deductions. This source of error caUnot exist in positive and direct evidence. Then you have only to judge of the credibility of the witnesses, and that being established, it follows that the facts testified to are to be taken as true. But, gentlemen, it is quite apparent that after you have established in your own minds the facts proved, great care and caution ought to be used in drawing the inferences from these facts. These inferences must be fair and natural, not forced or artificial. The common law appeals to the plain -dictates of common experience and sound judgment, and the inference to be drawn from the facts must be a reasonable and natural one, and, to a moral' certainty, a certain one. It will not do that it is probable only; it must be reasonably and morally certain. Another consideration is that each fact which is necessary to the conclusion must be distinctly and independently proved, by competent evidence; because it may, and often does happen, that in making out a case by circumstantial evidence, many facts are given in evidence,, not because necessary to the conclusion sought to be produced, but to show that they are consistent with it and not repugnant, and aid in rebutting a contrary presumption; and the rule is, that all the facts proved must be consistent with each other, and with the main facts Sought to be proved (as in this case, *605 the participation of the accused in the commission of the crime charged). It follows that if any other fact necessary to the conclusion is wholly inconsistent with the hypothesis of the guilt of the accused, it breaks the chain of circumstantial evidence upon which the inferences depend, and however plausible or apparently conclusive the other circumstances may be, the charge must fail. The circumstances all taken together must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no one else, committed the offense charged. It is not sufficient that these facts and circumstances create a probability, though a strong one; and if, therefore, assuming all the facts to be true, which the evidence tends to establish, they may yet be accounted for on any hypothesis which does not include the guilt of the accused, then the proof, fails to make out the charge. It is essential, therefore, that the circumstances, taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis. We must first be satisfied, as I have already stated, that the evidence establishes the corpus delicti, as it is termed, or the offense committed as charged; and in a case of homicide like the present, you must be satisfied not only that the death of the deceased was by violence, but must, to a reasonable extent, be satisfied that you can exclude the hypothesis of a death by suicide, or a death by the act of any other person. You must be satisfied of this beyond any reasonable doubt. Finally, if upon such proof there is a reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal. It is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary; but, as already observed, the evidence must establish the truth to a reasonable and moral certainty—a certainty *606 which convinces and directs the understanding, and satisfies the reason and the judgment of those who are Tbouftd conscientiously to act upon it. These rules, which are derived mainly from the case of the People v. Webster, laid down by the Supreme Court of Massachusetts, are well laid down by Edmonds, Justice, in the case of Polly Bodine; and, as they are briefly stated by him, I will call your attention to them: First, the evidence must exclude to a moral certainty every other hypothesis but that of guilt. If you can reconcile the facts that are proved with the belief or supposition that the prisoner is innocent— that somebody else committed the guilty deed—then that hypothesis which the law requires does not exist in your minds. You are, secondly, to bear in mind that circumstances are sometimes fabricated by innocent persons falsely accused. As, for instance, an uncle was arrested for the murder of his niece. He was heard chastising his niece severely, and she was heard to cry out, “ You will kill me.” • She was afterwards missing, and nobody knew where she was. The uncle was strongly interested in her death, because he would have inherited at her death. He endeavored to save himself by dressing up another child to serve as his niece. That very fact was, as might be expected, taken as very strong evidence of guilt. The man was convicted, and afterwards the child returned home, having eloped in consequence of her severe chastisement. There can be little doubt that fabricated evidence operated strongly on the minds of the jury. Fabrication is often resorted to by the really guilty to ward off suspicion from themselves. Another rule is, that the supposition of guilt must follow from all the facts, and be consistent with all of them, as I have before indicated to you. With these rules, gentlemen, and bearing them in mind, we will now proceed to consider the case before us. The theory on the part of the prosecution is that the prisoner committed the- offense, because it is manifest that she intended *607 to do so, and this intention was indicated by the threats she used and intentions expressed. If threats are used by a person having the power and opportunity of carrying them into execution, and the result threatened had been produced, then it is a strong circumstance, to fasten the guilt upon a party to show threats used or intentions expressed. They are considerations of peculiar importance, and often controlling. It becomes important for you, therefore, gentlemen, to consider the proof of the various witnesses in regard to this matter, and carefully to ascertain if any such threats or intentions were avowed by the prisoner. I do not think it necessary, after the very able and full comments of the counsel, to go over it particularly. I have observed, during the trial, that you have been most attentive listeners to the evidence, and I have no doubt that all the prominent parts of it are engraven on your memory. You will remember that the important testimony on this subject was that of Hannah Conlan, Davis, a policeman, Wilson, and other parties of less significance. These witnesses have testified to specific threats, and if they are to be believed, it shows an intention on the part of the accused to inflict some injury on the deceased, either for a real or an imaginary wrong. In this connection, it is well for you to consider the relations between the deceased and the prisoner. On the part of the people it is shown that they first became inmates of the same house on or about the first of May, 1855, and that, if the statement of Hannah Conlan is to be believed, about the first of December following the prisoner was delivered of the foetus of a child, of which she alleged the deceased was the father. That, on the first of May following, the deceased rented a portion of his house to the prisoner for a year, and they continued inmates of the same house up to the time of his death. It would seem to be quite certain that at times they were not on very friendly terms. If the witnesses are to be believed, they *608 frequently indulged in angry feelings towards each other, and it is for you to say whether those feelings resulted from wounded pride or unrequited affection, or from the omission of the deceased to fulfill his plighted vows to her, or proceeded from other causes. You must bear in mind that there is much testimony going to show that the deceased, on many occasions, held out to his friends and to others that he was paying attention to the prisoner with reference to making her his wife;, and that subsequently, as the defense alleges, on the 28th of October, they were married. That does not seem, from my view of the case, to be an important consideration. If, however, you deem it necessary, and you are satisfied from the evidence in the case that they were so married, you have a right to assume that in your deliberations. If you think that these things are adequate to satisfy your minds that either from threats, or revenge, or dissatisfaction, these expressions of ill-feeling proceeded from these causes, you will be justified in attributing them to that source. If, however, on the contrary, they proceeded from deadly hatred to the deceased, and emanated from a fixed determination upon her part to do him a personal injury, and to the extent expressed, then they are to be taken as strong evidence of such an intent; and if you are satisfied that the prisoner had the power and was in a condition to commit, and could otherwise have committed the offense charged, they are evidence that such intent was accomplished. This leads to another inquiry: could the defendant commit the offense charged? And this leads to the inquiry as to the transactions in the house on the night of the 30th of January. It would seem to be indisputable that it was arranged, in the early part of that day, that Miss Ellen Cunningham should go with Dr. Beecher the next day, at 11 a. m., to Saratoga Springs, to school. As soon as this arrangement was made, the family commenced preparations for that event. Taking the testimony of the inmates of the house, *609 except that of Hannah Conlan, it would appear that all the members of the family, the prisoner Eckel, two Misses Cunningham, and Snodgrass, were engaged till eleven o’clock in the preparations, when they severally retired to rest, the prisoner and her two daughters occupying the same bed, in the third story front room; that they so occupied it until morning, the prisoner sleeping in the middle, between the two daughters; that they arose the next morning, and all took breakfast together as usual, except Mr. Eckel, who was called away by a note from Mr. Ely, as he proved; that after breakfast they all retired to their apartments together in this third story front room, where they were when Hannah, the cook, announced to them the death of the doctor. You will also bear in mind the statement of the daughters as to the dress of their mother on Friday and Saturday. How, gentlemen, if this statement is true, if the testimony of these witnesses is to be taken as establishing these facts, and there.is nothing going to show that what they told was untrue, there can be no doubt that the prisoner did not participate, herself, in this bloody tragedy. It is for you to say, after a careful and deliberate examination of the testimony, sifting it thoroughly, taking into consideration all the relations of the witnesses to the prisoner, and the circumstances narrated by them, and corroborated or contradicted by other witnesses, to say whether it is such testimony as you can safely rely upon. In this connection it is proper to consider the theory announced on the part of the prosecution. They rely upon the threats by the prisoner towards the deceased, and the bitter feeling, the ill-will which was so frequently manifested by her towards him; that having been married to him and being desirous of getting speedy possession of a part of his property, was an inducement to the commission of this crime; that these motives induced her to commit this crime, and are adequate motives therefor. I do not think it necessary to go into *610 all the causes urged upon you by the counsel of the prosecution, as having produced this state of feelings between the prisoner and the deceased. Neither is it necessary to refer to the times at which these threats were expressed. If the testimony of Hannah Conlan is to be believed, they were expressed upon the very day of the death of the deceased, showing a continued expression of ill-feeling towards the deceased, by the prisoner at the bar, for several months at least. They also allege that she did it; and that upon the day the deed was committed she ascertained that a boarder in the house, Mr. Ullmann, was not to be at home until late in the evening; that she procured the preparation of a fire in the attic, to be lighted at any moment, for the purpose of destroying the evidence of her guilt; that it must have been committed by some one in the house, and that she was the only person in the house that day who could have any adequate motive for committing the crime, and, therefore, that she must have done it. That about midnight an offensive smell was perceived in Bond street, like the burning of clothes or leather, and that such burning took place, they say, is evident from the testimony of Dr. Parmly. In reference to the testimony upon that subject, you have, I doubt not, fresh in your minds Dr. Parmly’s going out in the early part of the evening, when he smelled an offensive odor; his returning, going out again, and again returning about eleven o’clock, when he smelled it more strongly than before, which he describes as a different odor, and the last he distinguishes as arising from the burning of leather or woolen clothing—also as to the fire in the front attic room, which he saw from the steps of his house. In this connection you will bear in mind the statement of Dr. Smith and of his son—the fact that Dr. Smith had that very afternoon been burning in his stove pieces of woolen and leather. Whether or not this offensive odor might not have been created from that source it is for you to say. You will *611 also remember the testimony of Dr. Mayne, that he experienced the same offensive smell; also, the testimony of a young gentleman, Mr. Baldwin, who experienced the same odor at an earlier hour, and also the testimony of a young gentleman who went through Bond street, stopped at the corner of Bond street, and who did not experience any offensive smell at all. You will also remember the testimony of Mr. Ullmann, who came into the house about half-past twelve, and experienced no sensation of this Mnd, and the testimony of the inmates of the house, who all concur in stating they experienced nothing of the Mnd. If I am incorrect in regard to this, counsel will correct me.
Mr. Qlinton: You are quite right, sir.
His Honor: Then, gentlemen, there is a theory laid before you, that it was impossible, from the experiments tried, that these matters could have been burned in that grate in that room, without penetrating through the whole house, and creating an odor that would have existed for some hours—twelve to twenty-four. It is for you to take these circumstances into consideration, give them their due weight, and arrive at such conclusions with reference to this fact as you may be. advised. It certainly is an important fact for yqu to arrive at in the progress of the case, because, if you establish it affirmatively, it shows that there must have been some proceeding upon, the part of the inmates of that house to do an extraordinary act, which, under the circumstances, might naturally and reasonably create the inference that they were endeavoring to destroy some evidence of guilt. But if you come to the conclusion that there was no matter of this Mnd burned there, that there was no fire there upon that night, then,' gentlemen, the prosecution is without any theory, as I understand it, in reference to any attempt upon the part of the accused in respect to destroying evidences of guilt. Therefore I say that it is an important point for you to *612 consider, because if you establish it in the affirmative, it tends much to elucidate the theory of the prosecution, and if you establish it in the negative it is a very serious obstacle in the way of establishing their theory.
It is alleged that the conduct of the accused on the Saturday when she heard of the death of Dr. Burdell, and her refusal to give testimony before the coroner, are evidences of guilt. Now, gentlemen, it is a very ordinary means of ascertaining the fact of guilt or innocence to prove the conduct of the party at, and immediately after, the commission of the offense, and the conduct of the party on the first communication being made to them of the offense committed.
You recollect the testimony of Hannah Conlan, who was the first person who announced the death of Dr. Burdell to the prisoner at the bar; you will bear in mind whether her conduct that morning, in dressing herself, in going down stairs, talcing her breakfast with her daughters and the rest of the family (Mr. Eckel was absent), returning to her room in the third story, engaging in her domestic avocations—if the witnesses are to be believed—whether it is consistent with guilt or innocence. ■ You are also to bear in mind whether the conduct she exhibited at the time this communication was made evinced innocence on her part of any instrumentality in the death of the deceased, or consciousness of guilt, This conduct has been so frequently alluded to by the learned counsel upon both sides, that it is not necessary for me to recapitulate it; but simply to call your attention to it. It is an important circumstance always—the conduct of the person charged with the crime when they first hear of the offense committed; and also their conduct when the crime is first charged home upon them. Now, among the ordinary evidences of guilt, is also the conduct.of the party after the deed is committed. Flight and concealment are considered very strong evidences of guilt always. Then, the hearing before the coroner’s jury—■ *613 that also should be taken into the account by you. Whether she manifested willingness to give such evidence in relation to the circumstances as were in her knowledge, or whether she showed hesitation, and attempted concealment. You must look to that. And you will also bear in mind all the circumstances under which she was called down before the coroner, and, if you think she exhibited any disposition of concealment—a refusal to disclose what she knew—then, that is to be taken as a circumstance against her. Then, gentlemen, another evidence, and which would have been a very striking one in this case, where a strong, stout, active, healthy man, as this deceased is proven to • haye been, in the prime and vigor of life, could have been murdered, as the deceased is alleged to have been, by a woman; whether such a rencontre could have taken place—whether such a result could have been produced by the prisoner at the bar, without leaving upon her person some marks or evidences of such a rencontre. You remember the evidence of the physician, of such marks remaining upon a female longer than upon a male, and the reason given for that established fact. ■ As no such marks were proven, except the one alluded to under the shawl—and that, I believe, was not made out at all by any evidence—I refused to permit the prisoner to show there were no marks upon her body, upon the principle well established by law that the party making the charge must prove it. Innocence is presumed until guilt is proven always; therefore, in the absence of any mark you are to assume that her person exhibited no evidence of this rencontre..
The appearance of the clothes of the accused. How, upon the theory of the prosecution, they not having proven that any clothes in the house were defiled or stained, it must foe perfectly apparent from the testimony of the physicians, and the evidences in the room which we have seen, that the person" who did inflict these injuries *614 must necessarily have been to a considerable extent covered with blood. I say the prosecution not having had it in their power to show any evidences of garments in the house thus defiled or stained, unless you shall find the theory sustained that this fire in the attic was prepared for the purpose of burning these clothes, it follows that there being no appearance of any stains or of any blood upon any of the garments of the prisoner, or of any in her house at' any time, you are bound to consider that there were none. But if you find that fact, it is very difficult to reconcile the guilt of the accused with the facts which have been proven in this case, and which are manifest and apparent to all, that the person who inflicted these wounds must have had upon his clothes and person marks of blood, if not marks of violence. Now, gentlemen, anothér evidence—and a striking, if not controling one of the guilt of the person charged with murder—is, finding upon the accused weapons with which the deed either was perpetrated, or with which it might have been perpetrated, or in any places over which the accused had exclusive control or possession—as, for instance, the case put by one of the counsel, of a person shot by a pistol ball, where a pistol was found in the possession of the accused, with which it was possible that the ball had been shot from it; and when the dissection took place, the ball found in the body of the deceased would not fit the pistol; there-, fore that presumption which, if the ball had fitted the pistol, would have been regarded in law as conclusive, failed entirely, because the two did not agree. Now, if in this present case there had been found upon the person of the accused, or in any one of her drawers over which she had exclusive control and possession, a weapon such as was competent to inflict these wounds upon the deceased, the case would have been a very strong one; hay, I may almost say a conclusive one, unless there were some other controlling facts tending to show that the injury was not *615 inflicted by the person who was in possession of the weapon.
Now, how is it in this case, gentlemen? While there was found in the possession of the prisoner—for I consider the bureau in her possession—there was found in her possession this dirk (holding up the dirk to the view of the jury), which I have had one of the officers of the court measure very carefully^-its length is four and a half inches, it is half an inch at the hilt, tapering down to a point, Dr. Uhl says those wounds could not have been inflicted with this instrument. Dr. Knight, Dr. Wood and Dr. Uhl, measured the wounds, and the statements that they have given show conclusively that these wounds were not inflicted by that instrument, just as in the case of-the pistol ball. It is a perfect mathematical demonstration. Then the lancet blade is thrown out of the case entirely. Then, gentlemen, the only item of evidence about this matter is the pistol being found in the possession of the accused.
Now, it is not alleged or pretended in this case that the wounds were inflicted by the pistol at all, but it is argued that the possession of a pistol by a female is evidence of some murderous intent. Now, what is the evidence in regard to this pistol? Dr. McGuire states that he wás present when Dr. Burdell purchased it, or one very much like it. I judge from the subsequent testimony that we commit no error in assuming that this was the pistol which Burdell originally purchased with Dr. McGuire and used as his own. The testimony of one of the Misses Cunningham, is, that this pistol was given by Dr. Burdell to Mrs. Cunningham, while she was living in Twenty-fourth street, before she went to the house in Bond street. It is not a very controlling circumstance in any event, because it is not pretended or alleged that any of the wounds inflicted upon the deceased were inflicted by a pistol. The most that can be made of this circumstance, supposing that the *616 prisoner had inflicted the wonnds, is that it was evidence that she had intended at some time or other (as it is argued on the part of the prosecution) to carry out the design which she had expressed in reference to injuring Dr. Burdell.
Whether the possession of the pistol under these circumstances, affords a reasonable presumption for you to draw, is for you to say. The next inquiry which presents itself is, had the prisoner at the bar the physical strength to inflict those wounds? That is a very important question for you to answer, if you get so far as this stage of the case. It is true, gentlemen, and you must bear it in mind, that a person. excited by passion would do fourfold what the same person unexcited could; and to determine this question you must regard the testimony in regard to the strength of resistance which Dr. Burdell would naturally be supposed to make. And it appears to me that this is a very proper point for me to state to you the testimony in reference to the manner in which those wounds were inflicted, saying nothing now about the person who inflicted them. I think all the physicians agree that the first wound was inflicted on the right shoulder, while Dr. Burdell was sitting in his chair at the desk in the centre of the room, about midway between the door and the rear of the room. The person, to have inflicted that wound on him, must necessarily have been either in the room when he came in, or was, perhaps, more probably concealed in the front room, and came out after the Doctor had seated himself in his chair; for you will remember that it is in testimony that the door of the front room was locked, and the other access to those two rooms, which we have seen had a passage between them, was from the door of the Doctor’s office, of which he had the key, and when he went out it was his custom to lock it. How it is alleged on the part of the prosecution, as one of their grounds of argument to bring the charge home to the prisoner, that she had the *617 key of the Doctor’s rooms, and that she could, and probably did, gain access to them; and she must have been in them, to make out their theory, at the time when he returned, to go into his room.
You will remember that the bracket light at this side of the window—this bracket light which was near the instrument case—was found lighted in the morning precisely as it was left at night, with head pretty well on; some witnesses say that it was full on, some that it was not quite full on. You will remark I asked the question whether that light was sufficient to enable a person sitting in this chair at the desk to read. My object was to see how generally it lit the room. The answei was in the affirmative, and the room, not being a very large one, must have been very fully lighted. Doubtless the Doctor was seated there examining his bank book, or perhaps reading the newspaper, and the person who inflicted this wound on the right shoulder must have necessarily approached from behind, him. Dr. Uhl says (and he was concurred in) that the wound must have been inflicted from behind while the Doctor was sitting, because the wound was on the right shoulder and drops of blood were found on the right side of the chair, as though blood had dropped there from the wound. Some of the witnesses seem to think that this wound must have been inflicted by a person taller than Dr. Burdell. It is for you to say if it was inflicted while he was sitting down, whether it must have been inflicted by a person taller than Dr.' Burdell, or not. It is very apparent, I think, that when that wound was inflicted, there was something applied to the neck (as from the' medical statements there would seem to have been), someihing either in the shape of a cord or a handkerchief, or a rope, something which was thrown round, which produced a strangling; whether it was done by the pulling of a handkerchief, or by a cord, it is evident that there was some effort of this kind. Immediately the Doctor must *618 have sprung up from the chair, and made for the door, because the side of the door and side of the wall manifestly exhibit it, the blood which came from this wound remaining there. The person must have necessarily got the Doctor quite into the corner of the room, and I think that probably would account-for the abrasion on the nose spoken of by Dr. Uhl. His head was pushed up into the corner of the room. I think that this theory is sustained by the evidence in the case, for all the other wounds upon the body were upon the left side, and none on the right side at all—not one of them. It seems, if I have correctly looked at the testimony, that the person who inflicted the wounds had the Doctor in the corner of the room, and that the wounds were thus inflicted which caused his death; that he must have dropped down almost instantaneously in the corner, and was drawn a little out, so as to permit the opening of the door, and there lay when he was found the next morning. That seems to me the result of this testimony, from the attention I have been able to give it. I am satisfied that is the theory of the case, and I think all the testimony harmonizes with that view of it. How, supposing that to be the theory of the case, had the prisoner at the bar physical strength to have produced those results? And in reference to settling this question, you are to bear in mind the circumstances which have been already detailed—the depth and the number of the wounds; fifteen in number; the circumstance of resistance on the part of the deceased; the absence of all evidence of any injury to the person of the prisoner, and the amount of force necessary to inflict those wounds." In reference to this point, it will be necessary for you to consider the evidence of the witnesses and your own observation as to the force necessary to inflict such wounds, and in this connection also you are to take into consideration the testimony of Dr. Gatlin, in reference to the alleged disability of the prisoner, by reason of the rheumatic affection with which *619 she was afflicted three years since. You have heard all the testimony on this subject. The theory was started that the wound on the right side was inflicted by a left-handed person. Dr. Francis thought it might be so. Others thought it might be or might not. You will judge, from the position of the body and of the wounds, if you arrive at the view which I have expressed to you, as to its position at the time the wounds were inflicted, whether or not a left-handed person could have inflicted them. By the testimony of Dr. Gatlin it would appear that the rheumatism affected the prisoner’s right arm and shoulder to a much greater degree than the left. The theory of the prosecution is that a left-handed person gave this blow, that the prisoner was left-handed, and that the natural conclusion was that it was inflicted by her. You will remember the testimony which has been given in reference to the use-of_,her left hand, and her reason for using it, and yon will make such deductions as you deem proper. If you come to the conclusion' that the prisoner had the physical strength to inflict those wounds, then you must bear in mind the testimony which has been given in reference to their being inflicted by a person taller than Dr. Burdell.
Dr. Mayne, the first witness examined, supposed that the blow must have been inflicted by a tall man when they were standing up—that is the blow under the ears—and some of the other physicians expressed the same idea. If you are satisfied that the blow was inflicted by a person taller than the doctor, then, of "course, it could not have been the defendant, for it is conceded that she is shorter than the doctor. Then there is another theory in the case— that those wounds were of a peculiarly mortal character; that they were nearly every one of them fatal or mortal blows, and that they must have’ been inflicted by a person having an anatomical knowledge of the human system. It is only necessary for me to call your attention to the *620 testimony of the physicians on the subject. Drs. Francis Uhl, Woodward, and Camochan, all, as I understand, concur in the opionion that the blows were peculiarly accurate blows. It is for you to say whether this was accidental or not, or whether they were inflicted by a person who must have possessed anatomical knowledge of the human system, knowing where to strike home every blow that was inflicted. There is no proof on the subject that the prisoner has or has not such anatomical knowledge;' and if you are satisfied that those blows were inflicted by a person having anatomical knowledge, to have brought it home to the prisoner it would have been necessary for the prosecution to show that, she had such anatomical knowledge. I have not felt it necessary to discuss the various theories in reference to whether persons might have got in from the back part of the house or the front, or to call attention to the various suggestions made in reference to this subject. I will state, gentlemen; that you must look at this case with reference to the prisoner at the bar, whether the hypothesis is sustained so as to exclude the idea that this death could have been caused by any other person. In reference to this rule of evidence, I will quote an old and well known authority: “ The case must be such as to exclude to a moral certainty every other hypothesis but that of the guilt of the party accused.” In cases of doubt it is safer to acquit than to condemn. Gentlemen, I have now discharged the duty which the law imposes upon me in this most painful and exciting trial. I think that you will bear me witness that I have exhibited no other motive than to elicit the truth, and the whole truth, and to aid in placing before you any facts which could avail you in solving this great crime. My duty is now ended, and you have to retire to your room, calmly to deliberate and decide on the fate of this unhappy woman at the bar. Meet your whole duty like men feeling your deep responsibilities and the solemnities of your oaths.. *621 To your decision I now commit the fate of this unfortunate woman, and the future of herself and her family. While you deal justly by her, it is your privilege also to deal mercifully; for, as I have before remarked, if you have any reasonable doubt of her guilt, that doubt is to be cast into the scale in her favor, and entitles her to your verdict of acquittal. If, on the contrary, on a review of the whole case, you deem the charge contained in the indictment proven, it is your duty to your country and your God to say so, though it be with anguish of heart, and may cause deep shame and sorrow" to others. But if, in this final reviewing, you are not satisfied of her guilt, pronounce a verdict of acquittal, and let the accused go free.
The jury rendered a_verdict of not guilty.